ED J. HAGEN AND MARTHA JO HAGEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HAGEN INVESTMENTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hagen v. Commissioner
Docket Nos. 7700-76; 8342-76
United States Tax Court
T.C. Memo 1989-473; 1989 Tax Ct. Memo LEXIS 473; 57 T.C.M. (CCH) 1489; T.C.M. (RIA) 89473; August 31, 1989
Ed J. and Martha Jo Hagen, pro se in docket No. 7700-76. Ed J. Hagen (an officer), for the petitioner in docket No. 8342-76. James D. Thomas and Leroy D. Boyer *483 , for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These consolidated cases were assigned to Special Trial Judge Francis J. Cantrel pursuant to section 7443A(b)(4) and Rule 180 et seq. [1] We agree with and adopt his opinion which is set forth hereinbelow. OPINION OF THE SPECIAL TRIAL JUDGE CANTREL, Special Trial Judge: In his notice of deficiency dated June 30, 1976 respondent determined deficiencies in the Federal income tax of Ed J. Hagen and Martha Jo Hagen and additions to the tax for the taxable calendar years 1964 through 1966 and 1968 through 1971 as follows: [2]
Ed J. Hagen and Martha Jo Hagen (docket No. 7700-76)
Additions to Tax, I.R.C. 1954
Years
Income Tax
Section 6653(a)
Section 6653(b)
1964
$ 26,831.86
-0-
$ 13,415.93
1965
51,907.66
-0-
25,953.83  1966
20,890.43
-0-
10,445.21  1968
37,081.98
$ 1,854.10
-0-
1969
88,261.30
4,413.07  -0-
1970
7,187.60
359.38    -0-
1971
5,531.34
276.57    -0-
*484 The issues for decision are: [3]
1. Whether petitioners understated gross receipts from Hagen Investments, a broker-dealer of securities, on their Federal income tax returns (their "returns") for the taxable years 1964 and 1965 by $ 16,666.00 and $ 68,739.40, respectively, and overstated gross receipts on their Federal income tax return (their "return") for the taxable year 1966 by $ 205,729.09. 2. Whether petitioners understated income from interest, dividends and fees on their 1964, *485 1965 and 1966 returns by $ 11,513.32, $ 8,019.27, and $ 18,118.74, respectively. 3. Whether petitioners understated income from life insurance commissions on their 1965 and 1966 returns by $ 1,906.75 and $ 192.53, respectively. 4. Whether petitioners understated income realized from the partnership of Hagen, Ltd. on their 1964 and 1965 returns by $ 4,969.81 and $ 64,269.46, respectively. 5. Whether petitioners realized income of $ 13,422.35 during 1966 from payments made by Hagen Holding Corporation on their note to Hagen, Ltd. 6. Whether petitioners realized income of $ 5,007.88 and $ 5,879.85 from unidentified sources during 1965 and 1966, respectively. 7. Whether petitioners received income of $ 945.00 during 1965 from The Schallmo Foundation, Inc. 8. Whether petitioners realized unreported income of $ 2,284.00 during 1966 from life insurance premiums paid by Acker Industries, Inc. on a policy insuring Ed J. Hagen. 9. Whether petitioners overstated cost of goods sold on their 1964 and 1966 returns and understated cost of goods sold on their 1965 return in the amounts determined by respondent. 10. Whether petitioners overstated allowable depreciation expenses *486 on their 1964, 1965 and 1966 returns by $ 1,557.53, $ 1,609.77, and $ 2,008.54, respectively. 11. Whether petitioners overstated allowable automobile expenses on their 1964, 1965 and 1966 returns by $ 1,696.72, $ 707.90, and $ 284.28, respectively. 12. Whether petitioners understated commission expenses on their 1964, 1965 and 1966 returns by $ 1,443.24, $ 4,005.35, and $ 5,535.54, respectively. 13. Whether petitioners overstated business expenses other than depreciation, automobile, commission and cost of goods sold expenses on their 1964, 1965 and 1966 returns by $ 4,845.05, $ 3,407.58, and $ 14,419.42, respectively. 14. Whether respondent correctly determined that the net operating loss carryover of $ 6,999.25 claimed on petitioners' 1964 return is not allowable. 15. Whether petitioners are entitled to itemized medical expense deductions for the 1964, 1965 and 1966 taxable years. 16. Whether petitioners overstated their 1964 charitable contributions by $ 45.75 and understated their 1965 and 1966 contributions by $ 55.00 and $ 497.00, respectively. 17. Whether petitioners understated itemized tax expenses on their 1964, 1965 and 1966 returns. 18. Whether petitioners *487 overstated itemized interest expenses on their 1965 return by $ 214.76. 19. Whether respondent correctly determined that the $ 1,000.00 capital loss claimed on petitioners' 1964 return is not allowable. 20. Whether petitioners understated income from life insurance commissions on their 1968 return by $ 461.95 and overstated income from insurance commissions on their 1970 return by $ 413.32. 21. Whether petitioners realized income from unidentified sources in the amounts of $ 44,403.41, $ 20,578.29, and $ 6,678.41 for 1968, 1969 and 1970, respectively. 22. Whether petitioners realized income of $ 1,142.00, $ 1,530.00 and $ 1,552.00 in 1968, 1969 and 1970 from premium payments made by Acker Industries, Inc. on a policy insuring Ed J. Hagen's life. 23. Whether petitioners received distributions taxed as dividends as the result of expenditures made by Hagen Investments, Inc. for their personal benefit, and in what amounts. 24. Whether petitioners received distributions taxed as dividends during 1968, 1969, 1970 and 1971 as the result of expenditures made by Capitol Car Care, Inc. for their personal benefit, and in what amounts. 25. Whether petitioners understated interest *488 income on their 1969 and 1970 returns by $ 52.88 and $ 807.61, respectively. 26. Whether petitioners realized additional income of $ 94,500.00 in 1969 relating to the acquisition of equity in Alliance Corporation. 27. Whether respondent correctly determined that petitioners are entitled to deductions of $ 229.72 for office-at-home expenses for each of the taxable years 1968, 1969, 1970 and 1971. 28. Whether petitioners overstated itemized interest expenses on their 1968 return by $ 1,164.40 and understated interest expenses for 1969, 1970 and 1971 by $ 2,378.20, $ 1,285.74, and $ 2,269.45, respectively. 29. Whether petitioners are entitled to itemized medical expense deductions for the 1968 through 1971 taxable years. 30. Whether petitioners are entitled to capital losses in 1968 with respect to stock warrants of Great Northern Gas Utilities, Ltd. and Western Copper Mills, Ltd. 31. Whether petitioners' underpayments of income tax for 1964, 1965 and 1966 were due to fraud within the meaning of section 6653(b). 32. Whether petitioners' underpayments of income tax for 1968, 1969, 1970 and 1971 were due to negligence or intentional disregard of rules and regulations *489 within the meaning of section 6653(a). In his notice of deficiency issued to Hagen Investments, Inc. on June 30, 1976 respondent determined deficiencies in its corporate income tax and additions to the tax for the taxable fiscal years ended September 30, 1967 through September 30, 1970 as follows: [4] Hagen Investments, Inc. (docket No. 8342-76)
Additions to Tax, I.R.C. 1954
[5] Years Income Tax
Section 6653(a)
1967
$ 276.21    -0-
1968
155,653.08
$ 7,937.85
1969
147,280.66
7,364.03  1970
1,944.39
97.22     The issues for decision are: 1. Whether the corporation understated gross profits from stock sales on its Federal corporate income tax returns for the *490 taxable years ended September 30, 1968, September 30, 1969 and September 30, 1970 by $ 191,768.95, $ 27,366.21 and $ 58,010.36, respectively. [6]
2. Whether the corporation's mutual fund commission income for the 1968, 1969 and 1970 fiscal years was as stated on the corporate returns. 3. Whether the corporation overstated interest income by $ 543.75 on its corporate return for the 1968 fiscal year. 4. Whether the corporation received management fee income of $ 9,750.00 during the 1968 fiscal year rather than $ 9,000.00 as reported on its corporate return. 5. Whether the corporation understated miscellaneous income by $ 60,000.00 on its corporate return for the 1968 fiscal year. 6. Whether the corporation realized ordinary income of $ 263,830.65 from the sale of Financial Reserve, Inc. stock during the 1969 fiscal year which was not reported on its corporate return. 7. Whether the corporation is entitled to a deduction of $ 43,275.00 for the 1968 fiscal *491 year with respect to contributions made to the Hagen Employees Profit-Sharing and Retirement Trust (HEPRET). 8. Whether the corporation overstated auto and travel expenses by $ 727.82, $ 16,015.76, and $ 3,924.56 on its corporate returns for the 1968, 1969 and 1970 fiscal years, respectively. 9. Whether the corporation overstated dues and subscription expenses by $ 994.89, $ 667.95, $ 1,546.95, and $ 144.40 on its corporate returns for the 1968, 1969, 1970 and 1971 fiscal years, respectively. 10. Whether the corporation overstated interest expenses by $ 3,469.75, $ 2,968.43, $ 2,168.04, and $ 2,269.45 on its corporate returns for the 1968, 1969, 1970 and 1971 fiscal years, respectively. 11. Whether the corporation overstated insurance expenses by $ 2,034.47 and $ 856.00 on its corporate returns for the 1968 and 1971 fiscal years, respectively. 12. Whether the corporation overstated office supply expenses by $ 537.96 and $ 1,175.76 on its corporate returns for the 1969 and 1970 fiscal years, respectively. 13. Whether the corporation overstated repair and maintenance expenses by $ 6,600.99, $ 4,151.96, $ 739.16 and $ 277.27 on its corporate returns for the 1968, 1969, *492 1970 and 1971 fiscal years, respectively. 14. Whether the corporation overstated expenses for taxes by $ 700.76, $ 755.14, $ 710.00 and $ 714.58 on its corporate returns for the 1968, 1969, 1970 and 1971 fiscal years, respectively. 15. Whether the corporation overstated travel and entertainment expenses on its corporate returns for the 1968 and 1971 fiscal years by $ 1,830.08 and $ 3,570.79, respectively. 16. Whether the corporation overstated utility expenses by $ 1,572.83, $ 1,500.60, $ 1,293.01, and $ 997.74, on its corporate returns for the 1968, 1969, 1970 and 1971 fiscal years, respectively. 17. Whether the corporation overstated audit and legal expenses on its corporate return for the 1971 fiscal year by $ 15,180.73. 18. Whether the corporation is entitled to a deduction for the 1969 fiscal year for a $ 107.00 expense incurred for William C. "Bill" Hagen, son of petitioners. 19. Whether the corporation is entitled to a $ 59.97 deduction for miscellaneous expenses on its corporate return for the 1971 fiscal year. 20. Whether the corporation overstated depreciation expenses by $ 1,037.47, $ 1,540.88, $ 735.17, and $ 555.55 on its corporate returns for the *493 1968, 1969, 1970 and 1971 fiscal years, respectively. 21. Whether the corporation is entitled to net operating loss carryback deductions for the 1967 and 1968 fiscal years. 22. Whether the corporation understated income from the sale of property in the 1970 fiscal year by $ 8,868.64. 23. Whether the corporation is entitled to investment tax credits for the 1968 and 1969 fiscal years. 24. Whether the corporation's underpayments of income tax for the 1968, 1969 and 1970 fiscal years were due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts and exhibits have been stipulated. The stipulation and exhibits are incorporated herein by reference. I. Background Facts
Petitioner graduated from the Frankfurt School of Economics, Frankfurt, West Germany with a Master of Economics Degree. Thereafter, he obtained a Master of Business Administration Degree from Stanford University. [7]
As of the beginning of 1964, petitioner was engaged in business as a registered broker-dealer in securities *494 under the Securities and Exchange Act of 1934. He operated as a sole proprietor under the name of Hagen Investments during the taxable years 1964 through 1966 and until approximately April 1, 1967, at which time Hagen Investments, Inc. succeeded Ed J. Hagen as the registered broker-dealer. [8]
The day-to-day business of Hagen Investments and its successor, Hagen Investments, Inc., was trading in stocks and securities, although petitioner also sold life insurance. Most stocks traded or sold were low-priced, speculative, over-the-counter issues. Mutual funds were also sold. Stocks were primarily traded at the wholesale level, but also at the retail level; that is, they were sold to and purchased from other broker-dealers but also from retail, or "street" customers. Stocks purchased for resale were placed in a trading account. In addition, petitioner held stocks in his own investment account *495 from time to time. These were not traded in the ordinary course of business. Inventories, principally of stocks, were a material income-producing factor of Hagen Investments and Hagen Investments, Inc. Petitioners were involved in other business enterprises which are relevant to these cases. The first is Hagen Holding Corporation, formed in 1963 to purchase and own controlling interests in other corporations. Petitioner was Hagen Holding Corporation's president from its formation on November 20, 1963 until March 31, 1969. [9] The second is Capitol Car Care, Inc., formed in 1964, which apparently operated a filling station. Petitioners were its majority shareholders at the time of its incorporation and through 1966. [10] The third was Hagen, Ltd., a limited partnership formed in 1964 with petitioner as its general partner. The business of the partnership was to engage in the ownership and operation of interests in land and in any manufacturing or mercantile business, and to manage property and assets relating to such pursuits. *496 Bertha Schallmo ("Mrs. Schallmo") was a friend of petitioners and a customer of Hagen Investments and Hagen Investments, Inc. Mrs. Schallmo was an elderly woman of considerable means who relied on petitioners for investment advice and personal counsel during the years at issue. We mention her at this point because of her involvement in various aspects of these consolidated cases. Mrs. Schallmo was a stockholder in Hagen Holding Corporation in the early years of its existence, and, as a trustee of The Schallmo Foundation, Inc., was a limited partner in Hagen, Ltd. Hagen Investments and its corporate successor were censored and fined by the National Association of Securities Dealers a number of times between 1964 and 1970 for violating various provisions of its Rules of Fair Practice. [11] The United States Securities and Exchange Commission revoked the registration of Hagen Investments, Inc. as a broker-dealer in 1970. [12] In 1971, petitioner was convicted under section 7201 in the United States District Court for the Western District of Oklahoma for willfully and knowingly attempting to evade and defeat his and Mrs. Hagen's Federal income tax for 1964 and 1965. [13]
*497 For convenience and in the interest of clarity and completeness we further divide our Findings of Fact into three parts: the taxable years 1964 through 1966 relating to petitioners, including Hagen Investments in its capacity as a sole proprietorship; the taxable years 1967 through 1971 relating to petitioners in their individual capacity; and all years relating to Hagen Investments, Inc. II.Ed J. Hagen and Martha Jo Hagen (docket No. 7700-76) Taxable Years 1964 through 1966
Petitioners resided at 5000 N.W. 31st Street, Oklahoma City, Oklahoma on the date they filed their petition. They timely filed joint Federal income tax returns for the taxable years 1964 through 1966 with the Internal Revenue Service. Respondent determined numerous adjustments in his notice of deficiency for these taxable years and they are as follows: Type of
[14] Adjustment 1964
1965
1966
Gross Receipts from
[15] Business    $ 16,692.00 $ 68,739.80  $ (205,729.09)
Interest, Dividends and Fees   11,591.88 8,019.27 18,118.74 Life Insurance
Commissions   1,906.75 192.53 Income from Hagen, Ltd.
5,545.81 64,269.46 13,422.35 Unidentified Income
5,007.88 5,879.85 Income from Schallmo
Foundation, Inc.   945.00 Additional Compensation
2,284.00 Cost of Goods Sold
18,120.16 (41,570.77)
231,780.21 Depreciation
1,557.53 1,609.77 2,008.54 Automobile Expenses
1,696.72 780.90 284.28 Commission Expenses
(1,443.24)
(4,005.35)
(5,535.54)
Other Business Expenses
4,845.05 3,407.58 14,419.42 Net Operating Loss
6,999.25 Medical Expenses
139.42 92.00 888.22 Contributions
45.75 (55.00)
(497.00)
Tax Expenses
(165.00)
(1,232.28)
(623.59)
Interest Expenses
214.76 Capital Loss
1,000.00 $ 66,625.33 $ 108,129.77 $ 76,892.92   *498 Respondent considered the books and records of both petitioners and Hagen Investments incomplete and unreliable sources for determining the correct amounts of income and expense for these taxable years. He therefore determined petitioners' taxable income for 1964, 1965 and 1966 primarily by the bank deposits method. Using this method, he categorized deposits to and withdrawals from petitioners' numerous accounts, both business and non-business accounts. [16] He based his expense adjustments mostly on disbursements he categorized. In all, respondent categorized transactions relating to some 21 bank accounts controlled by petitioners during these 3 years. Certain of his deposit and disbursement categories isolate different types of receipts and expenditures of Hagen *499 Investments for transactions at both the wholesale and retail levels. Respondent also used other types of evidence to establish items of income and expense, making his overall method a hybrid bank deposits and specific items method. The books and records of petitioners and Hagen Investments were not complete and in fact contained false entries. Therefore, they are not reliable sources of data to correctly *500 determine taxable income for 1964, 1965 and 1966. Accordingly, respondent's use of the bank deposits method was an appropriate method for arriving at taxable income for these years. Facts relevant to the above types of adjustments are set forth in the following paragraphs. A. Facts Relating to Income Adjustments
1. Gross Receipts from Hagen Investments
Petitioners reported the following business receipts on their 1964, 1965 and 1966 returns: Year
Amount
1964
$ 156,703.90
1965
$ 910,593.00
1966
$ 3,441,725.51.
The gross receipts of Hagen Investments reported on Schedule C of petitioners' returns were taken from the books of account of the business. [17] Petitioners stated on their 1964 return that Hagen Investments kept its books on the cash method. Their 1965 and 1966 returns state that its books were kept on the accrual method. *501 In 1964, gross receipts using the bank deposits method were from stock sales, commissions from sales of Atkinson Enterprises, Inc. stock and also mutual funds, stock dividends, unidentified income and income received from The Schallmo Foundation, Inc. [18] Receipts also include the value of stock received in trades. In 1965, gross receipts using the bank deposits method were from stock sales and commissions from sales of both mutual funds and Atkinson Enterprises, Inc. stock. Receipts in 1965 again include the value of stock received in trades. In 1966, gross receipts using the bank deposits method were from stock sales, commissions from sales of mutual funds and income from services rendered. No non-cash receipts are added to 1966 receipts derived from the bank deposits method. *502 Petitioners understated gross receipts received by Hagen Investments for 1964 and 1965 and reportable on Schedule C of their returns. However, they overstated gross receipts on their 1966 return. Gross receipts of Hagen Investments for these years, gross receipts per petitioners' returns and the amounts by which gross receipts were either understated or overstated are: 1964
1965
1966
[19] Gross Receipts [20] $ 173,369.90
[21] $ 979,332.40
$ 3,235,996.41 Gross Receipts per
Return  156,703.90
910,593.00
3,441,725.50 Understatement
[Overstatement] [22] $ 16,666.00 [23] $ 68,739.40
$ [205,729.09]
*503 We use 1964 gross receipts per return of $ 156,703.90 in our computation even though the business incorrectly utilized the cash method to arrive at that figure. In doing so we merely find that petitioners reported 1964 business receipts of $ 156,703.90. However, determined gross receipts are based on sales accruing in each of the 3 years. Use of the cash method in 1964 was improper because inventories were necessary. [24]
2. Interest, Dividends and Fees
Petitioners reported the following amounts of interest, dividends and fees on their 1964 return: Source
Amount
Commission Fees - Occidental Life
$ 7,221.37 Rental Fees
400.00
Stock Dividends
859.73
Income from Services Rendered
5,900.00
Interest
-0-  Total
$ 14,381.10 No interest or dividend income was reported for the taxable years 1965 and 1966. [25]
*504 Petitioner understated interest, dividends and fees for each of these 3 years. Correct interest, dividends and fees, the amounts reported and petitioners' understatements are: 1964
1965
1966
Interest, Dividends and
Fees      $ 25,894.42
$ 8,019.27
$ 18,118.74
Interest, Dividends and
Fees per Return     14,381.10
-0-   -0-   Understatement
[26] $ 11,513.32
$ 8,019.27
$ 18,118.74
3. Life Insurance Commissions
As stated previously, petitioner also sold life insurance. Petitioners reported income from life insurance commissions in 1965 and 1966 in the following amounts: [27] Source 1965 1966
Occidental Life
$ 5,540.00
$ 4,756.87
Standard Life
1,805.00
3,557.45
Totals    $ 7,345.00
$ 8,314.32
Commissions on life insurance sales were paid *505 to petitioner by the various insurance carriers he represented after the sales were consummated and after the total premium payments were first remitted to the carriers. Life insurance commissions received and reported by petitioners in 1965 and the amounts by which they were understated are: Commissions-1965
Occidental Life  $ 7,285.35
Standard Life  1,966.40
$ 9,251.75
Commissions
per 1965 Return   7,345.00
[28] Understatement $ 1,906.75
Life insurance commissions received and reported by petitioners in 1966 and the amounts by which they were understated are: Commissions-1966
Occidental Life  $ 4,949.40
Standard Life  3,557.45
$ 8,506.85
Commissions
per 1966 Return   8,314.32
Understatement
$ 192.53  4. Income from Hagen, Ltd.
On June 5, 1964 petitioners and Mrs. Schallmo formed Hagen, Ltd., a limited partnership, under the laws of the State of Oklahoma. Petitioner was its general partner and the only partner authorized by the terms of the Limited Partnership *506 Agreement ("the Agreement") to transact the business of the partnership. Mrs. Schallmo was described in the Agreement as participating in the partnership as a "trustee." [29] The ostensible purpose of the partnership was to engage in the ownership and operation of interests in land and other types of businesses and to manage property and assets relating to such pursuits. The partnership had only three partners -- petitioners and Mrs. Schallmo -- during the course of its 15-month existence. The Agreement provided that net profits would be distributed and net losses borne by the general and limited partners on the basis of the partners' capital accounts at the end of the accounting period before adjusting the amounts to reflect current profits or losses of the partnership. The Agreement also provided that if a partner's account was reduced to zero or below, *507 profits would be distributed and net losses borne on the basis of the ratio of the partners' capital accounts at the end of the last accounting period prior to the reduction of the capital account to zero. The proposed initial contributions to capital of Hagen, Ltd. are set forth on Exhibit A to the Agreement, as follows: Other
Cash
[30] Property Total
Ed J. Hagen
$ 2,000
$ 48,000 $ 50,000 Bertha Schallmo
2,000
48,000   50,000   Martha Jo Hagen
1,000
24,000   25,000   Total
$ 5,000
$ 120,000
$ 125,000
The initial cash *508 contributions were made by the three partners. However, no deeds or other instruments of conveyance are included in the record to establish conclusively that any "other property" was ever conveyed, and Hagen Investments in fact continued throughout the life of the partnership to depreciate items of office furniture and equipment that Mrs. Hagen was to have contributed as her "other property." The partners also contributed additional cash to the partnership after their initial investments were made. The capital accounts of Hagen, Ltd. during its existence are summarized as follows: Hagen, Ltd.
Capital Accounts
June 5, 1964 to September 1, 1965
Ed J.
Martha Jo
Bertha
Hagen
Hagen
Schallmo
Initial Contributions
$ 2,000.00   $ 1,000.00  $ 2,000.00   1964 Investments
146,000.00   92,000.00 81,107.78 Total 1964 Contributions
148,000.00   1,000.00 175,107.78 1964 Withdrawals
(93,000.00)  (20,000.00)  (10,000.00)
(102,000.00) (94,000.00)
(40.00)      (21.50)
Balance before Income
Allocation   (67,040.00)  (9,000.00)
81,086.28 1964 Allocation of
Income   3,313.20     1,656.61 3,313.20 Capital Accounts
12/31/64   (63,726.80)  (7,343.29)
84,399.48 1965 Contributions
4,000.00     2,000.00 424.94       212.94 66,144.00    1,800.00 39,000.00 Total 1965 Contributions
6,842.14     (5,130.35)
125,199.48 1965 Withdrawals
(3,056.80)   (4,000.00)   (13,334.23)  (6,616.12)
(19,999.34)  (10,000.66)
(9,500.00)   (44,000.00)
(4,550.00)
Balance before Income
Allocation   (43,048.23)  [32] (21,797.13)
76,649.48 1965 Allocation of
Income        -0-          -0-    416.63 $ (43,048.23)
$ (21,797.13)
$ 77,066.11 *509 Source of
Investment/
Recipient of
[31] Withdrawal Initial Contributions
1964 Investments
Ed J. Hagen
Schallmo Foundation, Inc.
Bertha Schallmo
Total 1964 Contributions
1964 Withdrawals
Ed J. Hagen
Ed J. or Martha Jo Hagen
Hagen Investments
Schallmo Foundation, Inc.
Mummer's Theatre (tickets)
Balance before Income
Allocation   1964 Allocation of
Income   Capital Accounts
12/31/64   1965 Contributions
Ed J. and/or Martha Jo Hagen
Ed J. or Martha Jo Hagen
Ed J. Hagen
Bertha Schallmo
Schallmo Foundation, Inc.
Total 1965 Contributions
1965 Withdrawals
Ed J. Hagen
Ed J. Hagen
Ed J. and/or Martha Jo Hagen
Ed J. and Martha Jo Hagen
Hagen Investments
Schallmo Foundation, Inc.
Bertha Schallmo
Balance before Income
Allocation   1965 Allocation of
Income        *510 a. 1964
As shown in the preceding schedule, all the partners withdrew cash from the partnership in 1964. The capital accounts of petitioner and Mrs. Hagen fell below zero in that year due to withdrawals in excess of contributions. Hagen, Ltd. had gross income of $ 10,177.91 and expenses of $ 1,894.90 in 1964. Its items of income were rental payments and farm income; expenses cannot be categorized as to type. Based on their capital accounts as of the end of 1964, respondent determined that petitioners realized $ 4,969.81 in partnership income, or 60 percent of the partnership's 1964 taxable income of $ 8,283.01. Respondent allocated 60 percent of the taxable income to petitioners because their combined initial investment of $ 3,000.00, was 60 percent of the total initial cash investment. [33] The balance was allocated to Mrs. Schallmo. No partnership income was reported by petitioners in that year. b. 1965
By the close of the *511 1965 partnership year petitioner and Mrs. Hagen still had negative capital accounts. The partnership had taxable income of $ 416.63 in 1965 (the year of dissolution), and respondent allocated the entire amount to Mrs. Schallmo. Her personal assets were, as of August 11, 1965, under the management and control of a trustee, A. Francis Porta. [34] The partnership never filed any Federal partnership tax returns. *512 Hagen, Ltd. was dissolved by agreement among the partners on September 1, 1965. [35] Petitioner and Mrs. Hagen never repaid the withdrawals in excess of their capital contributions and were not obligated to do so by the terms of the Agreement. By this time the Schallmo capital account balance was $ 77,066.11. As of that date petitioners had made cash contributions of $ 221,781.88 and withdrawals of $ 291,597.15 with respect to the partnership; Mrs. Schallmo and The Schallmo Foundation, Inc. had made cash contributions of $ 215,907.78 and withdrawals of $ 142,571.50. The partnership's bank account balance at dissolution was only $ 1,206.35. Because of the excess withdrawals, petitioners realized $ 64,845.36 in 1965. Respondent's adjustment per his notice of deficiency was a lesser amount, $ 64,269.46. He failed to amend his answer to conform his pleadings to reflect the $ 64,845.36 in excess withdrawals per his proof, so we find that petitioners realized $ 64,269.46. None of that amount *513 was reported in 1965. c. 1966
On December 24, 1964, Hagen Holding Corporation, by Ed J. Hagen, president, and Martha Jo Hagen, secretary, executed a note payable to Hagen, Ltd. for $ 12,500.00. [36] The note was to be repaid on June 24, 1966. It was subsequently assigned to petitioner. [37] He gave no consideration for the note, and nothing in the record shows that it may have been a gift. As president of Hagen Holding Corporation, petitioner paid himself $ 13,422.35 in satisfaction of the note on May 16, 1966. No part of this payment was reported on petitioners' 1966 return. [38]
*514 5. Unidentified Income
Petitioners received income in 1965 and 1966 from unidentifiable sources and income that could not be categorized as set forth hereinbefore. The amounts received are: Year
Amount
1965
$ 5,007.88
1966
$ 5,879.85
Most of the items of unidentified income were deposits of currency to petitioners' various bank accounts. [39] All income reported on petitioners' 1965 and 1966 returns is from sources identified either on the returns or in the books of Hagen Investments. We therefore find that none of the above amounts were reported on petitioners' 1965 and 1966 returns. [40]
*515 6. Income from The Schallmo Foundation, Inc. The Schallmo Foundation, Inc. ("The Foundation"), referred to earlier in conjunction with Hagen, Ltd., was an organization founded by Mrs. Schallmo for charitable pursuits. She contributed substantial sums of money to it in the early 1960's for the purpose of constructing a nursing home in Okeene, Oklahoma. When Schallmo Manor opened its doors in 1965, Mrs. Schallmo, petitioner and Mrs. Hagen were members of its board of directors. The Foundation purchased a piano from Mrs. Hagen on January 13, 1965. Mrs. Hagen was then treasurer of the organization in addition to being a director, and she wrote herself a check for $ 945.00 in payment for the piano on that date. Mrs. Hagen's basis in the piano is not known. Petitioners failed to report the $ 945.00 received by Mrs. Hagen on their 1965 return. By the time Mr. Porta was appointed trustee of the Bertha Schallmo Trust on August 11, 1965, the nursing home was being operated by The Foundation at a substantial financial loss, which had, in turn, become a serious and continuing drain on Mrs. Schallmo's personal resources. The board of directors therefore decided at the recommendation *516 of Mr. Porta to transfer Schallmo Manor to the Town of Okeene. The consideration for the transfer was assumption by the Town of Okeene of a $ 150,000.00 liability of The Foundation relating to the construction of the facility, and the release of The Foundation on the underlying obligation. 7. Additional Compensation from Acker Industries, Inc. As early as December, 1964, petitioner had assumed control of Acker Industries, Inc., ("Acker") an Oklahoma corporation involved in the manufacture of metal products. Petitioner was chairman of the board and treasurer of Acker after its reorganization in 1964 as a Hagen Holding Corporation subsidiary. He was also president of Hagen Holding Corporation until March 31, 1969. On November 9, 1965, Acker paid a semi-annual premium of $ 1,142.00 for the purchase of a preferred whole life insurance policy insuring the life of petitioner. The policy, Standard Life and Accident Insurance Company ("Standard Life") policy No. OL-92440, was sold by petitioner, and Mrs. Hagen was the original owner. The date of issue on the policy was October 21, 1965 and the amount of insurance purchased was $ 100,000.00. Mrs. Hagen assigned the Standard *517 Life policy to Acker on the date of purchase. She continued as primary beneficiary. Acker paid additional semi-annual premiums to Standard Life on policy No. OL-92440 during 1966. In all, Acker made premium payments totalling $ 2,284.00 in 1966. The premiums paid by the corporation during 1966 were additional compensation to petitioner. [41] Petitioners did not include this amount on their 1966 return. B. Facts Relating to Expense Adjustments
1. Cost of Goods Sold
Petitioners reported the following amounts of cost of goods sold for Hagen Investments on Schedule C of their 1964, 1965 and 1966 returns: Year
[42] Cost of Goods Sold 1964
$ 129,669.26  1965
$ 890,464.00  1966
$ 3,400,862.26
*518 Respondent determined that these amounts were incorrect. He therefore reconstructed cost of goods sold for 1964 through 1966, based again on the bank deposits method. His overall system was to (a) adopt Hagen Investments' closing inventory figures for the 1963, 1964 and 1965 business years as the correct opening inventory figures for 1964, 1965 and 1966, respectively; (b) add to opening inventory the cost of inventory purchases in 1964, 1965 and 1966, derived from respondent's check classifications, to arrive at goods available for sale; and (c) subtract from goods available for sale Hagen Investments' own closing inventory figures for 1964, 1965 and 1966. [43] We have adopted respondent's method. *519 In the interest of greater clarity, we treat separately each of the 3 years to which cost of goods sold adjustments have been made. a. 1964
Hagen Investments' cost of goods sold for 1964 was: Opening Inventory
$ 13,886.38 Add: Inventory Purchases
and Other Increases     122,910.56
$ 136,796.94
Less: Miscellaneous Decreases
7,402.59
Goods Available for Sale
$ 129,394.35
Less: Closing Inventory
17,803.85
Cost of Goods Sold
[44] $ 111,590.50
Cost of goods sold per Schedule C of petitioners' 1964 return was $ 129,669.26. They therefore overstated Hagen Investments' 1964 cost of goods sold as follows: Cost of Goods Sold Claimed
$ 129,669.26
Cost of Goods Sold - 1964
111,590.50
Overstatement to 1964 Cost of
Goods Sold  [45] $ 18,078.76 b. 1965
Hagen Investments' cost of goods sold for *520 1965 was: Opening Inventory
$ 17,803.85 Add: Inventory Purchases
and Other Increases     983,835.87
$ 1,001,639.72
Less: Miscellaneous Decreases
8,957.10
Goods Available for Sale
$ 992,682.62
Less: Closing Inventory
60,647.85
Cost of Goods Sold
[46] $ 932,034.77
Cost of goods sold per Schedule C of petitioners' 1965 return was $ 890,464.00. They therefore understated Hagen Investments' 1965 cost of goods sold as follows: Cost of Goods Sold Claimed
$ 890,464.00  Cost of Goods Sold - 1965
932,034.77 Understatement to 1965 Cost of
Goods Sold   $ (41,570.77) c. 1966
Hagen Investments' cost of goods sold for 1966 was: Opening Inventory
$ 60,647.85   Add: Inventory Purchases
and Other Increases     3,359,866.96
$ 3,420,514.81
Less: Miscellaneous Decreases
152,491.54
Goods Available for Sale
$ 3,268,023.27
Less: Closing Inventory
88,539.62
Cost of Goods Sold
[47] $ 3,179,483.65
*521 Cost of goods sold per Schedule C of petitioners' 1966 return was $ 3,400,862.26. They therefore overstated Hagen Investments' 1966 cost of goods sold as follows: Cost of Goods Sold Claimed
$ 3,400,862.26 Cost of Goods Sold - 1966
3,179,483.65
Overstatement to 1966 Cost of
Goods Sold   [48] $ 221,378.61   2. Depreciation
Petitioners depreciated equipment, and furniture and fixtures used by Hagen Investments on their 1964, 1965 and 1966 returns. They overstated depreciation expenses for each of these years. Allowable depreciation expenses for the taxable years 1964 through 1966 and the amounts by which petitioners overstated them are: 1964
1965
1966
Depreciation Claimed
$ 2,565.08
$ 2,438.00
$ 3,234.59
[49] Depreciation Allowable 1,007.55  828.23    1,226.05  Overstatement
$ 1,557.53
$ 1,609.77
$ 2,008.54
*522 3. Automobile Expenses
For the taxable years 1964 through 1966 the books of account of Hagen Investments recorded business-related mileage as follows: Years
Mileage
1964
26,834
1965
11,391
1966
8,928 Petitioners claimed automobile expenses on their 1964, 1965 and 1966 returns. The amounts claimed were incorrect. Automobile expenses claimed and allowable and the amounts by which they were overstated are: 1964 1965 1966 Auto Expense Claimed
$ 4,025.10
$ 1,901.00
$ 2,516.28
Allowable Auto
[50] Expense   2,328.38
1,193.10
[51] 2,232.00
Overstatement
$ 1,696.72
[52] $ 707.90  $ 284.28  *523 4. Commission Expenses
Hagen Investments incurred commission expenses in 1964, 1965 and 1966, which were charged against gross receipts on Schedule C of petitioners' returns. The commissions were paid to retail salespersons and wholesale traders employed by Hagen Investments. [53] Expenses claimed and allowable and the amounts by which they were understated are: 1964
1965
1966
Commission Expenses
Claimed  $ 5,423.85 $ 8,848.00  $ 11,788.37 Commission Expenses
Allowable  $ 6,867.09 $ 12,853.35 $ 17,323.91 Understatement
$ 1,443.24 $ 4,005.35  $ 5,535.54  5. Other Business Expenses
Petitioners reported business expenses of Hagen Investments other than cost of goods sold, depreciation expenses, automobile expenses and commissions on their 1964, 1965 and 1966 returns. The types and amounts, set forth on Schedule C of petitioners' returns, are: 1964 1965 1966
Salaries
$ 1,312.50 $ 2,667.00 $ 6,700.73 Materials and Supplies
694.83 1,665.00 3,919.60 Taxes, Licenses, Bonds
and Filing Fees   2,082.24 2,456.00 3,346.01 Repairs
423.89 592.00 2,999.99 Legal and Professional Fees
100.00 506.00 249.28 Interest
291.32 (2,060.00)
3,035.58 Rent
-0-   -0-   1,094.00 Inventory Adjustments
-0-   -0-   (1,068.13)
Other Costs:
Utilities    197.03 159.00 719.59 Dues and Subscriptions    972.63 934.00 1,150.45 Advertising    699.11 220.00 288.53 Telephone and Postage    1,338.54 2,045.00 14,739.77 Tax Stamps    138.67 104.00 59.68 Travel and Entertainment    544.64 214.00 2,672.91 Miscellaneous    871.43 388.00 275.10 Outside Work    1,155.66 2,579.00 3,168.25 $ 10,822.49 $ 12,469.00 $ 43,351.34 *524 Based on our examination of checks written for such expenditures, we find that petitioners overstated other business expenses for each of these years. These expenses, per return and allowable, and the amounts by which petitioners overstated them are: 1964 1965 1966
Other Expenses Claimed
$ 10,822.49
$ 12,469.00
$ 43,351.34
Other Expenses
[54] Allowable 5,977.44
9,061.42
28,931.92
Overstatement
$ 4,845.05 $ 3,407.58 $ 14,419.42
6. Net Operating Loss
Petitioners claimed a net operating loss carryover of $ 6,999.25 on their 1964 return. They had sustained a net operating loss in 1963 of $ 6,999.25, according to their 1963 return. Carried back to 1960, the 1963 net operating loss is totally absorbed because petitioners had adjusted gross income in excess of $ 10,000.00 in 1960. Petitioners sustained no net operating losses in 1961 and 1962. 7. Medical Expenses
Petitioners claimed *525 medical expense deductions on their 1964, 1965 and 1966 returns in the amounts of $ 139.42, $ 92.00 and $ 888.22, respectively. For these years, medical expense deductions are calculated by reference to a taxpayer's adjusted gross income: medical expenses are deductible to the extent they exceed 3 percent of adjusted gross income. Medicine and drug expenses are includible as medical expenses to the extent that they exceed 1 percent of adjusted gross income. [55]
Petitioners' medical expenses for the taxable years at issue were: 1964 1965
1966 [56] Medicine and Drugs $ 79.52 $ 933.00
$ 33.22   [57] Other Medical Expenses $ 574.38
$ 476.31
$ 2,169.41
8. Contributions
Petitioners claimed charitable contributions as itemized deductions on their 1964, 1965 and 1966 returns. They overstated the amount of their contributions in 1964 and understated them in 1965 and 1966. The correct contribution amounts, the amount of contributions *526 per return and the amounts by which the contributions are adjusted are: 1964
1965
1966
Contributions Claimed
$ 50.00
$ 50.00  $ 50.00   Contributions Allowable 4.25
105.00   547.00    Overstatement
(Understatement)   $ 45.75
$ (55.00)
$ (497.00)
9. Tax Expenses
Petitioners did not report general sales tax expenses on their 1964 return, but they did report general sales tax expenses on their 1965 and 1966 returns. In addition, they reported real estate tax expenses on their 1964 and 1966 returns. Respondent adjusted general sales tax expenses using the state sales tax optional deduction tables, and he used the check classifications to identify other tax expenses. He determined that total tax expenses allowable for each year had been understated. We find as follows with respect to petitioners' tax expenses: 1964
1965
1966
Taxes Paid per Check
Classification  $ 718.00
$ 1,158.28
$ 876.19
Taxes Paid per Return
$ 718.99
$ 91.00   $ 483.60
Petitioners' allowable expense for general sales taxes paid will be determined from the amount of adjusted gross income finally determined. *527 [58]
10. Interest Expenses
Petitioners paid nonbusiness interest in 1965 in the total amount of $ 2,541.32. They claimed an itemized deduction of $ 2,756.87 for interest paid in 1965. Their deduction was overstated by $ 215.55. [59]
*528 C. Capital Loss Carryover
During the taxable years 1961 through 1965 petitioners reported net capital losses and took deductions for capital losses on their tax returns, as follows: Capital Loss in 1961, per Return:
$ 1,070.28  Capital Loss Used in 1961:  (1,000.00)
Unused Capital Loss-1961:    $ 70.28     Capital Loss in 1962, per Return:
$ 1,735.32  Capital Loss Carried Forward:  70.28 Total of Capital Losses:    $ 1,805.60 Capital Losses Used in 1962:      (1,000.00)
Unused Capital Loss-1962:        $ 805.60    Capital Loss in 1963, per Return:
$ 1,293.48  Capital Loss Carried Forward:  805.60 Total of Capital Losses:    $ 2,099.08  Capital Losses Used in 1963:      (1,000.00)
Unused Capital Loss-1963:        $ 1,099.08  Capital Loss in 1964, per Return:
$ -0-       Capital Loss Carried Forward:  1,099.08 Total of Capital Losses:    $ 1,099.08  Capital Losses Used in 1964:      (1,000.00)
Unused Capital Loss-1964:        $ 99.08     Capital Loss in 1965, per Return:
$$-0-       Capital Loss Carried Forward:  99.08 Total of Capital Losses:    $ 99.08     Capital Losses Used in 1965:      (-0-)  Unused Capital Loss-1965:        $ 99.08     *529 As shown, petitioners reported a capital loss carryover of $ 1,099.08 in 1964, and used $ 1,000.00 of that amount to offset 1964 income. At trial, petitioners were unable to substantiate the capital losses from which their capital loss carryover to the 1964 taxable year arose. D. Section 6653(b) Additions to Tax
Petitioners failed to report income received in a number of specific transactions occurring in 1964, 1965 and 1966. We describe these transactions in detail because of their relevance to the issue of whether any underpayment of tax for 1964, 1965 and 1966 was due to fraud. [60]
*530 1. 1964
The 1964 transactions and the amounts of unreported income are: Source and Correct
Amount
Amount Not
Type of Income
Amount
Reported
Reported
W. P. Bill Atkinson
Enterprises, Inc. -
Commission Income
$ 7,437.60 $ 5,287.60 $ 2,150.00
Occidental Life -
Commission Income
9,485.68
7,221.37
2,264.31
Totals     $ 16,923.28
$ 12,508.97
$ 4,414.31
W. P. "Bill" Atkinson Enterprises, Inc. ("Atkinson") was incorporated under Oklahoma law in 1963 for the purpose of establishing a second daily newspaper for Oklahoma City. W. P. Atkinson, the president of the corporation, entered into an agreement with petitioner on March 15, 1964 under which Hagen Investments was to sell shares of Atkinson stock on a 15-percent commission basis. Atkinson's stock records show that Hagen Investments withheld $ 7,437.60 in commissions on gross stock sales of $ 56,384.00 in 1964. [61] Only $ 5,287.60 of the total commissions withheld were recorded in Hagen Investments 1964 general journal, and only that amount was reported as business receipts on petitioners' 1964 return. *531 Occidental Life paid commissions to petitioner in 1964 in the total amount of $ 9,485.68. None of these receipts were entered in any of petitioners' business records. Only $ 7,221.37 of the amount paid was reported. [62]
2. 1965
The specific transactions for 1965 are: Source and Correct
Amount
Amount Not
Type of Income
Amount
Reported
Reported
Occidental Life -
Commission Income
$ 7,093.08 $ 5,540.00 $ 1,553.08 Oklahoma Steel
Corporation - Interest
945.00
-0-   945.00
Hagen Holding
Corporation - Dividends
645.50
-0-   645.50
Hagen Holding
Corporation - Income
from Sale of Stock
23,731.00
231.00
23,500.00
National Foundation
Life - Income from Sale
of Stock
250.00
-0-   250.00
United Income Life -
Income from Sale of Stock
1,850.13
-0-   1,850.13
Dreyfus Fund, Inc. and
Fundamental Investors,
Inc. - Income from Sale
of Mutual Funds
4,996.00
-0-   4,996.00
Totals     $ 39,510.71
$ 5,771.00 $ 33,739.71
We *532 previously found that Occidental Life paid commissions of $ 7,285.35 to petitioner in 1965. [63] Copies of Occidental Life commission checks totalling a slightly lesser amount, $ 7,093.08, payable to Ed J. Hagen, are part of the record. We therefore use $ 7,093.08 to arrive at unreported income from Occidental Life in 1965. No part of the $ 7,093.08 was recorded in any business records and only $ 5,540.00 was reported on petitioners' 1965 return. [64]
The 1965 interest payments from Oklahoma Steel Corporation and the Hagen Holding Corporation dividend payments made in 1965 need no additional explanation. Income from petitioner's sales of Hagen Holding Corporation stock in 1965 is a more complex matter, requiring that the following calculation be set forth: Amount Realized on Sales of
Hagen Holding Corporation Stock  $ 46,536.00
Less: Cost of Stock
22,805.00
Gain on Sale
$ 23,731.00
Less: Gain Entered on Books
and Recognized  231.00
Gain Not Recognized or Reported
$ 23,500.00
*533 Hagen Investments did not trade in Hagen Holding Corporation stock. Similarly, sales and purchases of Hagen Holding Corporation shares were not entered in Hagen Investments' general journal. However, petitioner used Hagen Investments' confirmation slips and receipts when selling Hagen Holding Corporation stock he owned individually, and buyers made their checks for the purchase of these shares payable to the order of Hagen Investments. [65] The $ 231.00 of gain reported was actually the consequence of two sales transactions incorrectly entered in Hagen Investments' general journal and thereby treated as inventory sales. [66] In short, little effort was expended to keep Hagen Holding Corporation stock transactions separate and distinct from transactions of Hagen Investments. In all, petitioner sold 30,800 of his Class A shares and 1,488 of his Class B shares in Hagen Holding Corporation in 1965. The amount realized on the sales, $ 46,536.00, was *534 deposited into FNB 0-350-079. Petitioner's only records of his personal sales and purchases of Hagen Holding Corporation stock were the corporation's stockholder cards. Ownership of the shares sold and therefore petitioner's basis and amount realized were issues extensively argued at trial. Petitioner testified that 18,669 Class A and 902 Class B shares were purchased by Charles D. Dudley ("Mr. Dudley") in 1965 pursuant to a subscription agreement with Hagen Holding Corporation. He also testified that Mr. Dudley subscribed to and purchased an additional 6,000 Class A shares and 300 Class B shares in a separate transaction in 1965, and that all the Class A and Class B shares obtained in the transactions were sold by Mr. Dudley in that year. Hagen Holding Corporation's stock transfer records show that Mr. Dudley purchased and sold the shares in 1965. [67]
We find that petitioner *535 rather than Mr. Dudley purchased the 18,669 Class A shares and the 902 Class B shares from Hagen Holding Corporation in 1965. [68] Also, it was petitioner, not Mr. Dudley, who acquired the 6,000 Class A shares and the 300 Class B shares in 1965. Petitioner acquired the 6,000 Class A shares from Hagen Holding Corporation in a trade of 6,000 shares of his own United Income Life stock worth $ .25 per share, and he purchased the 300 Class B shares directly from the corporation. [69] Petitioner finally admitted at trial that it was he and not Mr. Dudley who acquired all the described shares. We find that the cost of all the Class A and Class B shares purchased in these transactions, $ 21,371.00, is includible in the above cost of stock figure of $ 22,805.00. We also find that petitioner sold all these shares in 1965 and that his amount realized is includible in his 1965 sales of $ 46,536.00. And, based on petitioner's admissions at trial regarding his purchase and sale of these shares, we find that Hagen Holding Corporation's stockholder records are false as to the ownership of the shares. [70]
*536 Further findings with respect to this matter are necessary. When petitioner sold the Class A and Class B shares obtained in the above-described transactions to various purchasers in 1965, the number of shares reissued exceeded the number of shares petitioner had acquired. The excess shares issued were obtained by petitioner directly from Hagen Holding Corporation, which he controlled, at no cost. The following shows the number of excess shares issued: Shares Purchased
Shares Reissued
Excess Shares
in 1965 [71] Upon Sale Issued
February 24, 1965
18,669(A)
19,765(A)
1,096(A)
902(B)
902(B)
--
October 7, 1965 6,000(A) 10,145(A)
4,145(A)
December 28, 1965
300(B)
560(B)
260(B)
Totals      29,910(A)
1,462(B)
5,241(A)
260(B)
As a result, petitioner's amount realized in 1965, $ 46,536.00, includes the amount realized upon the sale of 5,241 Class A and 260 Class B zero basis shares. Petitioner purchased 1,000 shares of National Foundation Life Insurance *537 Company ("National Foundation Life") for his investment account in 1965. He sold the shares to Buddy Brixey in the same year for $ 4,250.00. Petitioner's basis in the National Foundation Life stock was $ 4,000.00. The $ 250.00 gain on the sale was not reported. Bookkeeping irregularities surrounded this stock sale. Petitioner's original mail deposit slip for the check received in the transaction described the deposit of $ 4,250.00 as a check from "Buddy Brixey." On the duplicate mail deposit slip for the transaction "Buddy Brixey" is crossed out and "Ed J. Hagen, Add'l Investment" is substituted. It is from the duplicate mail deposit slip that the transaction was recorded in Hagen Investments' general journal. The journal entry describes the transaction as one in which $ 4,250.00 was received as "Add'l Inv.", i.e., an addition to capital of Hagen Investments rather than the result of a stock sale. In this manner $ 4,250.00 in receipts from 1965 stock sales bypassed any income accounts. The journal entry for the sale falsely represents the nature of the Brixey transaction. Hagen Investments purchased 14,148 shares of United Income Life stock for petitioner's investment account *538 in 1965 for $ 3,537.00, or $ .25 per share. Of the total number, petitioner sold 7,800 shares for $ 3,800.13 to various purchasers in the same year. His basis in the shares sold was $ 1,950.00 and his gain on the sales totalled $ 1,850.13. None of the sales were entered in either the general journal or petitioner's investment account records, and no gain was reported. Of the 6,348 shares not sold, 6,000 were traded by petitioner for 6,000 shares of Hagen Holding Corporation's Class A stock. [72] Those 6,000 Class A shares were the same shares that petitioner had originally claimed were purchased by Mr. Dudley in 1965. Petitioner sold interests in Dreyfus Fund and Fundamental Investors, Inc. from his investment account in 1965. The sales generated gains of $ 4,996.00. Petitioner's purchase and resale of these interests were not properly entered in petitioner's investment account records; entries relating to these sales transactions are very confusing. Wesley J. Long, the certified public accountant who prepared Hagen Investments' 1965 audit report, called these items of additional gain to petitioner's attention but *539 the gains were not reported on the 1965 return. 3. 1966
The specific transactions for 1966 are: Source and Correct
Amount
Amount Not
Type of Income
Amount
Reported
Reported
Confederate Steel
Corporation/Oklahoma
Steel Corporation -
Interest
$ 4,534.71
$ 279.71 $ 4,255.00
Acker Industries, Inc. -
Interest
4,925.00
95.00
4,830.00
Hagen Holding Corporation -
Interest
2,544.18
-0-  2,544.18
Dale Wrobbel -
Interest
81.00
-0-  81.00
Liberty National Bank
#584-667-6 - Interest
204.75
-0-  204.75
First National Bank
[73] #7-350-369 - Interest 153.23
-0-  153.23
Local Federal Savings &
Loan Assn. #51293 -
[74] Interest 234.50
-0-  234.50
Acker Industries, Inc.,
Payments to Standard Life
and Accident Insurance
Co. - Premiums
2,284.00
-0-  2,284.00
Hagen Holding Corporation -
Dividends
1,617.06
-0- 1,617.06
$ 16,578.43
$ 374.71 $ 16,203.16
*540 As to the first item, the note which gave rise to the $ 4,255.00 in unreported interest income was given by Confederate Steel Corporation to Oklahoma Steel Corporation on June 30, 1965. The face amount of the note was $ 24,992.43. Oklahoma Steel Corporation assigned the note to Hagen Investments on November 11, 1965, at which time the balance owed was $ 20,492.43. Confederate Steel Corporation retired the note in 1966 by making payments of principal and interest to Hagen Investments. Of the $ 4,534.71 in interest income, only $ 279.71 was reported on petitioners' 1966 return. [75] Similarly, only $ 279.71 of the total amount was recorded in Hagen Investments' general journal. Acker borrowed $ 33,000.00 from petitioners and Hagen Investments in a series of loan transactions in 1966. It repaid all the loans in the same year with interest totalling $ 4,925.00. The only loan transactions for which interest was recorded in any account books were loans from Hagen Investments. As to those loans, only $ 95.00 in interest payments were recorded in *541 Hagen Investments' general journal, and only $ 95.00 of the $ 4,925.00 in interest was reported on petitioners' 1966 return. [76]
Hagen Holding Corporation made interest payments of $ 2,544.18 to petitioner in 1966 which were not reported on the 1966 return. [77] The three interest payments involved are recorded in Hagen Holding Corporation's general journal. [78] Petitioner was still president of Hagen Holding Corporation at the time the payments were made. He signed the checks involved in these transactions but none of the income was reported. Petitioners also failed to report interest of $ 81.00 in 1966 on a loan made by Hagen Investments in 1964 to Dale Wrobbel. *542 Petitioners failed to report savings account interest in 1966. The savings accounts for which no interest was reported and the amounts not reported are shown above. Premium payments made by Acker in 1966 for the benefit of petitioners are explained in detail in Part II.A.7., supra. None of the premium payments were reported on petitioners' 1966 return. Finally, petitioners received dividends of $ 1,617.06 from Hagen Holding Corporation which they did not report. Mrs. Hagen signed petitioners' dividend check for $ 1,617.06, dated January 15, 1966, as treasurer of Hagen Holding Corporation. Payment of the dividend was recorded in the corporation's 1966 general journal, but this item of income also failed to make its way onto the 1966 return. 4. Books and Records
The general journals of Hagen Investments for 1964 and 1965 contain entries recording checks written to various customers as shown below. The journal entries record that Hagen Investments purchased stock in each of these transactions. However, the checks were not written to the customers whose names were entered in the journals. Rather, they were written either to petitioner or Hagen Holding Corporation. *543 The transactions are: Payee Per
Amount of
Date of
Payee per
Journal Entry
[79] Check Check
Check
Hugh B. Warren
$ 1,021.50 9/10/64
Ed J. Hagen
Paul J. Ottis
$ 3,654.00 9/17/64
Ed J. Hagen
Mary Jean Wise
$ 5,413.66 12/28/64
Hagen Holding
Corporation Richard M. Taliaferro
$ 13,200.00
12/22/65
Ed J. Hagen
Richard S. Roberts
$ 1,075.00 12/27/65
Ed J. Hagen
Petitioner's business records failed to correctly record the nature of the above transactions. As to the last two transactions, petitioner sold Hagen Holding Corporation stock to Messrs. Taliaferro and Roberts on or about the same dates that he received the $ 13,200.00 and $ 1,075.00 checks from Hagen Investments. The amounts realized on the sales equalled the amounts received by petitioner. Each of the sales generated gain. The sales are not recorded in any income accounts kept by petitioner (either business or personal) and gains from these transactions were not reported in 1965. [80]
*544 The general journal of Hagen Investments for 1964 and its cash receipts and disbursements journal for April 1, 1966 to December 31, 1966 contain entries recording a number of checks written to petitioner as shown below. The checks were not in fact written to petitioner; they were written to various customers of Hagen Investments. The transactions are: Payee per
Amount of
Date of
Payee per
Journal Entry
[81] Check Check
Check
Ed J. Hagen
$ 1,900.00 9/23/64
Max E. Sanders
Ed J. Hagen
$ 2,272.50 8/30/64
Dorothy Tyler
Ed J. Hagen
$ 87.50    9/2/64 Richard Taliaferro
Ed J. Hagen
$ 11,371.50
5/14/66
Mary Jean Wise
Petitioner's business records failed to correctly record the above transactions as well. [82]
*545 We have found petitioners' personal and business records for 1964 through 1966 to be woefully inadequate and confusing. They are false as to numerous transactions and incomplete because many transactions were not recorded at all. On the basis of these discrepancies we find that petitioners failed to keep satisfactory books and records during these years. 5. Criminal Tax Fraud
On September 17, 1971 a criminal indictment was filed in the United States District Court for the Western District of Oklahoma in which the Grand Jury charged as follows: COUNT 1
That on or about the 15th day of April, 1965, in the Western District of Oklahoma, Ed J. Hagen a resident of Oklahoma City, Oklahoma, who during the calendar year 1964 was married, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1964, by filing and causing to be filed with the District Director of Internal Revenue for the Internal Revenue District of Oklahoma City, at Oklahoma City, Oklahoma, a false and fraudulent joint income tax return on behalf of himself and his said wife, wherein it was *546 stated that their adjusted gross income for said calendar year was the sum of $ 3,750.24 and that the amount of tax due and owing thereon was zero, whereas, as he then and there well knew, their joint adjusted gross income for the said calendar year was the sum of $ 22,082.94 and their joint taxable income was the sum of $ 16,886.67, upon which said taxable income there was owing to the United States of America an income tax of $ 3,220.04, in violation of Section 7201, Internal Revenue Code; 26 U.S.C., Section 7201. COUNT 2
That on or about the 15th day of April, 1966, in the Western District of Oklahoma, Ed J. Hagen a resident of Oklahoma City, Oklahoma, who during the calendar year 1965 was married, did wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1965, by filing and causing to be filed with the District Director of Internal Revenue for the Internal Revenue District of Oklahoma City, at Oklahoma City, Oklahoma, a false and fraudulent joint income tax return on behalf of himself and his said wife, wherein *547 it was stated that their taxable income for said calendar year was the sum of $ 3,329.00 and that the amount of tax due and owing thereon was the sum of $ 505.93, whereas, as he then and there well knew, their joint taxable income for the said calendar year was the sum of $ 39,482.09, upon which said taxable income there was owing to the United States of America an income tax of $ 8,738.96, in violation of Section 7201, Internal Revenue Code; 26 U.S.C., Section 7201. [83]
The Judgment and Commitment filed in the District Court on January 6, 1972 recites in part: * * *
IT IS ADJUDGED that the defendant upon his plea of not guilty, and a verdict of guilty has been convicted of the offense *548 of violation of Title 26, U.S.C., Section 7201 (filing fraudulent income tax returns), as charged in Counts 1 and 2 of the Indictment. [84]
* * * Petitioner appealed his conviction and it was affirmed by the Court of Appeals for the Tenth Circuit. [85] The United States Supreme Court denied certiorari. [86]
As stated in Parts II.A. through II.B., supra, hereinbefore, petitioners failed to report income and overstated expenses on their 1964, 1965 and 1966 returns as follows: Income
Adjustments 1964 1965 1966
Gross Receipts
$ 16,666.00
$ 68,739.40 $ (205,729.09)
Interest, Dividends
and Fees   11,513.32
8,019.27 18,118.74 Life Insurance
Commissions   1,906.75 192.53 Income from Hagen, Ltd.
4,969.81
64,269.46 13,422.35 Unidentified Income
5,007.88 5,879.85 Income from The Schallmo
Foundation   945.00 Additional Compensation
2,284.00 Expense    Adjustments  Cost of Goods Sold
18,078.76
(41,570.77)
221,378.61 Depreciation
1,557.53
1,609.77 2,008.54 Auto Expenses
1,696.72
707.90 284.28 Commission Expenses
1,443.24
4,005.35 5,535.54 Other Business Expenses
4,845.05
3,407.58 14,419.42 [87] Medical Expenses *    *     *     Contributions
45.75
(55.00)
(497.00)
Tax Expenses
*    *     *     Interest Expenses
215.55 Capital Loss
1,000.00
Increase to Income
$ 61,816.18
$ 117,208.14 $ 77,297.77  *549 Petitioners' 1964, 1965 and 1966 returns reported the following amounts: [88] 1964 1965
1966
Adjusted Gross Income
$ 3,750.24
$ 9,318.00
($ 11,713.01)
Taxable Income
-0-   3,329.00
(19,891.02)
Income Tax Liability
-0-   505.93
-0-    Based on the preceding schedules, we find that petitioners with intent to evade and defeat tax substantially underreported taxable income for 1964 through 1966. Also with intent to evade and defeat tax, petitioners did not report their correct income tax liability for 1964, 1965 and 1966. Part of the underpayment of tax required to be shown on petitioners' returns for 1964, 1965 and 1966 is due to fraud. [89] Petitioners with intent to evade and defeat tax filed false and fraudulent returns for the years 1964 through 1966. *550 III. Ed J. and Martha Jo Hagen (docket No. 7700-76) Taxable Years 1968 through 1971
Petitioners timely filed joint returns for the taxable years 1968 through 1971 with the Internal Revenue Service. Respondent determined numerous adjustments in the notice of deficiency for these years and they are: Type of Adjustment 1968
1969 1970
1971
Life Insurance
$ 461.95    $ (413.32)   Commissions
Unidentified Income
44,403.41 $ 20,578.29  6,678.41 Additional Compensation
1,142.00 1,530.00 1,552.00 Income from
30,427.14 37,125.11 21,448.27 $ 28,221.49 [90] Distributions Interest Income
52.88 807.61 Income from Equity
94,500.00  Acquired
Office-at-Home
(229.72)
(229.72)
(229.72)
(229.72) Expenses
Interest Expenses
1,164.40 (2,378.20)
(1,285.74)
(2,269.45)
Medical and Dental
716.00 1,151.00 1,023.24 213.02  Expenses
Capital Losses
537.00 $ 78,622.18 $ 152,329.36 $ 29,580.75 $ 25,935.34 *551 Respondent employed third party records and indirect methods to make the above determinations. He was required to do so because petitioners' records were not complete when received for use in the audit process. When respondent requested to see petitioners' records he was informed that all business records had been lost and that only a few personal records still existed. Miscellaneous records were later turned over in an incomplete, piecemeal fashion. Facts relating to the various adjustments are in the following paragraphs. A. Facts Relating to Income Adjustments
1. Life Insurance Commissions
Petitioners reported the following commissions from the sale of life insurance on their 1968 and 1970 returns: Source
1968
1970
Occidental Life
$ 5,090.00
Standard Life
3,658.00  Unidentified Sources
$ 4,729.82
$ 8,748.00
$ 4,729.82
Petitioners understated life insurance commission income in 1968 and overstated it in 1970, as follows: [91]
1968 1970
Commissions Received
$ 9,209.95
$ 4,316.50 Commissions per Return
8,748.00
4,729.82   Understatement (Overstatement)
[92] $ 461.95  $ (413.32) *552 2. Unidentified Income
Petitioners received income in 1968, 1969 and 1970 from sources that have not been identified by either party. Income falling into this category took the form of deposits to three accounts controlled by petitioners. [93] The total of unidentified deposits for these years and the resulting understatements to income are: Bank Account Amount
1968
[94] Liberty 584-667-6   $ 37,000.00
[95] State Capitol 040-001-9   7,125.00
FNB X-XXX-079  278.41
Total 1968 Unidentified Deposits  $ 44,403.41
Less: Unidentified Income per Return  -0-   Understatement  $ 44,403.41
1969
Liberty XXX-667-6  $ 12,000.00
State Capitol XXX-XX1-9  8,050.00
FNB X-XX0-079  5,959.29
Total 1969 Unidentified Deposits  $ 26,009.29
Less: Unidentified Income per Return  5,431.00
Understatement  $ 20,578.29
1970
Liberty XXX-XXX-6  $ 1,000.00 State Capitol XXX-XX1-9  5,678.41
Total 1970 Unidentified Deposits  $ 6,678.41 Less: Unidentified Income per Return  -0-   Understatement  $ 6,678.41 *553 3. Additional Compensation from Acker Industries, Inc. Acker continued to pay premiums on Standard Life policy No. OL-92440 in 1968, 1969 and 1970. [96] Again, these premium payments were for the benefit of petitioners and constituted compensation to them. The payments were in the following amounts: 1968
$ 1,142.00
1969
$ 1,530.00
1970
$ 1,552.00
These amounts were not reported on petitioners' 1968, 1969 and 1970 returns. 4. Distributions from Hagen Investments, Inc. and Capitol Car Care, Inc. In conjunction with his examination *554 of petitioners' returns for 1967 through 1971, respondent examined the corporate returns of Hagen Investments, Inc. and Capitol Car Care, Inc. [97] In the process of doing so respondent determined that many expenditures of these enterprises were in fact made for the personal benefit of petitioners, and hence "distributions." Sometimes the corporations expensed these items and sometimes they did not. [98] We have characterized the distributions as to type. A major part of Hagen Investments, Inc.'s business was conducted from offices in petitioners' residence. Expenditures for maintenance and utilities relate to the upkeep of the structure or to purchases such as vacuum cleaners and wallpaper. Hagen Investments, Inc. has not shown that these expenditures were business expenditures, so we treat them as personal expenditures and as distributions. *555 Corporate expenditures for dues and subscriptions, travel and entertainment, office supplies, and the like also appear to have been personal in nature, particularly when the various payees are considered. Since neither the corporation nor the petitioners have carried their respective burdens of proof with respect to the purpose for which these expenditures were made, we treat them as distributions also. Distributions made for petitioners' benefit in these years were: Source and Type
of Distribution
1968
1969
1970
1971
Hagen Investments, Inc.
Interest Income  $ 573.75   Auto Expenses  727.82
$ 6,158.96 $ 530.59    Dues and Subscriptions  234.40
362.45
1,509.45 $ 144.40    House Payments  3,408.00
3,408.00
3,408.00 3,408.00 Insurance Premiums  5,583.47
4,951.74
4,060.75 4,471.00 Office Supplies  3,460.03
537.96
1,175.76 Repairs and Maintenance  5,984.75
2,681.70
649.15 145.06 Travel and Entertainment  2,232.57
10,168.80
1,059.22 3,326.67 Utilities  1,572.83
1,820.84
1,217.57 752.94 Training Program  (Bill Hagen)    -0-  Miscellaneous Expenses  26.49 33.48 Legal Fees  15,180.73 Capitol Car Care, Inc.
Auto Expenses  193.00
902.69
996.97 300.00 Insurance Premiums  619.75
-0-  918.45 -0-   Taxes  338.05 Dividend Exclusion
(200.00)
(200.00)
Totals            $ 24,590.37
$ 30,993.14
$ 15,690.45 $ 27,562.28
*556 Our additional findings relating to these distributions are set forth in Appendices E, F, G and H. Facts relating to corresponding corporate expenditures are also set forth in these appendices and in our findings for docket No. 8342-76, Hagen Investments, Inc. v. Commissioner, infra. Petitioners presented no evidence relating to the corporation's current or accumulated earnings and profits for these 4 years. None of the distributions were reported on petitioners' 1968, 1969, 1970 and 1971 returns. 5. Interest Income
Petitioners received interest income from bank accounts in 1969 and 1970 that was not reported on any returns. [99] For 1969 unreported interest income was: Liberty 584-667-6
$ 1,857.52
FNB 7-350-369
866.36
$ 2,723.88
Less: Amount Reported
2,671.00
Unreported Interest
$ 52.88   For 1970 unreported interest income was: Liberty 584-667-6
$ 603.88 FNB 7-350-369
203.73
$ 807.61 Less: Amount Reported
-0-  Unreported Interest
$ 807.61 *557 6. Income Relating to Alliance Corporation
Respondent determined that petitioners received income of $ 94,500.00 in 1969 when petitioner acquired "additional equity" in Alliance Corporation, an investment company. The record is extremely confusing with respect to this adjustment, and we have winnowed the facts from pages of complicated testimony and dozens of exhibits. As stated before, Alliance Corporation was the successor corporation to Hagen Holding Corporation. Petitioner was a major shareholder. He was also a member of its board of directors and president of the corporation from its founding until his resignation on march 31, 1969. During this time he was in control of the records of the corporation and continued to be in control of them after he resigned. When Hagen Holding Corporation was organized in 1963, two classes of common stock were authorized, Class A and Class B. The Class A shares were nonvoting shares. The Class B shares were designated in Article V of the Articles of Incorporation as voting shares "in the election of directors and in all other matters, except as may be otherwise provided by statute." As early as November 20, 1964, a corporate policy *558 was in place whereby Hagen Holding Corporation stock was to be issued in "units," each unit containing 20 shares of Class A nonvoting stock and one share of Class B voting stock. This policy never became part of the corporation's bylaws but it was adhered to in numerous transactions involving the sale of stock. The 20 to 1 ratio was perceived to be an established corporate policy by most shareholders and was followed with respect to transactions occurring through 1966. Neither the Articles of Incorporation of Hagen Holding Corporation nor its bylaws stated that the Class A stock carried a liquidation preference or any other type of preference. That class was simply described as "Class A nonvoting common." However, on February 3, 1966, amendments to the Articles of Incorporation were filed with the Oklahoma Secretary of State's Office adding the following language to Article V of the Articles of Incorporation: "Each share of outstanding common stock, either Class A or Class B, shall share equally in all dividends and any other distributions, in liquidation or otherwise, made in respect of the common stock of the corporation." The amendment was voted on at the January 26, 1966 Special *559 Meeting of Shareholders and passed unanimously. The directors of the corporation voted in favor of splitting the Class B voting shares a number of times between November, 1963 and September, 1969. In conjunction with these stock splits the Articles of Incorporation were amended to increase the number of authorized shares and to reduce the par value of each share. The stock splits were always proposed by and passed by the directors and then approved by the shareholders at the recommendation of petitioner. By August, 1969, petitioners had acquired the following Class B voting shares by stock splits or purchase: Date of
Class B Shares
Method of Acquisition
Issue
[100] to Petitioners (Par Value/Price)
11/25/63
1,000  Cash Purchase
(1.00)
6/15/64
5,000  Cash Purchase
(1.00)
10/10/64
6,000  2:1 Split
(.50)
12/16/64
18,000 Cash Purchase
(.50)
12/22/65
23,000 Cash Purchase
(.50)
1/26/66
53,000 2:1 Split
(.25)
11/15/66
14,000 Cash Purchase
(.25)
1/27/67
30,000 5:4 Split
(.20)
8/4/69
150,000
2:1 Split
(.10)
300,000
*560 For reasons not made apparent in the record, the Class A shares did not increase at the 20 to 1 ratio of Class A to Class B shares when the Class B shares split. Petitioners acquired Class B shares directly from the corporation from time to time. Petitioners' separate purchases of Class B shares occurred on December 22, 1965 and November 15, 1966, for 23,000 and 14,000 Class B shares, respectively. [101] Most shareholders were unaware of these very substantial purchases. The events precipitating the August 1969 stock split involved Hagen Holding Corporation's wholly-owned subsidiary, Western Bank & Office Supply Company ("Wesbanco") and Wesbanco's subsidiary, Financial Reserve, Inc. ("FRI"). [102] Wesbanco *561 was acquired by Hagen Holding Corporation in early 1967. (Hagen Holding Corporation changed its name to "Alliance Corporation" on September 12, 1966 and it is hereinafter known as "Alliance".) Wesbanco in turn acquired 1,000,000 shares of FRI from Thurston National Insurance Company in 1968. The acquisition made FRI a second-tier subsidiary of Alliance. Petitioner negotiated the FRI transaction, which was to have placed Wesbanco in control of the majority of FRI's capital stock. However, in consummating the transaction, petitioner diverted 400,000 shares of FRI stock to Capitol Car Care, Inc. and 200,000 shares to The Schallmo Foundation, Inc. Petitioner did so, in his own words, as Wesbanco's "nominee" and as collateral for all "past, present and future loans." [103]
*562 In mid-1969, FRI became the subject of an investigation by the Oklahoma Securities Commission. On July 7, 1968 FRI filed an "Application for Registration by Notification" with the Oklahoma Securities Commission to register 2,000,000 shares of its common stock, par value $ .05 per share. On July 11, 1969 the Oklahoma Securities Commission notified FRI that it intended to revoke the registration. In issuing its notice the Oklahoma Securities Commission alleged that FRI's March 31, 1969 consolidated balance sheet had seriously overvalued its assets and that, in particular, stocks owned by FRI which were stated as having a fair market value of $ 1,203,220.33 actually had little if any fair market value. The notice also alleged that a sale of FRI stock could operate as a fraud upon any purchaser of its stock relying on the financial information in FRI's consolidated balance sheet. [104] It was as a result of Oklahoma Securities Commission investigation that the board of directors of FRI first learned of the earlier diversion of FRI stock by petitioner to Capitol Car Care, Inc. and The Schallmo Foundation, Inc. *563 While the matter was still pending, petitioner caused the 600,000 shares of FRI to be reregistered to Wesbanco. Contemporaneously, the board of directors of Alliance voted to distribute 500,000 shares of FRI as a dividend to the shareholders of Alliance, Wesbanco's parent. The vote was taken at the August 4, 1969 directors meeting. These actions followed lengthy negotiations with the Oklahoma Securities Commission and were taken in an effort to settle the controversy over the registration of FRI's stock. One of the principal purposes of the dividend, which the Oklahoma Securities Commission had insisted upon, was to place the ownership of the 1,000,000 shares of FRI stock in the hands of more than one stockholder. In fact, the FRI stock was never reregistered. The two-for-one split of August 4, 1969, the last of the four stock splits, was devised by petitioner. He suggested to the board of directors that a two-for-one split of the Class B voting shares would facilitate distribution of the 500,000 FRI shares to Alliance's shareholders. Prior to the stock split 770,000 shares of Alliance stock were outstanding: 540,000
Class A Shares
230,000
Class B Shares
770,000
Total Shares Outstanding
*564 Thus, a two-for-one split of the Class B shares would increase Alliance's outstanding shares to an even 1,000,000, or 540,000 Class A shares and 460,000 (i.e., 230,000 X 2) Class B shares. One FRI share could then be distributed for every two shares of Alliance issued and outstanding. The resolution to split the shares passed after a heated discussion over the problems associated with the FRI purchase and stock registration. Petitioner was the target of much criticism on these issues. During the August 4th meeting he was asked to produce Alliance's stock records but he stated they were not available. He nevertheless assured the board that the stock split would not significantly reduce any stockholder's equity interest and that every stockholder would be treated approximately equally. The measure passed unanimously. [105]
At the August 4th meeting, the board of directors also passed a resolution to revamp Alliance's capital structure. The recapitalization was proposed by petitioner. The resolution to recapitalize, *565 which also passed unanimously, was as follows: THEREFORE BE IT RESOLVED: That the officers of the corporation call a special stockholders meeting for the purpose of presenting a recommendation to split the Common Stock Class B of Alliance Corporation by issuing one additional share for each one share presently held and to reduce the par value of all of Class B stock from [$ .]20 per share to [$ .]10 per share, and after said stock split and as a part of the same plan of re-organization to reclassify all of the outstanding shares of Alliance Corporation, irregardless of whether Class A or Class B, as voting common stock, so that after said re-organization there will then be outstanding one million shares of Common Stock-Full Voting having a par value of $ 1.00 each. A special meeting of stockholders was convened on August 20, 1969. The meeting was called to vote on the two-for-one split and the recapitalization. Petitioner was not present at the meeting. However, Alliance's president, Vincent V. Messer, assured the shareholders that all would benefit equally from the recapitalization. When a question arose as to the number of outstanding Class B shares, Mr. Messer advised *566 the shareholders that the stock records were in petitioner's possession and not available for examination. The shareholders unanimously passed the resolutions relating to the split of the Class B shares and the recapitalization. After the split 1,000,000 shares were outstanding: 540,000  Class A Shares
460,000  Class B Shares (230,000 X 2)
1,000,000
Total Shares
Total stockholders' equity as of December 31, 1969 was $ 899,494.17. [106]
In 1970, Alliance, Wesbanco and Acker filed a suit in the United States District Court for the Western District of Oklahoma (the District Court) against petitioner, Capitol Car Care, Inc., Hagen Investments, Inc., The Schallmo Foundation, Inc., Mrs. Hagen, and her father, T. Ernest Summers, who was then president of both Capitol Car Care, Inc. and The Schallmo Foundation, Inc. The First Amended Complaint in Alliance Corporation et al vs. Ed J. Hagen, et al (Cause No. CIV-70-536) alleged that petitioner had defrauded and deceived Alliance's stockholders and creditors by employing manipulative *567 and deceptive practices in contravention of Rule 10(b)(5) of the United States Securities and Exchange Commission Rules. Specifically, the plaintiffs alleged that petitioner, the defendant therein, had altered dividend and liquidation rights to the detriment of Alliance's Class A shareholders as the result of stock purchases and stock splits between 1963 and 1969. The District Court suit was settled in 1973 with petitioner returning 146,500 shares of Alliance's stock to the corporation. In return, the plaintiffs paid approximately $ 43,000 in cash to petitioner. Additionally, all other shares of Alliance's common stock owned by petitioners were to be placed in a voting trust for 5 years. Before the suit was initiated, however, the same plaintiffs brought an earlier suit in the District Court to recover the books and records of Alliance remaining in petitioner's possession after he ceased to be president and a board member of Alliance. The records obtained in the earlier suit provided the basis for the second suit, Cause No. CIV-70-536. B. Facts Relating to Expense Adjustments
1. Office-at-Home Expenses
Respondent allowed office-at-home expenses of $ 229.72 for *568 1968 through 1971 for the business use of the 5000 N.W. 31st Street property. When we consider the corporation's expenditures relating to the property (which are treated as distributions, infra), and consider as well the level of business activity carried on at the subject property, the $ 229.72 expense for each year strikes us as low. Even so, petitioner did not reallocate the expenditures to reflect the business use of the property. We therefore find that $ 229.72 is allocable to the partial use of the residence as a home office. 2. Interest Expenses
Petitioners claimed itemized interest expenses for the taxable years 1968 through 1971 in the amounts of $ 3,600.00, $ 883.00, $ 1,031.68 and $ 1,019.48, respectively. They overstated their interest expenses for 1968 and understated them for 1969, 1970 and 1971. The understatements were in part the result of respondent's treatment of house payments made by the corporation. He treated 4 years of house payments as corporate distributions. That portion of each house payment which was interest was deductible by petitioners under section 162. Interest expenses claimed and allowable, and the resulting adjustments are: *569 1968
1969
1970
1971
Interest Expense
Claimed   $ 3,600.00
$ 883.00   $ 1,031.68 $ 1,019.48 Allowable Interest
Expense   2,435.60
3,261.20 2,317.42 3,288.93 Overstatement
$ 1,164.40
(Understatement)  ($ 2,378.20)
($ 1,285.74)
($ 2,269.45)
3. Medical and Dental Expenses
Petitioners claimed itemized medical expense deductions on their 1968, 1969, 1970 and 1971 returns in the amounts of $ 716.00, $ 1,151.00, $ 1,023.24 and $ 213.02, respectively. Petitioners' medical expenses for these taxable years were: 1968 1969 1970 1971 Medicine and
Drugs   $ 495.00
$ 456.00  $ 273.78
$ 114.71
Other Medical
Expenses   $ 833.00
$ 1,064.00
$ 938.65
$ 231.50
Whether these itemized expenses qualify as deductions depends upon petitioners' adjusted gross income as redetermined. C. 1968 Capital Losses
Petitioners reported a $ 537.00 long term capital loss on Schedule C of their 1968 return relating to stock warrants that petitioner did not exercise. The warrants were for 100 shares of Great Northern Gas Utilities, Ltd. and 200 shares of Western Copper *570 Mills, Ltd. The Great Northern Gas Utilities, Ltd. warrant was exercisable from October 1, 1957 to September 14, 1965 and the Western Copper Mills, Ltd. warrant was exercisable from August 15, 1962 to August 15, 1967. The failure to exercise the warrants did not generate capital losses in 1968. D. Section 6653(a) Additions to Tax
During 1968 through 1971 petitioners did not keep satisfactory books and records and as a result failed to report substantial amounts of income relating to life insurance commissions, unidentified bank deposits, premiums paid on a life insurance policy by Acker, and corporate distributions relating to Hagen Investments, Inc. If the transactions were properly recorded in any books of account, the books are not part of the record. Respondent determined that petitioners' underpayments of tax for 1968 through 1971 were due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). In certain instances he made minor concessions to adjusted items, and the Court redetermined additional allowances. Petitioners presented no credible evidence to further modify respondent's determinations respecting the section *571 6653(a) additions to tax. IV. Hagen Investments, Inc. (docket No. 8342-76) Taxable Years 1967 through 1971
Petitioner Hagen Investments, Inc. (hereinafter "the corporation") timely filed Federal corporate income tax returns for the taxable fiscal years ended September 30, 1967 through September 30, 1971. [107] Respondent determined numerous adjustments in the notice of deficiency for these years and they are: Type of Adjustment 1968 1969 1970
1971
Gross Profits
$ 191,768.95 $ 27,366.21 $ 58,010.36 [108] Commission Income (6,535.62)
(31,671.39)
(3,644.92)
Interest Income
(543.75)
Management Fees
750.00 Miscellaneous Income
60,000.00 268,104.00 Profit Sharing Trust
43,275.00 (43,275.00)
Auto and Travel Expenses
727.82 16,015.76 3,924.56 Dues and Subscriptions
994.89 667.95 1,546.95 $ 144.40
Interest Expenses
3,469.75 2,968.43 2,168.04 2,269.45
Insurance Expenses
2,187.47 1,204.61 1,933.84 856.00
Office Supply Expenses
976.48 537.96 1,175.76 Repairs and Maintenance
6,600.99 4,151.96 739.16 277.27
Tax Expenses
700.76 755.14 710.00 714.58
Travel and Entertainment
1,830.08 3,570.79
Utility Expenses
1,572.83 1,500.60 1,293.01 997.74
Audit and Legal Expenses
15,180.73
Training Program Expenses
107.00 Miscellaneous Expenses
59.97
Depreciation
1,037.47 1,540.88 735.17 555.55
Net Operating Loss
(6,016.27)
Gain on Sale of Assets
8,868.64 $ 302,796.85 $ 293,249.11 $ 34,185.57 $ 24,626.48
*572 Respondent also disallowed investment tax credits for the 1968 and 1969 fiscal years, and disallowed the net operating loss which the corporation had tentatively carried back from 1969 to 1967. Again, respondent was required to use third party records and indirect methods in his determinations because the records of the corporation were not made available to him. A. Facts Relating to Income Adjustments
1. Gross Profits from Stock Sales/Commission Income
On its corporate income tax returns (Forms 1120) filed with the Internal Revenue Service for its fiscal years ended September 30, 1968, September 30, 1969 and September 30, 1970, the corporation reported gross receipts from the sale of securities, cost of goods sold and gross profits as follows: FYE 9/30/68
FYE 9/30/69
FYE 9/30/70
Gross Receipts -
Sale of Securities $ 14,743,165.41
$ 11,046,930.75
$ 1,744,376.45
Cost of Goods Sold
14,253,590.57
10,698,097.49
1,686,369.19
Gross Profits
$ 489,574.84   $ 348,833.26   $ 58,007.26   *573 The corporation failed to provide respondent with adequate books and records relating to its gross receipts and cost of goods sold. In such posture, respondent was unable to determine the corporation's gross business income by subtracting cost of goods sold from gross receipts. [109] Therefore, he determined the corporation's gross profit for these years by (a) ascertaining the amounts paid to each wholesale "trader" and retail "salesperson" during each year; [110] (b) determining the percentage of the gross profit paid to each trader and salesperson; and then (c) applying the appropriate multiplier to arrive at total gross profit. Traders, with the exception of Tom Summers and Bobby Summers, Mrs. Hagen's brothers, were paid 25 percent of the gross profit on stock sales and 25 percent of total commissions on mutual fund sales. Tom Summers and Bobby Summers were paid 30 percent of the gross profit on stock sales and 40 percent of mutual fund commissions. Retail salespersons *574 were paid 50 percent of the gross profit on their stock sales and 50 percent of total mutual fund commissions generated by them. The amounts paid to these traders and salespersons during 1968, 1969 and 1970 -- their "sales commissions" -- are shown on Appendices I through K, attached hereto. Also shown on these Appendices are the applicable percentages and multipliers, and the resulting gross profits generated by each of them. a. 1968
For 1968, gross profits, less gross profits and mutual fund commissions reported, resulted in a $ 184,928.64 understatement of gross profits: Gross Profits (on Sales
Commissions of $ 283,809.57)  [111] $ 681,039.10 Less: Gross Profits per Return
489,574.84  Subtotal
$ 191,464.26
Less: Mutual Fund Income per
Return  6,535.62    Understatement
[112] $ 184,928.64 *575 b. 1969
In 1969, the corporation charged 50 percent of total wire and telephone expenses to the traders. Specifically, the corporation deducted 50 percent of these expenses from gross profits (including mutual fund commissions) before applying the appropriate multipliers to profits generated by each of the traders. Fifty percent of these expenses were $ 41,244.41 in that year. For 1969, gross profits, less gross profits and mutual fund commissions reported, resulted in a $ 4,305.18 overstatement of gross profits: Gross Profits (on Sales
Commissions of $ 96,468.87)  $ 334,955.06 Plus: 50 percent of Wire and
Telephone Expenses  41,244.41 Adjusted Gross Profits
$ 376,199.47 Less: Gross Profits per Return
348,833.26 $ 27,366.21  Less: Mutual Fund Income per
Return  31,671.39 Overstatement
$ (4,305.18) c. 1970
For 1970, gross profits, less gross profits and mutual fund commissions reported, resulted in an understatement of gross receipts in the amount of $ 54,365.44: Gross Profits (on Sales
Commissions of $ 29,677.63)  $ 116,017.62
Less: Gross Profits per Return
58,007.26
Subtotal
$ 58,010.36 Less: Mutual Fund Income per
Return  3,644.92
Understatement
$ 54,365.44 *576 2. Interest Income
The corporation reported $ 937.40 in interest income on its 1968 return. Of the total, $ 543.75 reported was not earned by the corporation. It was earned by petitioners on personal accounts established at financial institutions in Oklahoma City. [113]The corporation's interest income was therefore overstated by $ 543.75 for 1968. 3. Management Fees
The corporation received a total of $ 9,750.00 in management fees in 1968. Of that amount, $ 9,000.00 was paid to the corporation by Capitol Car Care, Inc. We are unable to determine from the record what type of management services the corporation rendered to Capitol Car Care, Inc. The corporation also received a $ 750.00 management fee from Acker in 1968. Acker was at that time a wholly-owned subsidiary of Alliance, which petitioner controlled. Only $ 9,000.00 of the $ 9,750.00 in total management fees was reported on the corporate return. 4. Miscellaneous Income
a. 1968
The corporation received $ 60,018.98 from unknown sources in 1968. Income of $ 60,000.00 is described in an entry in the corporation's ledger as "miscellaneous income." Only *577 $ 18.98 of the $ 60,018.98 was reported. The corporation therefore understated income from miscellaneous sources by $ 60,000.00 in that year. b. 1969
Our findings relating to the corporation's gross profits in 1969 do not take into account income realized by the corporation on its 1969 sales of FRI stock. Petitioner "made the market" for the corporation's sales of FRI stock. That is, petitioner himself set the "bid" and "ask" prices for this stock. FRI's stock records were made available to respondent during his examination and they are part of the record in this case. Because of the availability of these records, it is from them rather than the indirect method that we have redetermined income from the corporation's 1969 sales of FRI stock. [114]
*578 Transactions in FRI stock are noted hereinbefore in conjunction with petitioner's acquisition of additional equity in Alliance, also in 1969. Petitioner attempted to gain control of FRI by diverting 600,000 of its shares to Capitol Car Care, Inc. and The Schallmo Foundation, Inc. when Wesbanco, a subsidiary of Alliance, purchased a controlling interest in FRI in 1968. As previously noted, the Oklahoma Securities Commission took up the issue of FRI's stock registration in mid-1969. Its concern was that FRI's consolidated balance sheet overvalued stock that it owned in Alliance, Thurston National Insurance Company, Thurston National Life Insurance Company and Computek Corporation. By August 8, 1969, FRI's earlier registration by notification became ineffective by order of the Oklahoma Securities Commission. As of that date most of the FRI sales which generated income for the corporation in 1969 had been made, although a few transactions occurred after that date. The corporation sold 163,949 shares of FRI stock in 1969 of which it was record owner. The record shows that the number of shares sold may actually have been much higher. The corporation purchased hundreds of shares *579 of FRI stock in 1968 and 1969 that it did not cause to have reissued in the corporate name. Subsequent sales of these shares are not shown on FRI's stock transfer records as having been sold by the corporation. We do not take any sales of FRI stock not reissued to the corporation into account in calculating gain on the corporation's FRI sales. The corporation realized income of $ 263,827.65 from the sale of 163,949 shares in 1969: Amount Realized
$ 366,068.25
Cost of Shares
102,240.60
Gain on Sale
[115] $ 263,827.65
None of the gain was reported on the 1969 corporate return. 5. Hagen Employees Profit Sharing and Retirement Trust (HEPRET)
On May 1, 1968 the corporation entered into an agreement with T.E. Summers, M.F. Oaks and petitioner establishing the Hagen Employees Profit Sharing and Retirement Trust ("HEPRET"). Petitioner signed the agreement as president of the corporation, and Messrs. Summers, Oaks and *580 Hagen signed as HEPRET's trustees. The first contribution to HEPRET was made on May 15, 1968, in the amount of $ 25,665.00. On September 30, 1968 a second contribution was made in the amount of $ 17,610.00. On May 16, 1968 petitioner forwarded a copy of the HEPRET trust agreement to the District Director of the Internal Revenue Service in Oklahoma City and requested a determination that HEPRET was a qualified trust under section 401(a) and therefore exempt from income tax under section 501(a). The District Director identified a number of problems in the plan as drafted. Because of these problems, he did not issue a determination letter by the end of the corporation's 1968 fiscal year. The District Director and petitioner corresponded a number of times between May 16, 1968 and the end of 1969 regarding modifications to the profit sharing plan as embodied in the trust agreement. The principal area of difficulty was the plan's Article V, its vesting and forfeiture provisions. Article V reads in pertinent part as follows: ARTICLE V FORFEITABLE AND NON-FORFEITABLE INTERESTS 1. Allocations to Participants in accordance with the provisions of Article IV shall not vest any *581 right or title to any part of the assets of the Trust. 2. At the end of his first year in the Plan, a Participant shall have a vested and non-forfeitable interest in 10% of the amount credited to his account. At the end of each additional full year of continuous service, an additional 10% of the amount shall become vested, so that after ten full years of continuous service the full amount credited to his account shall become vested and non-forfeitable, except that: (a) Upon death, severance due to permanent total disability or retirement at or after age 65 the full amount credited to his account shall become vested and non-forfeitable. 3. Upon severance of employment except as under 2(a) above or to join the Armed Forces of the United States or by leave of absence, all as defined in Article II, 2(b), a Participant's non-vested interest shall be forfeited. 4. When a Participant ceases to be in the service of the Company, the Company shall promptly give notice thereof to the Trustees together with any information necessary to determine the percentage of vesting applicable to the account of the Participant. The Trustees or their Agent, if any, shall then determine the *582 value of the vested interest of the Participant as of the close of the day when the Trustees (or the Agent if it is in charge of Trust accounting) received notice that said termination had occurred. The vested interest shall consist of the applicable percentage of the following: (a) * * * (b) Forfeitures for the prior year if not yet apportioned to the accounts of the Participants, said forfeitures to be apportioned among said accounts in the same manner as the contributions for the prior year. [Emphasis added.] The District Director took the position that the vesting and forfeiture provisions discriminated in favor of well paid personnel, such as petitioner himself, and that they needed to be modified. He also required that changes be made to plan provisions relating to employee eligibility and valuation of plan assets. He summarized these requirements in a letter to the corporation dated April 23, 1969. As of February 26, 1970 no action had been taken by the corporation to comply with the District Director's requirements. On that date the District Director issued a final adverse determination letter to the corporation stating that "the plan fails to meet the *583 requirements of section 401(a) of the Code and the trust is not entitled to exemption under section 501(a)." With respect to Article V, Part 2, providing for vesting at a rate of 10 percent per year, he stated in an accompanying letter that "(the corporation's) experience of employee turnover during 1968 shows that most of the amount which was contributed under the plan, as a result of forfeitures, has been reallocated to the accounts of those individuals in whose favor discrimination is expressly prohibited." The District Director also reiterated other areas of difficulty discussed in previous correspondence. The corporation did not seek a review of the adverse determination although advised by the District Director that the plan could be reconsidered by the Exempt Organization and Pension Trust Division at the National Office of the Internal Revenue Service in Washington, D.C.
The corporation deducted $ 43,275.00 on its 1968 corporate return for contributions made to HEPRET in that year. It included this amount in income on its 1970 corporate return. In his notice of deficiency, respondent disallowed the 1968 deduction in its entirety and correspondingly reduced the corporation's *584 1970 income by $ 43,275.00. B. Facts Relating to Expense Adjustments
1. Business Expenses
As stated before, the corporation's fiscal year ended on September 30th. A portion of the disallowed expenses addressed in the following paragraphs were treated as distributions to petitioners in overlapping calendar years. Some payments made by the corporation which primarily benefitted petitioners were not expensed by the corporation. [116]
a. Auto and Travel Expenses
The corporation reported auto and travel expenses on its 1968, 1969 and 1970 corporate returns. It was unable to substantiate many of these expenses at trial as ordinary and necessary business expenses. Auto and travel expenses claimed and allowable and the amounts by which they were overstated are: 1968 1969 1970
Auto Expenses Claimed
$ 1,718.85
$ 17,605.02
$ 5,222.40
Allowable Auto Expenses
991.03
1,965.27
1,297.84
Overstatement
$ 727.82  [117] $ 15,639.75
$ 3,924.56
*585 b. Dues and Subscription Expenses
The corporation reported dues and subscription expenses on its 1968 through 1971 returns and those it was unable to substantiate have been treated as distributions to petitioners. [118] Dues and subscription expenses claimed and allowable, and the amounts by which they were overstated are: 1968
1969
1970
1971
Expenses
Claimed  $ 2,244.16
$ 6,297.09
$ 5,452.95
$ 144.40
Allowable
Expenses  2,009.76
5,934.64
3,943.50
- 0 -
Overstatement
[119] $ 234.40  [120] $ 362.45  [121] $ 1,509.45
[122] $ 144.40
c. Interest Expenses
The corporation took excess interest *586 expense deductions on its 1968, 1969, 1970 and 1971 corporate returns. The overstated interest expense deductions related primarily to mortgage payments made by the corporation on petitioners' personal residence. Respondent treated these payments as distributions to petitioners and in addition adjusted petitioners' interest expense deductions. [123]
Interest expenses claimed and allowable, and the amounts by which these expenses were overstated are: 1968 1969 1970 1971
Interest Expenses
Claimed  $ 6,363.92
$ 5,918.42
$ 3,669.89
$ 2,689.57
Allowable Interest
Expenses  2,894.17
2,949.99
1,501.85
420.12
Overstatement
$ 3,469.75
$ 2,968.43
$ 2,168.04
$ 2,269.45
d. Insurance Expenses
The corporation reported excess insurance and license expenses on its 1968 through 1971 corporate returns. [124] Insurance and license expenditures that the corporation was unable to substantiate under section 162 have been reallocated to petitioners as distributions. Some premium payments which benefitted petitioners were not expensed. Expenses claimed and allowable, and the amounts *587 by which they were overstated are: 1968 1971
Insurance Expenses Claimed
$ 6,029.42
$ 922.00
Allowable Insurance Expenses
3,994.95
66.00
Overstatement
[125] $ 2,034.47
$ 856.00
e. Office Supply Expenses
The corporation overstated expenses for office supplies on its 1969 and 1970 corporate returns. [126] Office supply expenditures that it was unable to substantiate have been reallocated to petitioners. Expenses claimed and allowable, and the amounts by which they were overstated are: 1969 1970
Office Supply Expenses Claimed
$ 7,910.62
$ 1,175.76
Allowable Office Supply Expenses
7,372.66
- 0 - Overstatement
$ 537.96  $ 1,175.76
f. Repair *588 and Maintenance Expenses
The corporation overstated deductions for repairs and maintenance expenses on its 1968, 1969, 1970 and 1971 corporate returns. Appendices E through H fully set forth facts relating to this adjustment. Expenses claimed and allowable, and the amounts by which they were overstated are: 1968
1969
1970
1971
Repair and Main-
tenance Expenses Claimed $ 6,672.54
$ 4,700.41
$ 1,116.41
$ 277.27
Allowable Repair
and Maintenance Expenses 109.53
587.08
377.25
132.21
Overstatement
[127] $ 6,563.01
[128] $ 4,113.33
$ 739.16  [129] $ 145.06
g. Tax Expenses
Most of the deductions for taxes paid during the corporation's 1968 through 1971 fiscal years were allowable deductions. However, we have disallowed ad valorem taxes paid by the corporation which related to 5000 N.W. 31st Street. *589 The amount disallowed constitutes a portion of the house payments made by the corporation for the benefit of petitioners; the house payments have been treated as distributions. The amounts by which deductions for taxes paid were overstated are: 1968
1969
1970
1971
Expenses Claimed
$ 2,391.48
$ 5,474.31
$ 2,240.12
$ 1,705.31
Allowable Expenses
for Taxes  1,690.72
4,719.17
1,530.12
990.73
Overstatement
$ 700.76  $ 755.14  $ 710.00  $ 714.58  h. Travel and Entertainment Expenses
The corporation overstated travel and entertainment expenses for its 1968 and 1971 corporate years. [130] For 1968 respondent disallowed $ 1,830.08 in travel and entertainment expenses. Petitioner substantiated $ 321.99 of this amount at trial, thus reducing the amount of the overstatement for that year. [131]The corporation overstated allowable travel and entertainment expenses for 1968 and 1971 in the following amounts: 1968
1971
Travel and Entertainment
Expenses Claimed  $ 1,856.93
$ 3,570.99
Allowable Travel and Entertainment
Expenses  348.84
- 0 - Overstatement
$ 1,508.09
$ 3,570.99
*590 i. Utility Expenses
All utility expenses deducted on the corporate returns for 1968 through 1971 were disallowed by respondent. Correspondingly, respondent allowed petitioners modest home office expense deductions for 1968 through 1971 after having treated the expenditures disallowed to the corporation as distributions to petitioners. At trial petitioners did not establish what portion of the utilities were attributable to the corporation's business activities at the 5000 N.W. 31st Street property. The utility expenses reported on the corporation's returns were incorrectly reported, resulting in the following overstatments: 1968
1969
1970
1971
Utility Expenses
Claimed  $ 1,572.83
$ 1,500.60
$ 1,293.01
$ 997.74
Allowable Utility
Expenses  - 0 -
- 0 -
- 0 -
- 0 -
Overstatement
$ 1,572.83
$ 1,500.60
$ 1,293.01
$ 997.74
j. Audit and Legal Expenses
Of the $ 18,337.08 in audit and legal expenses reported by the corporation in 1971, $ 15,180.73 were not ordinary and necessary business expenses. Respondent contended at trial that the $ 15,180.73 constituted legal fees incurred in relation to the criminal action brought *591 against petitioner under section 7201, noting the attorneys involved. Petitioner did not challenge this assertion at trial. [132]
k. Training Program Expenses
The corporation deducted $ 1,557.00 in 1969 for training program expenses for Bill Hagen (petitioners' son) and others. Respondent disallowed $ 107.00 of the total deduction, thereby allowing $ 1,450.00 of the expense taken on the corporate return. After a review of the record, we find that the $ 107.00 balance was business related as well. Petitioners established at trial that expenditures totalling that amount were for the same general purpose as those allowed. They were to pay for books used in a business training program. [133]
1. Miscellaneous Expenses
The corporation made miscellaneous expenditures of $ 59.97 during 1971 which do not qualify as ordinary and necessary business expenses. The expenditures were primarily for flowers. We are unable to determine why the flowers and other items were purchased. [134]
*592 m. Depreciation
The corporation reported depreciation on its corporate returns for 1968 through 1971 in the following amounts: Year
Amount
1968
$ 2,843.44
1969
$ 4,171.64
1970
$ 2,442.97
1971
$ 1,355.55
The corporation's depreciable assets were office furniture and fixtures, and business machines. Many of the assets depreciated by the corporation on its returns were not depreciable assets, such as bar stools and a gazebo. Depreciation claimed and allowable, and the amounts by which it was overstated are: 1968
1969
1970
1971
Depreciation Claimed
$ 2,843.44
$ 4,171.64
$ 2,442.97
$ 1,355.55
Allowable Depreciation
1,805.97
2,630.76
1,707.80
800.00
Overstatement
$ 1,037.47
$ 1,540.88
$ 735.17  $ 555.55  2. Net Operating Loss Deductions
a. 1967
Respondent determined that the net operating loss which the corporation attempted to carry back from the 1969 to the 1967 fiscal year and tentatively allowed was eliminated by his adjustments. We sustain his determination on the basis of our findings relating to the 1969 taxable fiscal year. b. 1968
The corporation determined that it *593 had no taxable income in its 1970 fiscal year -- that it had in fact sustained total tax losses of $ 25,768.29. On the basis of this figure the corporation concluded that it had a 1970 net operating loss of $ 18,179.31. In late 1970 it applied to respondent for a refund with respect to its 1968 fiscal year resulting from a carryback of the 1970 net operating loss. The application for the tentative carryback was incorrectly filed, and respondent advised the corporation of the problems with the application. The corporation never made the suggested corrections. On the basis of the adjustments shown in the notice of deficiency, respondent determined that the corporation's 1970 fiscal year generated no net operating losses. Respondent did, however, conclude after audit adjustments that the corporation operated at a loss in 1971, and carried back the entire amount of the loss, $ 6,016.27, to 1968. Notwithstanding certain modifications made herein with respect to the adjustments per the notice of deficiency, we are able to state that the corporation operated at a loss in 1971. The amount of the loss, to be determined under Rule 155, is a net operating loss. C. Gain on Sale *594 of Assets
All the office furniture and office machines owned by the corporation (and depreciated as described hereinbefore) were sold on or about February 1, 1970 when the corporation closed its doors. [135] By that time the total adjusted basis of the furniture and machines was $ 4,316.57. The items were sold for $ 12,000.00 in that year, and the corporation claimed a $ 1,185.24 loss on the sales. [136] The sale of these assets was placed in a category for property other than capital assets on the 1970 return's "Sales or Exchanges of Property" schedule. The gain on the sale of these assets in 1970 was: Amount Realized (Accepted as Filed)
$ 12,000.00
Less: Adjusted Basis
4,316.57
Taxable as Ordinary Income
$ 7,683.43 Add: Loss per Return
1,185.24
Gain
$ 8,868.67 The gain was not reported on the 1970 return. D. *595 Investment Tax Credit
Respondent disallowed investment credits of $ 498.67 for the 1968 fiscal year and $ 529.90 for the 1969 fiscal year after having determined that the property upon which the credits were based were not qualified investments. The $ 529.90 tentative investment credit of 1969 was not applied because the corporation calculated that it owed no tax in that year. Respondent was unable to determine the nature of the property upon which the investment credits were based, and we are unable to make such a determination from the record. E. Section 6653(a) Additions to Tax
The corporation failed to maintain adequate, complete and correct books and records during each of its fiscal years 1968 through 1970. As a result it did not record nor report substantial amounts of income received from the following sources: stock sales of Hagen Investments, Inc., management fees, gain on the sale of assets, and gain on the sale of FRI stock. Additionally, it expensed on its books and records items which, in the aggregate, were significant in amount and which did not serve any business purpose. The expenditures were for autos, dues and subscriptions, interest, insurance, *596 office supplies, repairs and maintenance, taxes, travel and entertainment, utilities, audit and legal fees and a deduction claimed for HEPRET. V. ULTIMATE FINDINGS OF FACT Our ultimate findings of fact in these consolidated cases are: A. Adjustments to Taxable Income: Ed J. Hagen and Martha Jo Hagen
Taxable Years 1964 through 1966
Type of Adjustment
1964
1965
1966
Gross Receipts
$ 16,666.00 $ 68,739.40  $ (205,729.09)
Interest, Dividends
and Fees  11,513.32 8,019.27 18,118.74 Life Insurance Commissions
1,906.75 192.53 Income from Hagen, Ltd.
4,969.81 64,269.46 13,422.35 Unidentified Income
5,007.88 5,879.85 Income from Schallmo
Foundation, Inc.  945.00 Additional Compensation
2,284.00 Cost of Goods Sold
18,078.76 (41,570.77)
221,378.61 Depreciation
1,557.53 1,609.77 2,008.54 Car Expenses
1,696.72 707.90 284.28 Commission Expenses
(1,443.24)
(4,005.35)
(5,535.54)
Other Business Expenses
4,845.05 3,407.58 14,419.42 Net Operating Loss
6,999.25 Medical Expenses
?     ?     ?     Contributions
45.75 (55.00)
(497.00)
Tax Expenses
?     ?     ?     Interest Expenses
215.55 Capital Loss
1,000.00 *597 Ed J. Hagen and Martha Jo Hagen
Taxable Years 1968 through 1971
Type of Adjustment
1968
1969
1970
1971
Commission Income
$ 461.95    $ (413.32) Unidentified Income
44,403.41 $ 20,578.29 6,678.41 Additional Compensation
1,142.00 1,530.00 1,552.00 Income from
Distributions Hagen Investments, Inc. Interest Income  573.75 Auto Expenses  727.82 6,158.96 530.59 Dues and Subscriptions  234.40 362.45 1,509.45 $ 144.40    House Payments  3,408.00 3,408.00 3,408.00 3,408.00 Insurance Premiums  5,583.47 4,951.74 4,060.75 4,471.00 Office Supplies  3,460.03 537.96 1,175.76 Repairs and  Maintenance   5,984.75 2,681.70 649.15 145.06 Travel and  Entertainment   2,232.57 10,168.80 1,059.22 3,326.67 Utilities  1,572.83 1,820.84 1,217.57 752.94 Training Program  (Bill Hagen)   - 0 -  Miscellaneous Expenses  26.49 33.48 Legal Fees  15,180.73 Capitol Car Care, Inc. Auto Expenses  193.00 902.69 996.97 300.00 Insurance Premiums  619.75 - 0 -  918.45 - 0 -  Taxes  338.05 Dividend Exclusion (200.00)
(200.00)
Interest Income
52.88 807.61 Income from Equity
Acquired - 0 -  Office-at-Home Expenses
(229.72)
(229.72)
(229.72)
(229.72)
Interest Expenses
1,164.40 (2,378.20)
(1,285.74)
(2,269.45)
Medical and Dental
Expenses ?     ?     ?     ?    Capital Loss
537.00 *598 Hagen Investments, Inc.
Taxable Years 1967 through 1971
Type of Adjustment
1968
1969
1970
1971
Gross Profit
$ 184,928.64 $ (4,305.18) $ 54,365.44  Interest Income
(543.75)
Management Fees
750.00 Miscellaneous Income
60,000.00 263,827.65 Profit Sharing Trust
43,275.00 (43,275.00)
Auto and Travel
Expenses 727.82 15,639.75 3,924.56 Dues and Subscription
Expenses 234.40 362.45 1,509.45 $ 144.40   Interest Expenses
3,469.75 2,968.43 2,168.04 2,269.45
Insurance Expenses
2,034.47 856.00
Office Supply
Expenses 537.96 1,175.76 Repairs and
Maintenance Expenses 6,563.01 4,113.33 739.16 145.06
Tax Expenses
700.76 755.14 710.00 714.58
Travel and
Entertainment Expenses  1,508.09 3,570.99
Utility Expenses
1,572.83 1,500.60 1,293.01 997.74
Audit and Legal
Expenses 15,180.73
Training Program
- 0 -  Miscellaneous
Expenses 59.97
Depreciation
1,037.47 1,540.88 735.17 555.55
Net Operating Loss
?     Gain on Sale of
Assets 8,868.64 B. Hagen Investments, Inc. is not *599 entitled to investment tax credits for any of the taxable years under review. C. Petitioners, with intent to evade and defeat tax, substantially underreported taxable income for 1964 through 1966 and did not report their correct income tax liability for those taxable years. D. Petitioners underreported taxable income for 1968 through 1971 and did not report their correct income tax liability for those taxable years. Their failure to correctly report and to pay the correct tax liability was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). E. Hagen Investments, Inc. underreported taxable income for 1968 through 1971 and did not report its correct tax liability for those taxable years. This failure to correctly report and to pay the correct tax liability was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). OPINION I. Ed J. Hagen and Martha Jo Hagen (docket No. 7700-76) Taxable Years 1964 through 1966
At this juncture, it is probably apparent that these cases involve some measure of complexity. That complexity is reflected in the magnitude of the record *600 and is exacerbated by the contentiousness of the parties. Not surprisingly, our task of finding the facts has been laborious and frequently frustrating. We have listened to the testimony of some 70 witnesses, plodded through over 2,300 pages of the trial transcript and scrutinized some 600 exhibits, many embracing innumerable charts and figures. We have done our best to reconcile the conflicting portions of the record. In too many instances, however, we have reluctantly concluded that perfect harmony is not attainable. A. Adjustments to Income
1. Income Established by Bank Deposits Method
Respondent used the bank deposits method to determine that petitioners failed to report the following types of income on their 1964, 1965 and 1966 returns: 1964
Gross Receipts from Hagen Investments [137]
Interest, Dividends and Fees Income from Hagen, Ltd. 1965
Gross Receipts from Hagen Investments Interest, Dividends and Fees Unidentified Income Income from Hagen, Ltd. Income from The Schallmo Foundation, Inc. 1966
Gross Receipts from Hagen Investments Interest, Dividends and Fees Unidentified Income Income from Hagen, Ltd. He used *601 this method to determine income because petitioners failed to keep adequate records relating to both business and personal receipts. Under section 6001 all taxpayers are required to keep sufficient records to enable respondent to determine their correct tax liability. In the absence of adequate books and records, the existence and amount of a taxpayer's income may be proven by any method that clearly reflects income. Sec. 446(b); Harper v. Commissioner, 54 T.C. 1121, 1129 (1970). The bank deposits method has long been an accepted method of reconstructing income received. Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Halle v. Commissioner, 175 F.2d 500 (2d Cir. 1949), affg. 7 T.C. 245 (1946), cert. denied 338 U.S. 949 (1950). *602 Bank deposits are prima facie evidence of the receipt of income. Estate of Hague v. Commissioner, 132 F.2d 775, 777 (2d Cir. 1943), cert. denied 318 U.S. 787 (1943). Petitioners therefore have the burden of showing that respondent's determinations are not correct. Reaves v. Commissioner , 31 T.C. 690 (1958), affd. 295 F.2d 336 (5th Cir. 1961). Use of the bank deposits method is proper even when, as is the case for these 3 years, the taxpayer keeps books and records which support his return as filed. Campbell v. Guetersloh, 287 F.2d 878, 880 (5th Cir. 1961). Petitioners argued at trial that respondent should be compelled to rely on their books and records in determining taxable income, and that, in any event, income of a broker/dealer whose recordkeeping activities are governed by the Securities Exchange Act of 1934 cannot be reconstructed using the bank deposits method. We disagree. Because petitioners' personal records and books of account were incomplete and in dozens of instances misleading, respondent properly treated bank deposits to their accounts as income (subject to offsets for expenses *603 and nontaxable receipts). His reconstruction of income was not carried out capriciously or in haste. After a painstaking compilation of deposits made to some 21 accounts during 1964, 1965 and 1966, respondent eliminated all deposits determined to be gifts, transfers between accounts, loan proceeds, cash from the Bertha Schallmo Trust and other receipts deemed nontaxable. Whatever recordkeeping is required of a broker/dealer under the Federal securities laws was not respondent's immediate concern, and it is not ours. Respondent's reconstruction of income was therefore proper under the circumstances before us. a. Gross Receipts from Hagen Investments
Section 61(a) includes "gross income derived from business" in its general definition of gross income. Sec. 61(a)(2). Gross income from business means total sales, less cost of goods sold, plus any income from investments and from incidental or outside operations or sources. Sec. 1.61-3(a), Income Tax Regs. A determination of the correct amount of Hagen Investment's 1964, 1965 and 1966 gross business receipts *604 (and also its cost of goods sold, addressed infra) is thus a necessary step in finally determining whether Hagen Investment's gross income was accurately reported in those years. Petitioners urge us to accept the gross receipts figures derived from Hagen Investments' books of account and reported on their returns. We found hereinbefore that these books are incomplete and that they contain false and misleading entries. Respondent is not therefore required to rely on them. Furthermore, petitioners' self-serving testimony and oftentimes baffling exhibits, taken together, do not overcome the presumption of correctness that attaches to respondent's 1964, 1965 and 1966 gross receipts determinations. They are presumptively correct. Anson v. Commissioner, 328 F.2d 703, 706 (10th Cir. 1964), affg. a Memorandum Opinion of this Court. [138] We therefore uphold them, subject to concessions previously noted. Welch v. Helvering, 290 U.S. 111 (1933). We also sustain respondent's decision to adjust gross receipts to reflect sales accruing in their respective years. *605 b. Interest, Dividends and Fees
Gross income includes interest, dividends and fees. Sec. 61(a). [139] Dividends are included in gross income under section 61(a)(7) and section 301(c)(1). Petitioners' receipts of interest, dividends and fees during 1964, 1965 and 1966 were well documented by respondent using the bank deposits method and other corroborative evidence. Petitioners did not establish that the amounts of unreported interest, dividends and fees per respondent's notice of deficiency (subject to respondent's concession of $ 78.56 for 1964) were other than income. We therefore sustain his determinations in this category. Rule 142(a). *606 c. Income from Hagen, Ltd.
Hagen, Ltd. was formed in 1964. The net profits and net losses of the partnership were to be shared in the ratio of the partners' capital account balances before adjusting for profits and losses. In the case of negative capital accounts, the Partnership Agreement directed that profits be distributed on the basis of the partners' capital accounts at the end of the last accounting period prior to the reduction of the capital account to zero. We previously found that the capital accounts of petitioner and Mrs. Hagen fell below zero in 1964 due to withdrawals in excess of contributions. [140]
i. 1964
Respondent determined that petitioners realized $ 4,969.81 in partnership income from Hagen, Ltd. in 1964. This amount was 60 percent of the partnership's 1964 net income of $ 8,283.01, determined from respondent's analysis of bank deposits to and disbursals from Liberty 024-079-6. Respondent allocated 60 percent of the net income to petitioners because their combined initial investment of $ 3,000.00 was 60 percent of the total initial cash investment in the partnership. Petitioners contended that *607 all capital accounts had positive balances as of December 31, 1964. They also argued, based on the positive balances, that 4.23 percent of the partnership's 1964 taxable income rather than 60 percent should be allocated to them. In view of our findings relating to Hagen, Ltd.'s capital accounts, and in particular those findings relating to the numerous withdrawals from the accounts, we are unable to accept petitioners' figure of 4.23 percent. Their percentage is based on capital account records improperly maintained. Gross income includes a taxpayer's distributive share of partnership gross income. Sec. 61(a)(13). A partner's share of income, gain, loss, deduction or credit is determined by the partnership agreement. Sec. 702(a)(9). [141] If the partnership agreement fails to provide as to the partner's distributive share of any such item, it is determined in accordance with the partner's distributive share of the taxable income or loss of the partnership. Sec. 704(b)(1); [142]sec. 702(a)(9). *608 The Limited Partnership Agreement ("the Agreement") did not provide for the allocation of net profits in the case of negative capital accounts in the first partnership year. Even so, it is clear from the terms of the Agreement that partners with negative capital accounts were to be allocated a portion of any net profits. [143] We do not believe that respondent's allocation of 60 percent of the partnership's 1964 taxable income to petitioners as their distributive share was arbitrary. We reach this conclusion even though petitioners' total cash contributions to the partnership in 1964 were not made at the ratio of three to two relative to Mrs. Schallmo's 1964 contributions, and even though the Agreement did not require contributions in this ratio or require the partners to restore deficits in their capital accounts at any time. *609 Hagen, Ltd.'s records are incomplete and confusing. Its computation of the partners' capital accounts as of December 31, 1964 is wrong. On the basis of the record, we are unable to determine precisely why the partnership was formed, the nature of its day-to-day operations, or the reason for petitioners' numerous cash withdrawals. The burden of proof as to the allocation of partnership income lies with petitioners -- properly so since they are in a much better position than respondent to compute distributive shares of income, gain, loss, deduction, or credit. They have produced no credible evidence to persuade us that their distributive share of taxable income in 1964 was only 4.23 percent of the partnership's taxable income. We therefore uphold respondent's determination, subject to his 1964 concession. Welch v. Helvering, supra.Rule 142(a). ii. 1965
Respondent allocated all the partnership's 1965 taxable income, $ 416.63, to Mrs. Schallmo. When Hagen, Ltd. was dissolved, petitioners' combined capital account balance was $ (64,269.46). [144] None of that *610 amount was ever repaid. Respondent treated the $ (64,269.46) as income in 1965. In his brief, respondent did not state the statutory basis for his determination or characterize the income, but we assume he regarded the $ (64,269.46) as ordinary income. We previously found that petitioners withdrew cash in excess of their contributions as early as 1964. [145] We calculated petitioners' distributive share of the partnership's 1964 taxable income on the basis of that finding. This reduction of petitioners' capital accounts reduced the adjusted basis of their interest in the partnership to zero. [146] Respondent did not treat the 1964 withdrawals in excess of contributions as gain under section 731(a). [147]
*611 Respondent did not characterize the capital account deficit at dissolution in 1965 as gain from the sale or exchange of petitioners' partnership interests under section 731. We are therefore led to assume he did not regard the excess cash withdrawals as "distribution(s) by a partnership to a partner" exceeding petitioners' combined adjusted basis. Sec. 731(a). By the same token, we are unable to determine whether respondent regarded the 1965 capital account deficit as ordinary income from the discharge of indebtedness under section 61(a)(12). In any event, that provision would not have applied. There was no discharged loan. A loan by a partnership to a partner is considered to have been made when the partner is under an unconditional and legally enforceable obligation to repay. Mangham v. Commissioner, T.C. Memo. 1980-280. [148] Petitioners were not under such an obligation. Although we are concerned about the statutory basis for respondent's *612 determination, we sustain his conclusion that petitioners realized income in 1965 as a result of the excess withdrawals. Petitioners have not carried their burden of proof with respect to respondent's determination. In our opinion, the partnership form in docket No. 7700-76 was little more than a vehicle for the transfer of money from Mrs. Schallmo to petitioners. [149] Therefore, we hold that they received income of $ 64,269.46 in 1965 as a result of their excess withdrawals from Hagen, Ltd., and that the income was ordinary. Respondent allocated all the 1965 partnership income, $ 416.63, to Mrs. Schallmo. That is, he allocated no distributive share of partnership income to petitioners in that year. Since this determination *613 was obviously to petitioners' benefit, we do not address it further. iii. 1966
Petitioners received income of $ 13,422.35 from Hagen Holding Corporation in 1966 when petitioner wrote a check to himself in that amount relating to the December 24, 1964 Hagen Holding Corporation note. This payment was income under section 61(a). Although the note was obtained by petitioner from Mrs. Schallmo, it was not obtained by gift. That is, we are unaware that Mrs. Schallmo's assignment of the note to petitioner proceeded from detached and disinterested generosity. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). [150] Therefore, we sustain respondent's determination on this adjustment. d. Unidentified Income
Petitioners received income in 1965 and 1966 from sources unable to be identified and income that could not be categorized as to type. Most of the items were bank deposits of currency. Petitioner contended that the unidentified income *614 was from the Bertha Schallmo Trust, and nontaxable. However, respondent's calculations of unidentified 1965 and 1966 income specifically excluded receipts of this type. [151] Thus, petitioners' efforts to establish that the unidentified receipts were non-income items were unavailing. Gross income means all income from whatever source derived. Sec. 61(a). When respondent utilizes the bank deposit method to reconstruct income, evidence of the mere making of a bank deposit does not establish that the sum deposited was or was not income. Goe v. Commissioner, 198 F.2d 851, 852 (3d Cir. 1952), affg. a Memorandum Opinion of this Court; Reaves v. Commissioner, 31 T.C. at 717-718. However, once respondent has made his determination, the taxpayer has the burden of proving that the deposits were not the result of the receipt of taxable income. Estate of Mason v. Commissioner, 64 T.C. at 657; *615 Rule 142(a). It is not necessary that respondent prove the source of the unidentified income. A failure to show the source proves nothing more than that it was well hidden. Thomas v. Commissioner, 223 F.2d 83, 86 (6th Cir. 1955), revg. on other grounds a Memorandum Opinion of this Court. We sustain respondent's determinations relating to unidentified income received in 1965 and 1966. e. Income from The Schallmo Foundation, Inc.
We also sustain respondent's determination that petitioners received income in 1965 from The Schallmo Foundation, Inc. relating to a payment to Mrs. Hagen for the purchase of a piano. Sec. 61(a). Although Mrs. Hagen testified that the piano had been a gift to her, no basis in the piano was established. We therefore uphold respondent's determination that the $ 945.00 payment was taxable income in 1965. Rule 142(a). 2. Other Income
a. Life Insurance Commissions
The parties stipulated that petitioners understated life insurance commission income from Occidental Life and Standard Life in 1965 by $ 1,906.75. For 1966, the amount of Occidental Life commissions, $ 4,949.40, was stated in a letter from Bernard R. *616 Bent, a manager of Occidental Life, to Wesley E. Hendren of the Internal Revenue Service and one of respondent's key witnesses. The amount of Standard Life commissions received in 1966, $ 3,557.45, was established from a Form 1099, U.S. Information Return for Calendar Year 1966, sent to petitioners by Standard Life. Petitioner was unable to prove that the 1966 figures were incorrect. The understatement for 1966 was $ 192.53. Commissions from the sale of life insurance are income under section 61(a)(1). [152] See also sec. 1.61-2(a)(1), Income Tax Regs. We sustain respondent's determinations in this category. b. Additional Compensation from Acker Industries, Inc.
Premium payments made by Acker in 1966 on Standard Life policy OL-92440 were compensation to petitioner for services rendered. Petitioner was the insured party under the policy and Mrs. Hagen was the primary beneficiary. Petitioner was chairman of the board and president of Acker throughout 1966. *617 Life insurance premiums paid by an employer on the life of an employee, where the policy proceeds are payable to the beneficiary of the employee, are part of the employee's gross income. Sec. 61(a)(1); sec. 1.61-2(d)(2), Income Tax Regs. Taxation of premium payments is based on the economic benefits doctrine, broadly stated in section 1.61-1(a), Income Tax Regs.[153]
Petitioner contended that the income attributable to the 1966 premium payments should be ratably reduced to reflect the fact that Acker, the policy owner, had access to its accumulated cash value. He argued that "The *618 total premium has never been broken down yet into which went for investment or which went for insurance." In support of his argument, petitioner offered into evidence a chart showing the cost of decreasing term insurance for a male of his age. Admittedly, one type of "split-dollar" life insurance is the "employer pay-all" plan wherein the premium, which is prorated for tax purposes, is paid entirely by the employer. [154] However, the Standard Life policy was not by its terms a "split-dollar" plan. The primary beneficiary of the policy was Mrs. Hagen alone. The proceeds were not under the terms of the policy to be split or shared. Furthermore, the specific source of petitioner's chart, which is no more than a page photocopied from an unnamed treatise or manual, is not known. The exhibit is clearly hearsay and proves nothing. We therefore uphold respondent's determination that petitioners received $ 2,284.00 in additional compensation in 1966, the result of Acker's payment of the subject premium. Rule 142(a). *619 B. Expense Adjustments
1. Adjustments Established by Bank Disbursals
Respondent adjusted expenses reported on petitioners' 1964, 1965 and 1966 returns. Adjustments made to numerous types of expenses were again based on respondent's analysis of bank accounts. Based on the payees involved, respondent identified checks written for salaries and wages, stock and mutual fund purchases, operating expenses and other deductible expenses, and also personal expenses, then gave petitioners credit for the allowable items. [155]Gleckman v. United States, 80 F.2d 394 (8th Cir. 1935). He then disallowed expenses for lack of substantiation to the extent that petitioners had overstated them. From his analysis of bank disbursals, respondent made adjustments relating to the following types of expense: 1964
Cost of Goods Sold Commission Expenses Other Business Expenses Medical and Dental Expenses Contributions 1965
Cost of Goods Sold Commission Expenses Other Business Expenses Medical and Dental Expenses Contributions Interest Expenses 1966
Cost of Goods Sold Commission Expenses Other Business Expenses Medical and Dental *620 Expenses Contributions The taxpayer has a greater burden with regard to deductions. Because they are a matter of legislative grace, the taxpayer must establish not only error or arbitrary action in the disallowed deduction, but must also sufficiently persuade the finder of fact as to the amount of deduction allowable on each claimed item. Ruidoso Racing Assn., Inc. v. Commissioner, 476 F.2d 502, 508 (10th Cir. 1973), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court. a. Cost of Goods Sold
We made the following findings with respect to cost of goods sold for 1964, 1965 and 1966: 1964
$ 18,078.76 Overstatement 1965
$ 41,570.77 Understatement 1966
$ 221,367.61 Overstatement
Respondent's overall system for reconstructing cost of goods sold was to (a) adopt Hagen Investments' closing inventory figures for the 1963, 1964 and 1965 business years *621 as the opening inventory figures for 1964, 1965 and 1966, respectively; (b) add to opening inventory the cost of inventory purchases in 1964, 1965 and 1966, derived from respondent's check classifications, to arrive at goods available for sale; and (c) subtract from goods available for sale Hagen Investments' own closing inventory figures for 1964, 1965 and 1966. He also converted the closing inventory of the trading account in 1965 and 1966 from the lower of cost or market to cost, and he modified the cost of 1964, 1965 and 1966 inventory purchases consistent with the accrual method. [156]
Cost of goods sold must be ascertained in order to determine gross income from a merchandising business. Sec. 1.61-3(a), Income Tax Regs.; sec. 61(a)(2). We consider Hagen Investments a merchandising business. If the purchase or sale of merchandise is an income-producing factor, inventories at the beginning and end of each taxable year are necessary to ascertain cost of goods sold. This is required in order to correctly reflect income. *622 Sec. 1.471-1, Income Tax Regs. A taxpayer who uses inventories determines the cost of goods sold by adding to the opening inventory the amount of purchases during the year, and deducting from the result the closing inventory. A securities dealer who inventories unsold securities on hand at cost, market, or the lower of cost or market may make his return on the basis of how those accounts are kept. [157]Sec. 1.471-5, Income Tax Regs. All stocks and securities in an inventory must be valued by the same method, and that method must be adhered to in subsequent years unless permission to change is obtained from the Commissioner of Internal Revenue. Secs. 1.446-1(c)(2)(ii) and 1.471-5, Income Tax Regs. To insure the proper matching of the deduction for purchases with income from sales, the accrual method of accounting is used when inventories are required. Sec. 1.446-1(c)(2)(i), Income Tax Regs.
*623 We do not have a clear picture of how petitioners calculated cost of goods sold in 1964, 1965 and 1966. Certified public accountants generated audit reports showing closing inventories of Hagen Investments for 1963 through 1966. Since petitioner caused the reports to be prepared, it is realistic to conclude that the closing inventory amounts were utilized to calculate cost of goods sold per the returns. [158] Therefore, although respondent's method of calculating cost of goods sold depends partly on bank records of disbursals because of petitioners' inadequate books, and partly on inventory figures which petitioners caused to have calculated from these very books, we do not believe that respondent's method is inconsistent or arbitrary. Petitioners have not convinced us otherwise, so we accept it. Rule 142(a); Hill v. Commissioner, T.C. Memo. 1983-308. This method is also applicable to 1965, the year petitioners understated cost of goods sold. We also sustain respondent's conversion of the 1965 and 1966 closing inventories to cost, and his modification *624 of purchases consistent with the accrual method. In order to clearly reflect income, the taxpayer's accounting practices must be consistent from year to year. Sec. 1.446-1(c)(2)(i) and (ii), Income Tax Regs.
Petitioners attempted to substantiate additional stock costs with an exhibit entitled "Additional Cost of Sales Not Available Nor Visible from Check and Deposit Spread." The exhibit is difficult to follow. It is a self-serving document, handwritten, and prepared for use at trial. The transactions it records have not been substantiated. Furthermore, it appears to represent the cost of shares received only in stock-for-stock trades; since income from those trades would not have been recorded in the check classifications, the stock costs should be omitted. [159] Neither the exhibit nor petitioner's testimony is sufficient to rebut respondent's figures, modified by his concessions and further modified as described in Appendices B through D. Rule 142(a). b. Commission Expenses
We previously found that petitioners understated commission *625 expenses for 1964, 1965 and 1966. Our findings were based on respondent's check classifications. On the basis of testimony relating to docket No. 8342-76, we presume that the commissions were paid to retailers and traders, and that the amount paid per transaction was a percentage of the total commission earned by Hagen Investments. Commissions are deductible under section 162(a). See also sec. 1.162-1(a), Income Tax Regs. We sustain respondent's determination. Rule 142(a). c. Other Business Expenses
Expenses thus described are those of Hagen Investments other than cost of goods sold, depreciation expenses, automobile expenses and commission expenses. We found that petitioners overstated these expenses for 1964 through 1966, based on respondent's check classifications. Deductible expenses were for travel and entertainment, telephone and postage, dues and subscriptions and other expenses necessary for the day-to-day operation of Hagen Investments. Three *626 conditions must be satisfied before a deduction will be allowed for a claimed business expense under section 162(a). It must be (1) incurred in carrying on a "trade or business," (2) "ordinary and necessary," and (3) "paid or incurred during the taxable year." A business purpose is implicitly required by section 162(a). Whether an expenditure qualifies as an ordinary and necessary expense incurred in a trade or business is an issue of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). Petitioner's evidence on these adjustments consisted of lists of purported business expenditures. Some of them had previously been allowed by respondent. The balance was not substantiated. In accepting respondent's determinations, we conclude that the allowed expenditures were ordinary and necessary and incurred for the benefit of Hagen Investments. d. Medical Expenses
For 1964 through 1966, medical expense deductions are calculated by reference to a taxpayer's adjusted gross income. Medical expenses are deductible to the extent they exceed 3 percent of adjusted gross *627 income. Medicine and drug expenses are "medical expenses" to the extent that they exceed 1 percent of adjusted gross income. Sec. 213(a) and (b). Respondent determined medical expenses from the returns and also from checks. Petitioners presented no persuasive evidence to establish that these figures are incorrect, and we adopted the determinations in our findings. Rule 142(a). The expenses will be allowed, or not allowed, based upon adjusted gross income finally determined for 1964 through 1966. e. Contributions
Petitioners overstated contributions in 1964 and understated them in 1965 and 1966, based on checks paid to charitable organizations. Section 170(a) allows as a deduction any charitable contribution payment made in a taxable year, subject to limitations set forth in section 170(b). Petitioners did not sustain their burden of proof with respect to the disallowed deductions -- virtually no testimony was offered on the adjustments -- so we uphold respondent's determinations. Rule 142(a). Again, the deductions will be allowed, or disallowed, depending upon adjusted *628 gross income ultimately determined. f. Interest Expenses
Petitioners paid non-business interest in 1965 of $ 2,541.32, based on the check classifications. They claimed an itemized deduction of $ 2,756.87 for interest paid. Their deduction was overstated by $ 215.55. Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtednesses. Petitioners did not carry their burden of proof with respect to the determination of respondent, so it is upheld. Rule 142(a). 2. Other Expense Adjustments
a. Depreciation
Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business. The issues of whether property is depreciable and its useful life are inherently issues of fact, and the burden rests with petitioners to prove that respondent's determinations are incorrect. Petitioners did not describe the assets they depreciated on their returns. After a review *629 of petitioners' books, respondent determined the depreciable assets, the cost of the assets, the date they were acquired, their useful lives, and the allowable depreciation. Petitioners have not sustained their burden of proof with respect to the depreciation adjustments. Their testimony at trial has not enlightened us, as it amounted to little more than a denial of respondent's figures. We therefore uphold respondent's determinations. Rule 142(a). b. Automobile Expenses
Under section 162(a) an employee or self-employed individual may deduct the cost of operating an automobile to the extent it is used in a trade or business. For the years 1964 through 1966 the taxpayer may use a simplified method to calculate the deduction. It can be computed using a standard mileage rate of (a) $ .10 per mile for the first 15,000 miles of business use each year, and (b) $ .07 for each mile in excess of 15,000 miles. A deduction under this method is in lieu of all operating and fixed costs allocable to business purposes, including fuel and depreciation. Rev. Proc. 66-10, 1966-1 C.B. 622. *630 Secs. 1.162-17(d) and 1.274-5, Income Tax Regs.
Respondent adopted the number of business miles driven, recorded each month in Hagen Investments' general journals, to calculate the automobile expenses. Petitioners used an incorrect formula to calculate the deductions they took on their returns. As a consequence the deductions were overstated. We sustain respondent's adjustments for auto expenses. c. Net Operating Loss
Petitioners claimed a $ 6,999.25 net operating loss deduction on their 1964 return. They had sustained a net operating loss of $ 6,999.25 in 1963, according to their 1963 return, and we stated this fact in our findings. They sustained no net operating losses in 1961 and 1962. Section 172(b)(1)(A), in effect for 1964, provides that a net operating loss for any taxable year shall be a net operating loss carryback to each of the three taxable years preceding the taxable year of the loss. The entire amount of the net operating loss for any taxable year is carried to the earliest taxable year to which it can be carried. Sec. 172(b)(2). A "net operating loss" *631 is the excess of the deductions allowed by Chapter 1 of subtitle A of the Internal Revenue Code (relating to income taxes) over gross income, subject to modifications set forth in section 172(d). Sec. 172(c). We are not called upon to calculate a net operating loss in this case. We are simply called upon to determine whether any net operating loss is available to be carried to 1964. As previously found, petitioners had adjusted gross income in excess of $ 10,000.00 in 1960. If carried back to 1960, the $ 6,999.25 net operating loss is totally absorbed. No evidence was presented to the effect that other operating losses were generated which might be carried to 1964. Petitioners did not sustain their burden of proof with respect to this adjustment, so we uphold it. Rule 142(a). d. Tax Expenses
We previously found the amount of taxes paid per respondent's check classifications, but left undetermined the amount of allowable general sales tax expenses pending the recalculation of adjusted gross income. Section 164, relating to the itemized deduction for taxes, states as follows: *632 SEC. 164. TAXES. (a) General Rule. -- Except as otherwise provided in this section, the following taxes shall be allowed as a deduction for the taxable year within which paid or accrued: (1) State and local, and foreign, real property taxes. (2) State and local personal property taxes. (3) State and local, and foreign, income, war profits, and excess profits taxes. (4) State and local general sales taxes. (5) State and local taxes on the sale of gasoline, diesel fuel, and other motor fuels. The Commissioner of Internal Revenue has issued optional guideline tables showing the average sales tax paid annually by states which impose general sales taxes, using adjusted gross income and nontaxable receipts. Petitioners' allowable expenses for general sales taxes paid, and thus the amount of petitioners' allowable tax expense, will turn on adjusted gross income as finally determined. The itemized deduction for taxes will be understated for each of the 3 years under review, given our earlier findings. C. Capital Loss Carryover
As previously found, petitioners reported a capital loss carryover of $ 1,099.08 in 1964, and used $ 1,000.00 of that amount to offset 1964 *633 income. [160] Respondent disallowed the loss for lack of substantiation. Petitioners were unable to substantiate the capital losses from which their capital loss carryover to 1964 purportedly arose. They presented no evidence relating to relevant sales or exchanges. Therefore, we again uphold respondent's determination. Rule 142(a). D. Section 6653(b) Additions to Tax
We now turn our consideration to whether the additions to tax under section 6653(b), relating to fraud, should be sustained. That section provides in pertinent part: If any part of any underpayment (as defined in subsection (c)) *634 of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * [161]
Fraud means actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Zell v. Commissioner, 763 F.2d 1139, 1142-1143 (10th Cir. 1985), affg. a Memorandum Opinion of this Court; Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. "An allegation of fraud *635 is a serious matter; it is never presumed and must be proved by clear and convincing evidence." United States v. Thompson, 279 F.2d 165, 167 (10th Cir. 1960); Beaver v. Commissioner, 55 T.C. 85, 92 (1970). We are not limited to respondent's affirmative evidence on this issue. Imburgia v. Commissioner, 22 T.C. 1002, 1014 (1954). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Proof of fraud may depend to some extent upon circumstantial evidence, and may rest upon reasonable inferences properly drawn from the evidence of record. Hooper v. United States, 216 F.2d 684, 688 (10th Cir. 1954); Stone v. Commissioner, 56 T.C. 213, 224 (1971). An intent to conceal or mislead may be inferred from the pattern of conduct. Spies v. United States, 317 U.S. 492, 499 (1943). The mere failure to *636 report income is not sufficient to establish fraud, Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court, and it may not be found under circumstances which at most create only suspicion. Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950), affg. a Memorandum Opinion of this Court. However, a pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137 (1954). Respondent has the burden to prove fraud for each year by clear and convincing evidence. Rule 142(b) and sec. 7454(a). It is not necessary that he prove the precise amount of the underpayment resulting from fraud but only that any part is attributable to fraud. Ruidoso Racing Assn., Inc. v. Commissioner, 476 F.2d at 505; Estate of Beck v. Commissioner, 56 T.C. 297, 362 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). *637 Hence, it is incumbent upon respondent to establish that (1) there has been an underpayment of tax, and (2) the underpayment was due to fraud by the taxpayer. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. Parts II.A. and B. of our findings, supra, make it clear that petitioners underreported income during these 3 years. Because the net increase to taxable income for 1964, 1965 and 1966 is substantial, we conclude that there was an underpayment of tax. With respect to his allegations of fraud, respondent asserts that petitioner is estopped to deny the existence of fraud in 1964 and 1965 because of petitioner's criminal conviction under section 7201. We agree. Petitioner was adjudged guilty of filing fraudulent Federal income tax returns, "as charged in Counts 1 and 2 of the Indictment." In other words, he was adjudged guilty of willfully and knowingly attempting to evade and defeat a large part of his and Mrs. Hagen's Federal income tax due by filing false and fraudulent joint income tax returns for 1964 and 1965. On those returns their joint taxable income and the tax due was fraudulently underreported. *638 It has long been held that a criminal conviction based upon an indictment charging a willful attempt to evade or defeat tax necessarily carries with it the ultimate factual determination that the underpayment was due to fraud. Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Hence, petitioner is estopped to deny the existence of fraud for the years 1964 and 1965. The collateral estoppel plea notwithstanding, and after a exhaustive consideration of the record, we hold that respondent has independently sustained his burden of proving fraud by clear and convincing evidence with respect to each petitioner for 1964 through 1966. See and compare Otsuki v. Commissioner, 53 T.C. at 113. Indeed, it is difficult to visualize a record more replete with badges of fraud and conduct likely to mislead and conceal than this one. Petitioners were shareholders and/or officers in the various entities involved herein -- Hagen Investments, Inc., Hagen Holding Corporation, Hagen, Ltd., Capitol Car Care, Inc. and The Schallmo *639 Foundation, Inc. They were vitally interested in the operations of each entity and they well knew the income they were receiving from them. They received substantial amounts of income from these and other sources which were not entered in their books and records and which never found their way onto the tax returns. Petitioner's misconduct relating to the underreporting of Hagen Holding Corporation and Hagen, Ltd. income was, in our opinion, particularly egregious. We specifically found hereinabove that petitioners received taxable income from some 18 transactions which they failed to report in 1964, 1965 and 1966 in the respective amounts of $ 4,414.31, $ 33,739.71 and $ 16,203.16. [162]A consistent pattern of underreporting large amounts of income is an indication of fraud. Holland v. United States, 348 U.S. at 139. See Merritt v. Commissioner, 301 F.2d at 487; and Shahadi v. Commissioner, 266 F.2d 495, 501 (3d Cir. 1959), affg. 29 T.C. 1157 (1958). Petitioners' fraudulent conduct was no less improper in 1966 than *640 in the two earlier years. *641 Petitioners maintained some 21 checking or savings accounts during these years. Only the income deposited into two or three of those accounts was utilized in the preparation of their returns, which were prepared by petitioner. Much business income went into personal accounts and was not entered in Hagen Investments' books and records. That income went unaccounted for. Moreover, many false entries were made in the books and records that were maintained, as shown in Part II.D.4. of our findings, supra. We note in particular the bookkeeping irregularities associated with the ownership and transfer of Hagen Holding Corporation stock, which petitioner acknowledged at trial. A failure to maintain adequate books and records is likewise a badge of fraud. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Lollis v. Commissioner, 595 F.2d 1189, 1192 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. Petitioners' records, both personal and business, were a bookkeeping disaster. Petitioners *642 consistently overstated expenses during these 3 years. It is well settled that a fraudulent understatement of income can be accomplished by means of an overstatement of deductions. Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). In determining the presence of fraud we must consider the native equipment and the training and experience of the party charged. Iley v. Commissioner, 19 T.C. 631, 635 (1952); Plunkett v. Commissioner, 465 F.2d at 303. This includes a party's educational background. Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Panzitta v. Commissioner, T.C. Memo. 1986-279. The evidence shows that petitioner was well educated. He obtained two degrees (Master of Economics and Master of Business Administration) and *643 he was mature, sophisticated and shrewd in business matters. We think he knew exactly what he was doing in 1964, 1965 and 1966 and what he attempted to accomplish, which was the evasion of tax on substantial income in these years. See Nell v. Commissioner, T.C. Memo. 1986-246. It is not our purpose to single out each and every instance of fraudulent conduct attributable to petitioners in these years; to do so would unduly lengthen this opinion. [163] Thus, we have confined our discussion to several principal areas that have been of critical importance to all Courts for many years. So, in conclusion, we add the following language enunciated by the Supreme Court of the United States some 46 years ago, which we think characterizes petitioners' every fraudulent act during these years: By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets *644 or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * [Spies v. United States, 317 U.S. at 499.] In sum, we hold that petitioners received substantial amounts of taxable income in each of the years 1964 through 1966 which were not reported on their joint returns and that there was an underpayment of tax which was due to fraud. Accordingly, we sustain respondent's section 6653(b) determinations against petitioners. II. Ed J. Hagen and Martha Jo Hagen (docket No. 7700-76) Taxable Years 1968 through 1971
A. Adjustments to Income
Respondent used third party records and indirect methods to make adjustments to income for the taxable years *645 1968 through 1971. He did so because petitioners did not cooperate in turning personal and bank records over to respondent in the audit process. The records respondent later obtained were not complete. Petitioners offered numerous documents into evidence at trial which respondent had not previously seen. We admonished petitioners for this obvious lack of cooperation in the discovery process but have exercised our discretion in admitting many of them at trial, affording each whatever weight it deserves. We treat each type of income adjustment in the paragraphs that follow. Previous parts of this opinion are cited if legal issues involved in the adjustments have been discussed hereinbefore. 1. Life Insurance Commissions
We previously found that petitioners understated life insurance commission income in 1968 and overstated it in 1970. Commissions from the sale of life insurance are income under section 61(a)(1). See also sec. 1.61-2(a)(1), Income Tax Regs. Petitioner's testimony has not persuaded us that respondent's 1968 adjustment is incorrect, and respondent's evidence on the adjustment is persuasive. We sustain the determination. Rule *646 142(a). 2. Unidentified Income
Amounts deposited to petitioners' bank accounts during 1968, 1969 and 1970 from "unidentified sources" are substantial, and we have painstakingly reviewed the exhibits and testimony relating to respondent's corresponding adjustments. Petitioner attempted to substantiate the sources of the deposits with cancelled checks made payable either to him, to cash, or to the account to which a particular deposit was made. The payors on the checks were Hagen Investments, Inc., Mrs. Schallmo (not the Bertha Schallmo Trust) and Mrs. Hagen. [164] Sometimes the checks were written just before or on the same date as the date of deposit. More often the spread was much longer. The check amounts and the deposit amounts do not always correlate. For these reasons, we are unable to trace deposits to checks in many instances. Moreover, and more importantly, we do not regard Mrs. Schallmo or Hagen Investments, Inc. as nontaxable sources of income. Nor do we consider Mrs. Hagen a nontaxable source; the record does not enable us to ascertain where she obtained the money purportedly transferred by check to the "unidentified income" *647 accounts. From this we conclude that petitioners have not carried their burden of proof. Gross income means all income from whatever source derived. Sec. 61(a). See also that part of our opinion relating to unidentified income received in the taxable years 1964 through 1966, which is Part I.A.1.d, supra. The law cited therein is incorporated by reference into this Part II.A.2. We sustain respondent's adjustments relating to unidentified income. Rule 142(a). 3. Additional Compensation from Acker Industries, Inc.
Acker continued to pay premiums on Standard Life policy No. OL-92440 in 1968, 1969 and 1970 as it had in 1966. We treated Acker's 1966 premium payments as additional compensation to petitioners in Part I.A.2.b. of this opinion, supra, and we do so with respect to premium payments made in 1968 through 1970. Incorporated herein by reference is our legal analysis as set forth in Part I.A.2.b., supra. 4. Distributions from Hagen Investments, Inc. and Capitol Car Care, Inc.
We must decide whether the expenditures made by Hagen Investments, Inc. and Capitol Car Care, Inc. for the benefit of petitioners in the taxable years 1968 through 1971 *648 were constructive dividends. Section 301(c)(1) provides that a distribution of property by a corporation to a shareholder with respect to its stock shall be included, to the extent it is a dividend, in the gross income of the shareholder. Under section 316(a) a "dividend" is any distribution of property made by a corporation to a shareholder out of current or accumulated earnings and profits. No formal dividend declaration need be made for a distribution to be taxable as a constructive dividend, Yelencsics v. Commissioner, 74 T.C. 1513, 1529 (1980), and the distribution need not be to the shareholder but only be for the shareholder's benefit. Cirelli v. Commissioner , 82 T.C. 335, 351 (1984). That portion of a distribution which is not a dividend because it exceeds the amount of the corporation's earnings and profits is applied against and reduces the adjusted basis of the shareholder's stock. Any amount in excess of basis is treated as a sale or exchange of property. Sec. 301(c)(2) and (3). In the case of a noncorporate distributee, the amount of *649 a distribution is the fair market value of the property received. Sec. 301(b)(1)(A). The nonstatutory test for constructive dividends is two-fold: (1) the expense must be nondeductible to the corporation, and (2) it must primarily be for the economic gain or benefit of the stockholder. Meridian Wood Products Co. Inc. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984). See also Ashby v. Commissioner, 50 T.C. 409, 417-418 (1968). Based on books and records that petitioners had made selectively available, respondent disallowed corporate expenditures of Hagen Investments, Inc. and determined that constructive dividends had been received. At trial and during our subsequent review of the record we examined innumerable invoices and checks offered to substantiate an entire range of purported business expenditures. Mrs. Hagen's trial testimony relating to these expenditures was very difficult to follow, and petitioners inundated the Court with invoices in an extremely disorderly manner. Even so, we believe that some corporate expenditures (more fully *650 discussed in Appendices E, F, G and H and in Part III.B.1. of this opinion, infra, regarding the disallowed corporate expenditures) fall within section 162(a). We have reduced the amount of corporate distributions to petitioners accordingly. To the extent that petitioners have not carried their burden of proof with respect to the business nature of the expenditures, and because they primarily benefitted petitioners, they are distributions under section 301. Because petitioners presented no evidence relating to current and accumulated earnings and profits of the corporation for the years at issue, we are unable to conclude that the distributions were other than constructive dividends. Sec. 301(c)(1); Ashby v. Commissioner, 50 T.C. at 418. We therefore hold that they received constructive dividends in the amounts shown on Appendices E, F, G and H. Secs. 301(c)(1) and 316(a); Rule 142(a). 5. Interest Income
As previously stated, petitioners received interest income from bank accounts in 1969 and 1970. The interest income was not reported on any returns. Section 61(a)(4) includes interest income in gross income. Petitioners have not convinced us that *651 the unreported interest was income to anyone other than them. [165] We therefore sustain respondent's determinations. Rule 142(a). 6. Income Relating to Alliance Corporation. We devoted many paragraphs in our findings of fact to this adjustment for three reasons: (1) testimony relating to it was lengthy, confusing and sometimes conflicting; (2) the numerous exhibits involved were highly detailed; and (3) the adjustment is substantial. It concerns a series of transactions that required a tedious and careful unraveling. The composite of transactions reflects profoundly on petitioner's ability to both manage and mismanage business affairs and, we believe, to deceive. Nonetheless, it is our task here to decide whether the August 1969 stock split and recapitalization constituted a taxable event and, if so, what tax flowed therefrom. In his explanation of adjustments attached to petitioners' statutory notice of deficiency for 1969, respondent determined that petitioners realized $ 94,500.00 *652 income which is includible in gross income under Section 61 of the Internal Revenue Code of 1954 by the improper acquisition of a substantial portion of the equity in the Alliance Corporation from the nonvoting stockholders by means of a stock split as follows: $ 899,494.17 / 770,000 shares = $ 1.17 value per share before split (value of stockholders equity) $ 899,494.17 / 1,000,000 = .90 value per share after split 300,000 X .90 = $ 270,000 - value of Hagen's stock after split
150,000 X 1.17 =
175,500 - value of Hagen's stock before split  $ 94,500 - value of equity acquired by Hagen On direct examination at trial, Mr. Moates, the revenue agent who made these adjustments, corrected respondent's counsel in the latter's characterization of the stock split as a disproportionate stock dividend not within the purview of the general rule that a stock dividend is not taxable. "[I]t wasn't actually a stock dividend. It's a stock split. And [the adjustment to income is] based upon the realization by Mr. Hagen of the benefit of actual transfer -- economic benefit from the nonvoting shares to the voting shares that he received." *653 On brief, respondent argued that petitioners realized a $ 94,500 economic benefit as a result of the August 1969 Class B stock split. According to respondent, the proper test for the inclusion in income of stock dividends is whether a shareholder's proportionate interest was altered by the dividend. Respondent concludes that because petitioners' proportionate interest in Alliance materially increased "after the stock distribution generated by the August 1969 stock split," petitioners' taxable income should be increased to the extent of the fair market value of the shares received. Respondent cites as support Helvering v. Sprouse, 122 F.2d 973 (9th Cir. 1941), affd. 318 U.S. 604 (1943), and Wiegand v. Commissioner, 14 T.C. 136 (1950), revd. on other grounds 194 F.2d 479 (3d Cir. 1952). On the other hand, petitioners' main thrust, both at trial and on brief, is that the transactions involved a stock split and reorganization from which no tax consequences flowed. On this record we agree with petitioners. Although the record shows that petitioners' equity in Alliance was increased as a result of the August 1969 split *654 and recapitalization, respondent has failed to persuade us that such increase is taxable to petitioners. In asserting his theory of taxation under section 61, Sprouse and Wiegand, respondent appears to ignore the fact that Congress spoke in the area of stock distributions in 1954 when it enacted section 305. Section 305 provides the general rule that gross income does not include the amount of distributions of the stock of a corporation made by such corporation to its shareholders with respect to its stock. A disproportionate distribution of stock is an exception to this general rule if it has the result of the receipt of property by some shareholders, and an increase in the proportionate interests in the corporation of other shareholders. Sec. 305(b)(2). Thus, the Code requires something more than a disproportionate increase in petitioners' interest before a stock dividend is treated as taxable. This something more is not present in our record because Class A shareholders did not receive property in the August 1969 split. We conclude that if the split were to be characterized *655 as a stock dividend, it would not be taxable under the disproportionate distribution exception to section 305. A stock split, as distinguished from a stock dividend, is also a nontaxable event effected by a corporation through amending its Articles of Incorporation to divide shares of a particular class of stock into more shares and to reduce each share's par value. A stock split increases the number of shares representing a shareholder's interest in the corporation without changing the shareholder's proportionate share of equity in the corporation. Fletcher Cyc. Corp., sec. 5362.1 (1986). While we recognize that petitioners' equity increased as a result of the August 1969 transactions, we disagree with respondent that we can isolate the Class B split and tax it because, consistent with a traditional nontaxable stock split, the Alliance shareholders approved the Class B stock split and amended the Articles of Incorporation to reflect the increased number of outstanding shares and reduced par value per share. *656 The split was followed immediately by a recapitalization in which all Class A and B shares were reclassified as full voting common shares with a $ 1.00 par value. This also is a nontaxable event under the Code. Section 1036(a) provides that no gain or loss shall be recognized on the exchange of common stock for common stock in the same corporation. Thus, the August 1969 split and recapitalization in and of themselves do not trigger taxation. Respondent asks us to impose a tax on the result -- petitioners' increased equity position. This we cannot do without authority under the Code or case law. Even if we were to accept respondent's theory of a general accession to wealth under section 61, we would observe that respondent's calculations do not accurately reflect the value of the Alliance stock before the split and recapitalization. The Class A and B shares, otherwise equal in dividend and liquidation rights, cannot be equal in value if the latter had voting power and the former did not. Dividing shareholder equity by an amount of outstanding shares having differing attributes as well as a different number before and after the split to arrive at two figures representing share *657 values and then charging petitioners with income in the amount of the difference, is specious and inconsistent with corporate tax law principles in our opinion. Furthermore, because the Class B shares ceded voting power to the Class A shareholders in the recapitalization, any accession of equity might be considered to have been for value. B. Expense Adjustments
1. Office-at-Home Expenses
Petitioners did not claim an office-at-home deduction for business activities carried on at 5000 N.W. 31st Street during 1968, 1969, 1970 and 1971. Instead, a myriad of expenditures purportedly relating to Hagen Investments, Inc.'s business activities at that location were treated by the corporation as ordinary and necessary business expenses. Those either apparently or obviously personal in nature were disallowed. Petitioners' burden was to either establish that the expenditures were corporate expenditures, or to establish that some portion of the expenditures were ordinary and necessary business expenses. Sec. 162(a); Rule 142(a). If part of an expenditure is made for a deductible *658 purpose and the record contains sufficient evidence for us to make a reasonable allocation, we will do so. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). However, there is no reasonable basis for making allocations on this record. Some of the corporation's expenditures -- for repairs and maintenance, utilities, insurance and office supplies -- might have conceivably been prorated, but testimony relating to the amount of the structure used for business purposes is meager and uninformative. Moreover, we are unable to determine the very purpose for which many of the expenditures were made. Under such circumstances, a deduction based on the Cohan rule would be "unguided largesse." Epp v. Commissioner, 78 T.C. 801, 807 (1982). We therefore sustain respondent's determinations. Rule 142(a). 2. Interest Expenses
Respondent determined that petitioners overstated their itemized interest expense deduction for 1968, and that itemized interest expense deductions had been understated in 1969, 1970 and 1971. The understatements were the consequence of mortgage interest paid in those years. Mortgage payments were made by the corporation in *659 1968 through 1971. Respondent treated the payments as constructive dividends, then reallocated the interest expense deductions from the corporation to petitioners. Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Petitioners did not carry their burden of proof on the 1968 interest expense adjustment, so it is upheld. Rule 142(a). 3. Medical and Dental Expenses
Our findings relating to medical and dental expenses during 1968, 1969, 1970 and 1971 are in Part III.B.3. of our findings of fact, supra. We adopt and incorporate Part I.B.1.d. of our opinion, supra, for this adjustment. The medical and dental expenses will be allowed, or not allowed, based upon adjusted gross income as finally determined. C. 1968 Capital Losses
Petitioners reported a $ 537.00 long term capital loss on their 1968 return. As our findings state, the failure to exercise the stock warrants that were the basis of the purported loss did not generate capital losses in 1968. We uphold respondent's determination. Rule 142(a). D. Section 6653(a) Additions to Tax
Respondent determined that petitioners are liable for *660 additions to tax under section 6653(a) for the taxable years 1968 through 1971.[166]Negligence under section 6653(a) is lack of due care, or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determinations that petitioners' underpayments of tax were due to negligence or intentional disregard of rules and regulations is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of this Court. Petitioners therefore bear the burden of proving that they are not liable for the additions to tax. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Enoch v. Commissioner, 57 T.C. 781, 802 (1972). *661 As stated earlier, respondent made slight concessions to certain adjustments and the Court made minor redeterminations to other adjustments. Aside from that, petitioners have wholly failed to introduce any credible or probative evidence to show that any portion of the determined underpayments was not due to negligence or intentional disregard of rules and regulations. In our view, not only have petitioners failed to show error in respondent's determinations; the record shows negligence on the part of petitioners in not keeping proper books and records and in not including in income substantial amounts which they clearly received. Just as unreasonable were petitioner's actions in causing many expenses clearly personal in nature, such as family trips to Puerto Rico and the purchase of bar stools and swimming pool paraphernalia, to be paid by Hagen Investments, Inc. and Capitol Car Care, Inc. See Vesco v. Commissioner, T.C. Memo. 1979-369. We cannot imagine that petitioner, had he given it any consideration, would have concluded that such expenditures would qualify under section 162. [167] Respondent's determinations, subject to slight modifications, are therefore *662 sustained. III. Hagen Investments, Inc. (docket No. 8342-76) Taxable Years 1967 through 1971
Adjustments for the corporate years were made on the basis of miscellaneous corporate records. A. Adjustments to Income
1. Gross Profits from Stock Sales
We previously found that the corporation did not provide respondent with adequate books and records relating to its gross receipts and cost of goods sold. Respondent therefore determined the corporation's gross profits for its fiscal years 1968 through 1970 by (a) ascertaining the amounts paid to each trader and salesperson, (b) determining the percentage of gross profits paid to each on transactions negotiated by them, then (c) applying the appropriate multiplier to arrive at total gross profits, which amounts subsumed cost of goods sold. The cornerstone of our system of tax collection is self-assessment and payment by the taxpayer. Certain demands are placed on the taxpayer, one of which is to keep *663 such books of account as are sufficient to establish the amount of gross income. Sec. 6001. If that obligation is not met, respondent is entitled to use any reasonable method to recompute income. Sec. 446; Holland v. United States, 348 U.S. at 121. Thus, where a taxpayer keeps no books or records, or his records are inadequate, the Commissioner is authorized to compute income by whatever method will, in his opinion, clearly reflect the taxpayer's income. No particular method is required since circumstances will vary in individual cases. [Harbin v. Commissioner, 40 T.C. 373, 377 (1963). Emphasis added.] This rule has been restated on occasions too numerous to list. Respondent reconstructed gross profits using various sources and data, including commission figures from audit papers prepared by the corporation's own accountants. [168] A similar method was used in DiLando v. Commissioner, T.C. Memo. 1975-243, where respondent reconstructed petitioner's income through the "percentage mark-up method" whereby gross sales *664 are determined by adding a predetermined percentage to cost of goods sold. The percentage mark-up method has been widely recognized. See also Bollella v. Commissioner, 374 F.2d 96 (6th Cir. 1967), affg. a Memorandum Opinion of this Court. The burden of proof is on the corporation to show that respondent's method does not clearly reflect income. Rule 142(a). The corporation presented no competent *665 evidence to cause us to question respondent's method of reconstructing gross profits. As indicated earlier, we sustain the method used by respondent as reasonable. Further, we sustain his determinations of gross profit, subject to our own modification relating to a mathematical error in respondent's 1968 calculation. 2. Commission Income
The corporation earned commissions on the sale of mutual funds in 1968, 1969 and 1970. We have treated mutual fund commissions in conjunction with the corporation's 1968, 1969 and 1970 gross profits. See Part IV.A.1. of our findings and n. 112, supra. 3. Interest Income
The corporation overstated interest income on its 1968 return; part of the income reported was in fact earned by petitioners on personal bank accounts. We sustain the adjustment and the reallocation of interest income to petitioners. See Appendix E, par. a). 4. Management Fees
The corporation received a management fee of $ 750.00 from Acker in 1968. Acker was at that time a wholly-owned subsidiary of Alliance. Fees are included in income under section 61(a). Acker's check for $ 750.00, made payable to Hagen Investments, Inc. and signed by Ingeborg *666 Acker, is part of the record. No facts presented lead us to the conclusion that the $ 750.00 was other than income to the corporation. 5. Miscellaneous Income
We previously found that the corporation received unreported miscellaneous income of $ 60,000.00 and $ 263,827.65 in 1968 and 1969, respectively. The source of the 1968 income is unidentified; the source of the 1969 income was sales by the corporation of 163,949 shares of FRI stock at highly inflated prices. [169] Our findings are based on a very careful review of the record. Petitioner's testimony on these sizable adjustments was scant and vague, and he has not persuaded us that respondent's adjustments were in any manner incorrect. Gross income means all income from whatever source derived. Sec. 61(a). This includes gross income derived from business and gains derived from dealings in property. Sec. 61(a)(2) and (3). In view of our findings, we sustain respondent's determinations, subject to his 1969 concession and our minor adjustment *667 for a mathematical error. Rule 142(a). 6. Hagen Employees Profit Sharing and Retirement Trust (HEPRET)
Hagen Investments, Inc. deducted $ 43,275.00 on its 1968 corporate return for contributions made to the Hagen Employees Profit Sharing and Retirement Trust (HEPRET) in that year. It included this amount in income on its 1970 corporate return after HEPRET was determined not to be a qualified trust under section 401. On the notice of deficiency, respondent disallowed the $ 43,275.00 deduction because the corporation did not establish that the 1968 contributions constituted ordinary and necessary business expenses, and adjusted income reported in 1970 accordingly. Respondent's disallowance was consistent with the District Director's adverse determination of February 26, 1970. Petitioner has not persuaded us that respondent's adjustments are incorrect. In fact, we are convinced that they are proper. As shown in our findings, the District Director based his adverse determination in major part on the plan's failure to satisfy the nondiscrimination provisions of section 401. That section (in effect in 1968) is set forth in pertinent part in a footnote and its nondiscrimination *668 provisions are emphasized. [170]Section 1.401-1(a)(3), Income Tax Regs., states that "All of the surrounding and attendant circumstances and the details of the plan will be indicative of whether it is a bona fide stock bonus, pension, or profit-sharing plan for the exclusive benefit of employees in general. The law is concerned not only with the form of a plan but also with its effects in operation." *669 The District Director determined that the 1968 forfeitures resulted in reallocations to accounts in whose favor discrimination is prohibited. [171] This made the trust's vesting and forfeiture provisions (in Article V) unacceptable under sections 401(a)(3)(B) and 401(a)(4), and under section 1.401-1(a)(3), Income Tax Regs. The District Director ultimately determined that HEPRET, forming part of the overall profitsharing plan, did not constitute a qualifed trust under section 401(a), and that it was not an exempt organization under section 501(a) and (c). Petitioner did not seek a reconsideration of the decision. *670 Since the corporation's 1968 contributions to HEPRET were not contributions to a qualified trust, deduction of the contributions was subject to section 404(a)(5); that is, contributions were deductible under section 162 to the extent that employees' rights to the contributions were nonforfeitable. The corporation never established at trial that any contributions were nonforfeitable in whole or in part. Deposits to HEPRET's bank account in 1968 were substantiated, but the corporation included the entire $ 43,275.00 in income in 1970 as a refund from HEPRET. We conclude from this fact that no part of the contributions were nonforfeitable. If any part was, the corporation did not carry its burden of proof as to the amounts. Rule 142(a). We do not know how the corporation arrived at the amounts to be contributed. Considering the record as a whole, we observe that the profit-sharing plan was assembled carelessly and in haste. The trust instrument was no more than a "form" with blanks to be filled in. Furthermore, we note the apparent lack of attention and diligence paid by the corporation to the District Director's requests for information. In view of the foregoing, we sustain *671 respondent's disallowance of the 1968 deduction and his reduction of 1970 taxable income by the same amount. [172]
B. Expense Adjustments
1. Business Expenses
As our findings show, disallowed business expense deductions have fallen into the following categories: (a) auto and travel expenses, (b) dues and subscriptions, (c) interest expenses, (d) insurance expenses, (e) office supply expenses, (f) repair and maintenance expenses, (g) tax expenses, (h) travel and entertainment expenses, (i) utility expenses, (j) audit and legal expenses, (k) training program expenses, (1) miscellaneous expenses, and (m) depreciation. Respondent disallowed virtually all the expenditures for lack of substantiation. He treated them as distributions to petitioners and as constructive dividends. We sustained his determinations relating to constructive dividends, with minor modifications. See Part III.A.4. of our findings of fact, supra, Appendices E, F, G and H, and Parts II.A.4. and II.B.1. of our opinion, supra. In doing so we implicitly sustained respondent's determinations *672 to disallow the expenditures which gave rise to the constructive dividends. [173] That the constructive dividends had their source in disallowed corporate expenditures is obvious from Appendices E through H. We now focus directly on the disallowed items. There is allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Sec. 162(a). Whether an expenditure qualifies as an ordinary and necessary expense incurred in a trade or business is an issue of fact. Commissioner v. Heininger, 320 U.S. at 475. On the basis of our thorough review of the record, we conclude that the unsubstantiated expenditures were not "ordinary and necessary expenses" paid or incurred "to carry on a trade or business" within the meaning of section 162(a). Those which were found to be constructive dividends (all disallowed expenses except depreciation) primarily benefitted petitioners, not the business. Meridian Wood Products Co. Inc. v. United States, 725 F.2d at 1191. *673 We do not perceive the need to discuss separately each type of disallowed business expense [174] because the problem common to each is lack of substantiation, pure and simple. Respondent's determinations, subject to his concessions and our further modifications, are therefore upheld. Rule 142(a). 2. Net Operating Loss Deductions
a. 1967
A net operating loss shall be a net operating loss carryback to each of the three taxable years preceding the taxable year of the loss. Sec. 172(b)(1)(A). A net operating loss is carried to the earliest of the taxable years to which such a loss may be carried. Sec. 172(b)(2). We sustain respondent's determination for 1967 on the basis of our findings of fact relating to the 1969 taxable year. See Part IV.B.2.a. of our findings of fact, supra. b. 1968
We incorporate by reference the law relating to net operating losses immediately above. The net operating loss deduction for 1968 (from the 1971 taxable year) is to be determined under *674 Rule 155. C. Gain on Sale of Assets
Gross income includes gains derived from dealings in property. Sec. 61(a)(3). We agree with respondent's determination that the corporation realized a gain of $ 8,868.64 in 1970 from the sale of office furniture and machines. Rule 142(a). D. Investment Tax Credit
Section 38 allows a credit against income tax for qualified investments in certain property. Section 48 defines the type property which qualifies for the credit as allowed by section 38. Respondent was unable to determine the nature of the property upon which the 1968 or 1969 investment tax credits were based, and we are unable to make such a determination from the record. We are therefore unable to find that the corporation is entitled to an investment tax credit for either year. E. Section 6653(a) Additions to Tax
Respondent determined that the corporation is liable for additions to tax for each of the fiscal years 1968, 1969 and 1970. Section 6653(a), as stated *675 earlier, provides for an addition to tax of 5 percent of any underpayment which is due to negligence or intentional disregard of rules and regulations. Respondent's determinations are presumptively correct and petitioner bears the burden of proving that it is not liable for these additions to tax. Rule 142(a); Hall v. Commissioner, 729 F.2d at 632, and Bixby v. Commissioner, 58 T.C. at 757. Petitioner has failed to produce any credible or probative evidence to show that its underpayments were not due to negligence or intentional disregard of rules and regulations. We therefore sustain respondent's determinations on this issue. [175] Even so, not only has petitioner failed to show error in respondent's determinations, the record explicitly shows negligence on the corporation's part by deliberately and intentionally keeping improper books and records and in not including substantial amounts in income. Additionally, it is clear that many of its expenditures were personal in nature, made for the sole benefit of petitioners (its major shareholders) and members of their family. See Lysek v. Commissioner, 583 F.2d 1088, 1094 (9th Cir. 1978), *676 affg. a Memorandum Opinion of this Court; Finney v. Commissioner, T.C. Memo. 1980-23, and Vesco v. Commissioner, T.C. Memo. 1979-369. Decisions will be entered under Rule 155. Appendix A
Ed J. and Martha Jo Hagen (docket No. 7700-76)
Concessions per Respondent's Brief
Types of
Per Statutory
Years
Adjustment
Notice
Concession
1964
Gross Receipts
$ 16,692.00
$ 26.00   1964
Interest, Dividends
and Fees  11,591.88
78.56
1964
Partnership Income
5,545.81
576.00
1964
Cost of Goods Sold
18,120.16
41.40
1965
Car Expense
780.90
73.00
1968
Dividends
30,427.14
4,738.31
1969
Dividends
37,125.11
4,100.22
1970
Dividends
21,448.27
3,586.48
1971
Dividends
28,221.49
327.00
Appendix A-1
Hagen Investments, Inc. (docket No. 8342-76)
Concessions per Respondent's Brief
Types of
Per Statutory
FY Ended
Adjustment
Notice
Concession
9/30/68
Insurance Expense
$ 2,187.47  $ 153.00  9/30/69
Miscellaneous Income
268,104.00  4,273.35
*677 Appendix B
We repeat our calculation of 1964 cost of goods sold as a convenience to the reader. Our further findings are in the notes below: Opening Inventory
* $ 13,886.38 Add: Inventory Purchases
and Other Increases      ** 122,910.56
$ 136,796.94
Less: Miscellaneous Decreases *** 7,402.59
Goods Available for Sale
$ 129,394.35
Less: Closing Inventory **** 17,803.85
Cost of Goods Sold
$ 111,590.50
*678 Appendix C
We again repeat our calculation of 1965 cost of goods sold. Our further findings are in the notes below: Opening Inventory
* $ 17,803.95   Add: Inventory Purchases
and Other Increases      ** 983,835.87
$ 1,001,639.72
Less: Miscellaneous Decreases *** 8,957.10
Goods Available for Sale
$ 992,682.62  Less: Closing Inventory **** 60,647.85
Cost of Goods Sold
$ 932,034.77  *679 Appendix D
We again repeat our calculation of 1966 cost of goods sold. Our further findings are in the notes below. Opening Inventory
* $ 60,647.85   Add: Inventory Purchases
and Other Increases      ** 3,359,866.96
$ 3,420,514.81
Less: Miscellaneous Decreases *** 152,491.54
Goods Available for Sale
$ 3,268,023.27
Less: Closing Inventory **** 88,539.62
Cost of Goods Sold
$ 3,179,483.65
*680 Appendix E
Distributions were received by petitioners in 1968 as follows: Hagen Investments, Inc.:
a) Interest Income  $ 573.75   b) Auto Expense  727.82
c) Dues and Subscriptions  234.40
d) House Payments  3,408.00
e) Insurance Premiums  5,583.47
f) Office Supplies  3,460.03
g) Repairs and Maintenance  5,984.75
h) Travel and Entertainment  2,232.57
i) Utilities  1,572.83
Capitol Car Care, Inc.
j) Auto Expenses  193.00
k) Insurance Premiums  619.75
Total          $ 24,590.37
Additional facts relating to these distributions are: a) Interest Income: Hagen Investments, Inc. reported $ 937.40 in interest income on its corporate return for 1968. Of the total, $ 543.75 was in fact earned on personal accounts at Local Federal Savings and Loan Association of Oklahoma City and First National Bank of Oklahoma City. The amount of interest earned by petitioners was actually $ 573.75. Although this reallocation of interest income is not technically a corporate distribution, we include it with other 1968 corporate distributions as a convenience to the reader. b) Auto Expense: Hagen *681 Investments, Inc. paid $ 727.82 for traffic ticket expenses and other expenses of an unspecified nature in 1968 that were not substantiated. The expenditures were recorded in the corporation's general ledger as auto expenses, but appear to have been made for the benefit of petitioners. c) Dues and Subscriptions: Hagen Investments, Inc. paid dues and subscription fees of $ 234.40 in 1968 that primarily benefitted petitioners. The payments were entered in the general ledger of the corporation. They were made to such entities as Greater Oklahoma City Chess Club and the National Rifle Association. Respondent's notice of deficiency stated that these payments totalled $ 994.89, but he modified this to $ 972.89 at trial. Petitioner testified that a $ 738.49 expenditure posted was the cost of a stock subscription for City National Bank stock, and that it was therefore incorrectly posted. We accept petitioner's testimony and have reduced the adjustment accordingly. d) House Payments: Hagen Investments, Inc. made monthly installment payments of $ 284.00 throughout 1968, 1969, 1970 and 1971 on a home mortgage held by Local Federal Savings and Loan Association of Oklahoma City. *682 Payments for each of these years totalled $ 3,408.00. The mortgage was given by petitioners when they purchased their residence at 5000 N.W. 31st Street in 1965. They at all times held legal title to the property. Hagen Investments, Inc. operated from this address in 1968 and respondent has allowed petitioners a home office deduction. Respondent's adjustment per his notice of deficiency was $ 4,156.00, not $ 3,408.00. The larger figure includes mortgage payments made by the corporation on property occupied by petitioners as a residence prior to 1968; the modification reflects respondent's determination that the property became investment property after petitioners moved. Respondent has conceded the $ 748.00 difference. e) Insurance Premiums: Hagen Investments, Inc. paid insurance premiums and license fees in 1968 that it was unable to establish as business expenses. Although entered in the general ledger, who or what was insured has not been established. The amount treated as a distribution, $ 5,583.47, is less than the $ 7,386.47 shown on the notice of deficiency, and respondent has conceded the $ 1,803.00 difference. f) Office Supplies: Hagen Investments, Inc. *683 paid $ 3,460.03 for "office supplies" in 1968 that primarily benefitted petitioners. Payments were entered in the corporation's general ledger. A substantial part of the payments related to the swimming pool behind 5000 N.W. 31st Street property. Distributions for office supplies per the notice of deficiency were $ 5,017.45 rather than $ 3,460.03. Respondent has conceded the $ 1,557.42 difference. No adjustment has been made to the corporation's deduction for office supply expenses in 1968. g) Repairs and Maintenance: In 1968, Hagen Investments, Inc. paid for repairs and maintenance to property owned by petitioners. Respondent's adjustment per his notice of deficiency was $ 6,330.62 but he revised his adjustment at trial to $ 6,022.73. We have determined that expenditures totalling $ 37.98, the first to Hessmer Company for $ 22.68 and the second to Wolfenbarger Electric Company for $ 15.30 were for the benefit of the corporation. Respondent's revised adjustment is therefore reduced by the total of these expenditures. The correct adjustment is $ 5,984.75. h) Travel and Entertainment: Hagen Investments, Inc. paid for travel and entertainment that primarily benefitted *684 petitioners. Respondent determined that the total amount was $ 2,554.56. Some of the expenditures included in that figure were properly substantiated at trial, as follows: Date
Payee
Amount
2/19/68
Chandelle (restaurant)
$ 86.33 3/19/68
Chandelle
13.28
5/29/68
Chandelle
43.15
7/4/68
Dub Adams Hickory Kitchen
99.96
8/20/68
Chandelle
21.60
9/3/68
Able Rents
45.32
9/3/68
Dub Adams Hickory Kitchen
12.35
$ 321.99
The resulting amount of the distribution for 1968 is $ 2,232.57. i) Utilities: A $ 1,572.83 utility expense on the corporate return for 1968 was for utilities at the 5000 N.W. 31st Street property. The expense is disallowed to the corporation and reallocated to petitioners. Respondent allowed petitioners a home office deduction for their 1968 through 1971 taxable years. j) Auto Expense - Capitol Car Care, Inc.: Capitol Car Care, Inc. paid an auto expense of $ 193.00 in 1968 for which no business purpose was established. k) Insurance Premiums - Capitol Car Care, Inc.: Capitol Car Care, Inc. paid an insurance premium in 1968 for which no business purpose was established. The amount paid was $ 619.75. The notice *685 of deficiency stated that income of $ 919.75 rather than $ 619.75 was attributable to payments by Capitol Car Care, Inc. for petitioners' benefit. Respondent has since conceded the $ 300.00 difference. Appendix F
Distributions were received by petitioners in 1969 as follows: Hagen Investments, Inc.
a) Auto Expense   $ 6,158.96 b) Dues and Subscriptions   362.45
c) House Payments   3,408.00
d) Insurance Premiums   4,951.74
e) Office Supplies   537.96
f) Repairs and Maintenance   2,681.70
g) Travel and Entertainment   10,168.80
h) Utilities   1,820.84
i) Training Program (Bill Hagen)   - 0 -
Capitol Car Care, Inc.
j) Auto Expense   902.69
k) Insurance   - 0 -
Total               $ 30,993.14
Additional facts relating to these distributions are: a) Auto Expense: Hagen Investments, Inc. paid $ 6,158.96 in auto expenses in 1969 that it was unable to substantiate as ordinary and necessary expenses and that appear to have primarily benefitted petitioners. The expenditures were entered in the general ledger of the corporation. They were for bus transportation for the Hagen *686 children, parking tickets and auto leasing for petitioners. The notice of deficiency stated that such auto expenses totalled $ 5,298.68 in 1969. At trial respondent increased that amount to $ 6,158.96 to reflect a calendar year rather than the corporation's fiscal year. We accept this increase to distributions. b) Dues and Subscriptions: Hagen Investments, Inc. paid dues and subscription fees in 1969 that were primarily for petitioners' personal benefit. The amount of subscriptions reported per the corporate return was $ 6,297.09. Respondent determined that this expense was overstated by $ 667.95 and treated that amount as a distribution to petitioners. The only expenses allowed the corporation were subscription payments to the National Quotation Bureau. Petitioner presented additional evidence at trial relating to this adjustment. His evidence substantiates certain dues and subscription expenditures made during the corporation's 1969 fiscal year. They are: Payee
Amount
Oklahoma Securities Commission
$ 115.00
National Assn. of Securities Dealers
180.00
Value Line Investment Survey
5.00
Commerce Clearing House
5.50
Total          $ 305.50
*687 As a result, distributions in 1969 for dues and subscription payments are: Per Return
$ 6,297.09
Less: National Quotation Bureau
Expense  5,629.14
Per Notice of Deficiency
$ 667.95  Less: Expenses Substantiated
at Trial  305.50
Dues and Subscriptions
$ 362.45  c) House Payments: Hagen Investments, Inc. made monthly mortgage payments in 1969 on the 5000 N.W. 31st Street property. Respondent's adjustment in the notice of deficiency was $ 5,292.00 rather than $ 3,408.00 per his proof. He has conceded the $ 1,884.00 difference. See Appendix E, par. d). d) Insurance Premiums: Hagen Investments, Inc. paid insurance premiums and license fees in 1969 that benefitted petitioners personally. Most of the payments were entered in the corporation's general ledger and no business purpose was established for them. Most premiums paid were for life, auto and homeowners' insurance. The amount of distributions, $ 4,951.74, is less than the $ 6,309.35 shown on the notice of deficiency. Concessions of $ 153.00 and, later, $ 1,204.61 were made by respondent. e) Office Supplies: Hagen Investments, Inc. paid for "office supplies" of $ 537.96 *688 in 1969 that primarily benefitted petitioners. Of the total, $ 169.07 related to supplies for the swimming pool. f) Repairs and Maintenance: Expenditures of Hagen Investments, Inc. to repair and maintain petitioners' 5000 N.W. 31st Street property in 1969 totalled $ 2,681.70. In certain cases it is impossible to determine whether the expenditures related to the business as opposed to the personal use of the property. However, some expenditures were made by the corporation to such enterprises as "Northeast Dog and Cat Hospital" and "Paddock Pools." Total expenditures per the notice of deficiency was $ 4,151.96. Respondent conceded $ 1,431.63 of that amount, for a revised adjustment of $ 2,720.33. We have reduced this by $ 38.63 due to a maintenance expenditure relating to a photocopy machine used by the corporation, bringing the adjustment to $ 2,681.70. g) Travel and Entertainment: The notice of deficiency increased income in this category by $ 10,697.68 for corporate expenditures primarily benefitting petitioners. Respondent modified that amount to $ 10,544.81. We have reduced that amount by $ 376.01, to $ 10,168.80, to account for corporate expenditures substantiated *689 at trial. Those expenditures are: Date
Payee
Amount
1/2/69
Val Gene's
$ 175.90
5/5/69
Chandelle (restaurant)
102.19
9/5/69
Chandelle
97.92
$ 376.01
Among the disallowed expenditures we treat as distributions are substantial expenditures for a trip made by the Hagen family to Puerto Rico. Trips to Dallas, New York, Las Vegas and Canada were also made in 1969. No business purpose for these trips was established at trial. h) Utilities: The $ 1,820.84 utility expense paid for by the corporation in 1969 is disallowed and reallocated to petitioners. The utilities expense deduction on the 1969 corporate return was $ 1,500.60 and it is disallowed entirely. See also Appendix E, par. i). i) Training Program (Bill Hagen and others): Respondent's adjustment per the notice of deficiency was $ 1,407.00. He has since conceded $ 1,300.00 of that amount. Petitioners substantiated corporate expenditures of the $ 107.00 balance at trial. Those expenditures related to a business training program for William C. "Bill" Hagen, petitioners' son; he too was associated with Hagen Investments, Inc. The $ 107.00 in expenditures were similar in nature to *690 training program expenditures made for other employees. j) Auto Expense - Capitol Car Care, Inc.: Capitol Car Care, Inc. paid an auto expense of $ 902.69 in 1969 for which no business purpose was established. k) Insurance - Capitol Car Care, Inc.: Respondent has conceded the entire $ 39.00 adjustment shown in the notice of deficiency. Appendix G
Distributions were received by petitioners in 1970 as follows: Hagen Investments, Inc.
a) Auto Expense  $ 530.59    b) Dues and Subscriptions  1,509.45 c) House Payments  3,408.00 d) Insurance Premiums  4,060.75 e) Office Supplies  1,175.76 f) Repairs and Maintenance  649.15 g) Travel and Entertainment  1,059.22 h) Utilities  1,217.57 i) Miscellaneous Expenses  26.49 Capitol Car Care, Inc.
j) Auto Expense  996.97 k) Insurance  918.45 l) Taxes  338.05 Dividend Exclusion
(200.00)
Total               $ 15,690.45 Additional facts relating to these distributions are: a) Auto Expense: Hagen Investments, Inc paid expenses of $ 530.59 in 1970 journalled simply as car expenses that were not substantiated. *691 They appear to have been made for petitioners' benefit. Respondent's adjustment per his notice of deficiency was $ 1,622.94 but that was based on expenditures made during the corporation's fiscal year. Respondent conceded the $ 1,092.35 difference resulting from a reallocation of expenditures based on petitioners' calendar year, bringing shareholder distributions in this category to $ 530.59. b) Dues and Subscriptions: Hagen Investments, Inc. reported dues and subscription expenses of $ 5,425.95 in 1970. The only expenditures allowed the corporation by respondent were for payments to the National Quotation Bureau, in the amount of $ 3,906.00. Distributions per the notice of deficiency were $ 1,546.95. Petitioner substantiated 1970 membership payments of $ 37.50 to the Oklahoma City Board of Realtors. Distributions in this category for 1970 are summarized as follows: Per Return
$ 5,452.95
Less: National Quotation Bureau
Expense  3,906.00
Per Notice of Deficiency
$ 1,546.95
Less: Expenses Substantiated
at Trial  37.50
$ 1,509.45
c) House Payments: Mortgage payments paid by Hagen Investments, Inc. in 1970 totalled $ 3,408.00. Respondent's *692 adjustment per his notice of deficiency was $ 5,292.00 and he has conceded the $ 1,884.00 difference. See Appendix E, par. d). d) Insurance Premiums: Hagen Investments, Inc. paid $ 4,060.75 in insurance premiums in 1970 for which no business purpose was established. None of this was expensed on the corporate return. The payment was for a life insurance premium on a policy insuring petitioner. The beneficiary is not known. The premium payment of $ 4,060.75 is treated as a distribution to petitioners. The notice of deficiency made an adjustment of $ 5,994.59 but respondent conceded $ 1,933.84. e) Office Supplies: Hagen Investments, Inc. claimed deductions for office supplies in 1970 in the amount of $ 1,175.76. The expenditures were not substantiated. f) Repairs and Maintenance: Hagen Investments, Inc. paid $ 649.15 in 1970 to repair and maintain property. It was unable to substantiate these payments, which we assume were for the repair of the 5000 N.W. 31st Street property. Expenditures per the notice of deficiency were $ 739.16 and respondent has conceded the $ 90.01 difference. g) Travel and Entertainment: Hagen Investments, Inc. paid $ 1,059.22 for *693 travel and entertainment in 1970 that primarily benefitted petitioners. The expenditures were entered in the corporation's general ledger, but none were properly substantiated. Expenditures per the notice of deficiency totalled $ 1,479.34. Respondent has conceded the $ 420.12 difference, bringing the adjustment to $ 1,059.22. h) Utilities: The $ 1,217.57 utility expense for 1970 is allocated to petitioners as a distribution. See also Appendix E, par. i). i) Miscellaneous Expenses: Expenditures for flowers and other miscellaneous items totalling $ 26.49 were paid by Hagen Investments, Inc. in 1970. They were primarily for petitioners benefit. j) Auto Expense - Capitol Car Care, Inc.: Capitol Car Care, Inc paid $ 996.97 in auto expenses in 1970 for which no business purpose was established. k) Insurance - Capitol Car Care, Inc.: Capitol Car Care, Inc. paid $ 918.45 in insurance expenses in 1970 for which no business purpose was established. The amount on the notice of deficiency was $ 1,218.45. Respondent has conceded the $ 300.00 difference. l) Taxes - Capitol Car Care, Inc.: Capitol Car Care, Inc. paid taxes of $ 338.05 in 1970 that primarily benefitted *694 petitioners. It reported $ 1,811.32 in taxes paid in 1970 and respondent allowed a deduction of $ 1,473.27. The difference of $ 338.05 is treated as a distribution. Dividend Exclusion: Petitioners are entitled to a $ 200.00 dividend exclusion for their 1970 taxable year. Appendix H
Distributions were received by petitioners in 1971 as follows: Hagen Investments, Inc.
a) Dues and Subscriptions  $ 144.40    b) House Payments  3,408.00 c) Insurance Premiums  4,471.00 d) Repairs and Maintenance  145.06 e) Travel and Entertainment  3,326.67 f) Utilities  752.94 g) Miscellaneous Expenses  33.48 h) Legal Fees  15,180.73 Capitol Car Care, Inc.
i) Auto Expenses  300.00 j) Insurance Premiums  -0-  Dividend Exclusion
(200.00)
Total               $ 27,562.28 Additional facts relating to these distributions are: a) Dues and Subscriptions: Hagen Investments, Inc. claimed $ 144.40 in dues and subscription expenses on its 1971 corporate return. No details of these expenditures were provided to respondent and petitioners did not substantiate the expenditures at *695 trial. They are treated as having been paid for the benefit of petitioners. b) House Payments: Hagen Investments, Inc.'s monthly mortgage payments on the 5000 N.W. 31st Street property totalled $ 3,408.00 in 1971. See Appendix E, par. d). c) Insurance Premiums: Hagen Investments, Inc. paid insurance premiums of $ 4,471.00 in 1971 that it was unable to prove were business expenses. Included in the total is a life insurance premium, $ 856.00, was treated by the corporation as a business expense. The premium was not expensed. The entire $ 4,471.00 is a distribution to petitioners. d) Repairs and Maintenance: Respondent stated in his notice of deficiency that Hagen Investments, Inc. paid repair and maintenance expenses of $ 277.27 that primarily benefitted petitioners. We have reduced that amount to reflect expenditures substantiated at trial. Those expenditures are: Thomas A. Edison Industries
$ 22.47 R. K. Black, Inc.
10.29
Federal Corporation
40.95
Federal Corporation
18.50
Comfort Inn
40.00
$ 132.21
Distributions in 1971 for repairs and maintenance are therefore $ 145.06. e) Travel and Entertainment: The amount claimed *696 on the 1971 corporate return, $ 3,570.79, was paid primarily for petitioners' benefit. It is disallowed and that amount which relates to petitioners' calendar year, $ 3,326.67, is reallocated as a distribution. f) Utilities: The $ 752.94 utility expense for 1971 is reallocated to petitioners. See Appendix E, par. i). g) Miscellaneous Expenses: Hagen Investments, Inc. paid $ 33.48 for flowers in 1971. The expenditure is a distribution to petitioners. h) Legal Fees: The general ledger of Hagen Investments, Inc. recorded $ 15,180.73 in legal fees paid that were not ordinary and necessary expenses. They relate to petitioner's defense against the charges in the criminal action brought pursuant to section 7201. i) Auto Expense - Capitol Car Care, Inc.: Auto expenditures of $ 300.00 for which no business purpose was established were paid by Capitol Car Care, Inc. in 1971. We find that the expenditures primarily benefitted petitioners. j) Insurance Premiums - Capitol Car Care, Inc.: Respondent has conceded the $ 527.00 adjustment per his notice of deficiency. Dividend Exclusion: Petitioners are entitled to a $ 200.00 dividend exclusion for 1971. *697 Appendix I
Hagen Investments, Inc.
Computation of Gross Profit
Based on Commissions Paid
Year Ended: September 30, 1968
Type of
Percent of
Gross
Salesman
Sales
Commissions
Profit/Multiplier
Profit
Willard Buck
Retail
$ 15,731.89 50/2.0 $ 31,463.78 Jimmy G. Cain
Wholesale
1,478.05
25/4.0 5,912.20
Harry Chupack
Retail
1,597.50
50/2.0 3,195.00
Sam Duncan
Retail
958.35
50/2.0 1,916.70
Dale Hunter
Retail
5,214.10
50/2.0 10.428.20
William C. Johnson
Retail
17,445.57
50/2.0 34,891.14
Marvin F. Oaks
Retail
30,509.61
50/2.0 61,019.22
Other
Wholesale
737.86
25/4.0 2,951.44
W. C. Patzack
Retail
1,898.21
50/2.0 3,796.42
John Porter
Wholesale
5,744.12
25/4.0 22,976.48
E. H. Reagan
Retail
198.19
50/2.0 396.38
Paul Rice
Retail
35,389.35
50/2.0 70,778.70
Keith Strong
Wholesale
3,000.00
25/4.0 12,000.00
E. L. Stucker
Retail
1,862.50
50/2.0 3,725.00
Bob Summers
Wholesale
25,510.86
40/2.5 63,777.15
Bob Summers
Wholesale
43,355.29
30/3.33
144,373.12
Tom Summers
Wholesale
18,967.46
40/2.5 47,418.65
Tom Summers
Wholesale
48,053.91
30/3.33
160,019.52
Salaries
26,156.75
--
--
Totals     $ 283.809.57
$ 681,039.10
Gross Profit per Return     489,574.84
Adjustment     * $ 191,464.26
*698 Appendix J
Hagen Investments, Inc.
Computation of Gross Profit
Based on Commissions Paid
Year Ended: September 30, 1969
Type of
Percent of
Gross
Salesman
Sales
Commissions
Profit/Multiplier
Profit
Ray Ballon
Wholesale
$ 1,197.38 25/4.0
$ 4,789.52  J. C. Brown
Wholesale
7,277.07
25/4.0
29,108.28
Willard Buck
Retail
6,462.24
50/2.0
12,924.48
Jimmy Cain
Wholesale
26,733.54
25/4.0
106,934.16
Harry L. Chupack
Retail
4,551.61
50/2.0
9,103.22
Sam Duncan
Retail
264.63
50/2.0
529.26
Dale Hunter
Retail
1,742.54
50/2.0
3,485.08
William C. Johnson
Retail
4,178.45
50/2.0
8,356.90
James Mashore
Wholesale
13,347.53
25/4.0
53,390.12
W. C. Patzack
Retail
1,237.00
50/2.0
2,474.00
Buddy Phillips
Wholesale
3,429.29
25/4.0
13,717.16
John Porter
Wholesale
18,416.53
25/4.0
73,666.12
E. H. Reagan
Retail
6,432.09
50/2.0
12,864.18
E. L. Stucker
Retail
591.65
50/2.0
1,183.30
Ann Trent
Wholesale
607.32
25/4.0
2,429.28
Totals     $ 96,468,87
$ 334,955.06
Add wire and telephone expense     deducted in computing commission       41,244.41
Gross profit as adjusted     $ 376,199.47
Gross profit per return     348,833.26
Adjustment     $ 27,366.21 *699 Appendix K
Hagen Investments, Inc.
Computation of Gross Profit
Based on Commissions Paid
Year Ended: September 30, 1970
Type of
Percent of
Gross
Salesman
Sales
Commissions
Profit/Multiplier Profit
J. C. Brown
Wholesale
$ 8,129.69 25/4.0
$ 32,518.76 Jimmy G. Cain
Wholesale
7,368.93
25/4.0
29,475.72
Ron Hall
Wholesale
1,953.10
25/4.0
7,812.40
James Mashore
Wholesale
3,466.99
25/4.0
13,867.96
Other
Wholesale
810.00
25/4.0
3,240.00
Buddy Phillips
Wholesale
1,575.49
25/4.0
6,301.96
E. H. Reagan
Retail
1,345.85
50/2.0
2,691.70
Keith Strong
Wholesale
1,200.00
25/4.0
4,800.00
E. L. Stucker
Wholesale
112.62
25/4.0
449.28
Ann Trent
Wholesale
3,714.96
25/4.0
14,859.84
Totals     $ 29,677.63
$ 116,017.62
Gross profit per return     58,007.26
Adjustment     $ 58,010.36 Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Ed J. Hagen and Martha Jo Hagen are hereinafter referred to as "petitioners." Ed J. Hagen is hereinafter sometimes referred to as "petitioner."↩
3. Respondent made certain concessions with respect to adjustments set forth in his notice of deficiency for petitioners' taxable years 1964 through 1966 and 1968 through 1971. They are shown in Appendix A, attached hereto, and are taken into account in the issues for decision. Similarly, he made concessions with regard to adjustments determined in his notice of deficiency issued to Hagen Investments, Inc. They are reflected in Appendix A-1, attached hereto. Due to concessions of the parties, the decisions will be entered under Rule 155.↩
4. Petitioner Hagen Investments, Inc., is hereinafter referred to as "Hagen Investments, Inc." and sometimes as "the corporation." ↩
5. Respondent also made adjustments relating to Hagen Investments, Inc.'s taxable year ended September 30, 1971. Those adjustments were either total or partial disallowances of deductions. Due to the adjustments, Hagen Investments, Inc.'s loss position for that fiscal year was determined to be ($ 6,016.27) rather than ($ 30,642.75).↩
6. The corporation's Federal corporate income tax returns are hereinafter sometimes referred to as its "corporate returns." Its taxable fiscal years are hereinafter sometimes referred to as the "fiscal years."↩
7. While at Stanford he took a course in auditing for which he received a grade of B.↩
8. Hagen Investments succeeded Hagen & Smith Investments, a partnership, in December, 1960. Hagen Investments, Inc. was incorporated as an Oklahoma corporation on or about March 16, 1967. It operated as the registered broker-dealer from approximately April 1, 1967 to January 26, 1970.↩
9. Acker Industries, Inc., an Oklahoma corporation involved in the manufacture of metal products, became a subsidiary of Hagen Holding Corporation in late 1964. ↩
10. Capitol Car Care, Inc. v. Commissioner↩, docket No. 6875-76, is pending before this Court. It will not be tried until after the disposition of these cases.
11. The National Association of Securities Dealers (NASD) was, and still is, the self-regulating agency for the over-the-counter securities business. Its primary purpose is to enforce United States Securities and Exchange Commission rules, state rules for the regulation of the securities industry and its own rules among its members. ↩
12. It was as a result of the United States Securities and Exchange Commission proceedings Nos. 3-1905 and 3-2205 collectively entitled "In the Matter of Hagen Investments, Inc. and Ed J. Hagen" that Hagen Investments, Inc. ceased doing business in 1970. ↩
13. The judgment of conviction and commitment, entered on January 6, 1972, was affirmed by the Tenth Circuit Court of Appeals, and the United States Supreme Court denied certiorari.↩
14. As stated above, respondent made certain concessions with respect to these adjustments and they are set forth in the attached Appendix A. ↩
15. The principal place of business of both Hagen Investments and Hagen Investments, Inc. was 5000 N.W. 31st Street, Oklahoma City, Oklahoma 73122. However, certain of its employees worked out of the "May-Ex Building" in Oklahoma City during the latter half of the 1960's.↩
16. Respondent's categories for deposits made during the three year period include: (1) receipts from stock sales, (2) commissions from mutual fund sales, (3) commissions from sales of Atkinson Enterprise, Inc. stock, (4) interest, dividends and fees, and (5) cash and unidentified income. Respondent also categorized deposits of loan proceeds and loan repayments, and transfers between accounts, which were considered non-income deposits. Respondent's disbursement categories for 1964 through 1966, his basis for credit given to petitioners for deductible expenses, consist of: (1) commissions, salaries and wages, (2) stock purchases, (3) mutual fund purchases, (4) operating expenses, (5) loans made and loans repaid, (6) transfers between accounts, and (7) personal expenses.↩
17. These books consisted of customer account ledgers, a general ledger, general journals for 1964 and 1965, a sales and purchase journal for the period beginning August 1, 1965 and ending December 31, 1966, and a cash receipts and disbursements journal for 1966. Between 1964 and 1966 some business receipts of Hagen Investments were deposited in First National Bank and Trust Company account No. X-XX0-079, a personal account which petitioner considered a "business record." Business receipts deposited to this account were not recorded in the general journal of Hagen Investments. Therefore, such deposits were not used to arrive at profit and loss as reflected on Schedule C of petitioners' returns. account No. X-XX0-079, a personal account which petitioner considered a "business record." Business receipts deposited to this account were not recorded in the general journal of Hagen Investments. Therefore, such deposits were not used to arrive at profit and loss as reflected on Schedule C of petitioners' returns.↩
18. For these 3 years, cash receipts received by Hagen Investments were deposited in three accounts. The most active was Penn Square National Bank account No. XX-803-2For these 3 years, cash receipts received by Hagen Investments were deposited in three accounts. The most active was Penn Square National Bank account No. XX-803-2 ("Penn Square 13-803-2"), maintained in the name of Hagen Investments. Also used were Guaranty National Bank account No. XX6070 ("Penn Square 13-803-2"), maintained in the name of Hagen Investments. Also used were Guaranty National Bank account No. XX6070 ("Guaranty 176070"), maintained in the name of Hagen Investments, and First National Bank and Trust Company of Oklahoma City account No. X-XX0-079 ("FNB 0-350-079"), a personal account maintained in the name of Mr. and/or Mrs. Ed J. Hagen. of Oklahoma City account No. X-XX0-079 ("FNB 0-350-079"), a personal account maintained in the name of Mr. and/or Mrs. Ed J. Hagen.↩
19. Gross receipts for 1964, 1965 and 1966 do not include "short sales" of Hagen Investments. Short sales are sales which are not completed transactions because the seller has not delivered the securities sold and has not purchased, by year end, the securities necessary to close the transaction. ↩
20. Respondent increased 1964 gross receipts by $ 3,300.00 to reflect a trade of 550 units of W. P. Bill Atkinson Enterprises, Inc. stock for 1,700 shares of First Equity Corporation stock. On July 1, 1964 Hagen Investments received 1,700 shares of First Equity Corporation stock worth $ 3,400.00 from Max Sanders. On the same day Sanders received 550 units of W. P. Bill Atkinson Enterprises, Inc. stock worth $ 3,300.00 plus a check for $ 100.00 from Hagen Investments. Stock purchases of Hagen Investments in 1964 include the entire $ 3,400.00 "cost" of the trade. It is not known why respondent included only $ 3,300.00 rather than the entire $ 3,400.00 in 1964 gross receipts. He did not correct this at trial. We therefore find that Hagen Investments had receipts of $ 3,300.00 in the July 1, 1964 trade. ↩
21. Respondent increased 1965 gross receipts by $ 1,500.00 to account for a trade with Midwest Securities. In an offsetting adjustment respondent also increased 1965 purchases by $ 1,725.00 "for stock acquired in trade with Midwest Securities." We are unable to establish from the record (other than a summary exhibit) the nature of this trade, the types of stocks involved, or their market values. However, the overall transaction as computed by respondent inures to petitioner's financial benefit. We therefore accept respondent's figures relating to the purported trade. ↩
22. The understatement determined in the notice of deficiency is $ 16,692.00. Respondent has conceded the $ 26.00 difference. ↩
23. The understatement determined in the notice of deficiency is $ 68,739.80. Respondent has conceded the $ .40 difference.↩
24. Secs. 1.446-1(c)(2)(i) and 1.471-1, Income Tax Regs.↩
25. Although life insurance commissions were reported by petitioners on their 1965 and 1966 returns, and although such income is in the nature of a fee for services, we do not set forth our findings with respect to 1965 and 1966 life insurance commissions here. They are treated separately. See Part II.A.3., infra↩.
26. The understatement determined in respondent's notice of deficiency is $ 11,591.88. Respondent has conceded the difference of $ 78.56.↩
27. The complete names of these companies are Occidental Life Insurance Company of California ("Occidental Life") and Standard Life and Accident Insurance Company of California ("Standard Life").↩
28. The parties stipulated that petitioners understated life insurance commissions by $ 1,906.75 in 1965.↩
29. Contributions were made to the partnership from The Schallmo Foundation, Inc., a charitable organization which Mrs. Schallmo was instrumental in establishing and funding, and also from her personal assets. Capital contributions from either of these sources are treated herein as having been received from Mrs. Schallmo.↩
30. The Agreement provided that petitioner's property contribution was to have been a parcel of land and improvements located in Oklahoma County, Oklahoma. Mrs. Schallmo's contribution was to have been numerous parcels of land, some located in Blaine County, Oklahoma and some in Watonga, Oklahoma. Mrs. Hagen's contribution was to have been 2,000 shares of common stock in Sanco Enterprises Company, Inc., all office furniture and equipment carried on the books of Hagen Investments and a 1963 Mercedes Benz. The values of such properties were described in the Agreement as agreed upon values.↩
32. Respondent's figure for Mrs. Hagen's balance before income allocation was $ 21,605.24 rather than $ 21,797.13. His calculation contained a mathematical error.↩
31. The partners' capital accounts were reconstructed from bank records. Investments and withdrawals are identified by the names of the bank accounts from which contributions were made and to which withdrawals were deposited. Liberty National Bank and Trust Company account No. 024-079-6, maintained in the name of Hagen, Ltd., was the only partnership account. Petitioner maintained that the partnership had two other bank accounts and that movements of cash out of the Hagen, Ltd. account at Liberty National Bank and Trust Company and into these accounts were not, therefore, withdrawals of capital from the partnership by petitioners. The first of these accounts was Liberty National Bank and Trust Company account No. XXX-667-6 Company account No. XXX-667-6, maintained in the name of Ed J. Hagen. The signature card shows that it was an individual and not a partnership account. It was still active in 1971. The second account was Citizens Bank and Trust Company (Chicago) account No. X-XX420-7, maintained in the name of Ed J. or Martha Jo Hagen. This account was a joint tenancy account. These two accounts were none other than personal accounts of petitioners. As a result, withdrawals from the partnership checking account which were deposited to either of these accounts have been treated as withdrawals of capital. (Chicago) account No. X-XX420-7, maintained in the name of Ed J. or Martha Jo Hagen. This account was a joint tenancy account. These two accounts were none other than personal accounts of petitioners. As a result, withdrawals from the partnership checking account which were deposited to either of these accounts have been treated as withdrawals of capital. A "Statement of Changes in Partners' Capital Accounts" for the period beginning June 5, 1964 and ending June 30, 1965 appears in a report prepared at petitioner's request by Billups, Arnn & Mascho, certified public accountants. The report is dated June 30, 1965. Based on evidence received at trial, the amounts in each of the partners' capital accounts on that date are incorrect. The report does not state the status of the partners' capital accounts as of the end of the 1964 taxable year. The partners' capital accounts from June 15, 1964 to September 28, 1965, with December 31, 1964 balances, are set forth in another report dated November 15, 1971, prepared by Gus Karey, certified public accountant. The figures used to compute capital accounts in the Karey report are inconsistent with those used in the Billups, Arnn & Mascho report. Based on evidence received at trial, we find that the figures used in the Karey report are also incorrect. ↩
33. Respondent allocated 1964 income in this manner in his notice of deficiency. However, the adjustment to income in the notice of deficiency is $ 5,545.81 rather than $ 4,969.81. Respondent has conceded the difference of $ 576.00.↩
34. In early 1965, certain of Mrs. Schallmo's relatives brought an action in the County Court of Blaine County, Oklahoma to have Mrs. Schallmo adjudged an incompetent. A. Francis Porta ("Mr. Porta"), an Oklahoma attorney who testified at trial, was requested by Mrs. Schallmo and petitioners to resist the appointment of a guardian. Mr. Porta was ultimately retained by Mrs. Schallmo. By this time Mrs. Schallmo had already invested at least $ 83,107.78 of her own money in the partnership. Furthermore, $ 92,000.00 of The Schallmo Foundation, Inc.'s money had also been invested in Hagen, Ltd. Mrs. Schallmo was adjudged an incompetent in the County Court proceeding, and the case was appealed de novo to the District Court of Blaine County, Oklahoma in an action entitled "In the Matter of the Bertha Schallmo Trust," Cause No. 10762. In the District Court proceeding the Court advised Mrs. Schallmo that if she would appoint Mr. Porta as trustee of the Bertha Schallmo Trust (which she had previously established), it would deny the request that she be adjudged incompetent. She complied, and Mr. Porta was appointed on August 11, 1965. By this date all contributions to the partnership by either Mrs. Schallmo or The Schallmo Foundation, Inc. had been made, with the exception of one contribution of $ 2,500.00 from The Schallmo Foundation, Inc., deposited into the partnership's bank account on September 2, 1965, the day after the partnership was dissolved.↩
35. The Certificate of Dissolution was signed by petitioner, Mrs. Hagen, Mrs. Schallmo in her capacity as a "trustee," and Mr. Porta as "Trustee successor to Mrs. Schallmo, Trustee."↩
36. As noted hereinbefore, Hagen Holding Corporation was incorporated under the laws of the State of Oklahoma on November 20, 1963. Its name was changed to Alliance Corporation on September 12, 1966. ↩
37. The December 24, 1964 Hagen Holding Corporation note was assigned by Hagen, Ltd. to Mr. Porta as trustee for Mrs. Schallmo on an unknown date. Petitioner argued at trial that the note was assigned to Mr. Porta as a return of Mrs. Schallmo's capital when Hagen, Ltd. was dissolved on September 1, 1965. Mr. Porta assigned the note to Mrs. Schallmo, trustor, pursuant to an order entered in Blaine County District Court Cause No. 10762, entitled "In the Matter of the Bertha Schallmo Trust," on March 1, 1966. Mrs. Schallmo then assigned the note to petitioner. It was cancelled on May 16, 1966. ↩
38. Of the $ 13,422.35, interest of $ 922.35 was paid by Hagen Holding Corporation. The $ 922.35 is not included in our 1966 adjustment for interest, dividends and fees.↩
39. The accounts were FNB X-XX0-079The accounts were FNB X-XX0-079, Penn Square 13-803-2 and State Capital Bank account No. XXX-001-9 ("State Capital 040-001-9"), maintained in the name of Mr. or Mrs. Ed J. Hagen. The 1966 amount includes the fair market value of 1,625 shares of Class A Hagen Holding Corporation stock ($ 1,625.00) issued to petitioner at no cost. On or about January 5, 1965, Mary Jean Wise, a customer, purchased 11,755 shares of Class A Hagen Holding Corporation directly from the corporation. On or about September 1, 1966, petitioner purchased these shares from Mrs. Wise. When Hagen Holding Corporation reissued the Class A shares to petitioner, 13,380 rather than 11,755 were reissued to him. The additional 1,625 Class A shares issued had a fair market value of $ 1.00 per share. Petitioner was president of Hagen Holding Corporation at that time and Mrs. Hagen was treasurer and assistant secretary. account No. XXX-001-9 ("State Capital 040-001-9"), maintained in the name of Mr. or Mrs. Ed J. Hagen. The 1966 amount includes the fair market value of 1,625 shares of Class A Hagen Holding Corporation stock ($ 1,625.00) issued to petitioner at no cost. On or about January 5, 1965, Mary Jean Wise, a customer, purchased 11,755 shares of Class A Hagen Holding Corporation directly from the corporation. On or about September 1, 1966, petitioner purchased these shares from Mrs. Wise. When Hagen Holding Corporation reissued the Class A shares to petitioner, 13,380 rather than 11,755 were reissued to him. The additional 1,625 Class A shares issued had a fair market value of $ 1.00 per share. Petitioner was president of Hagen Holding Corporation at that time and Mrs. Hagen was treasurer and assistant secretary. The 1966 amount also includes $ 1,625.00 deposited by petitioner into a Capitol Car Care, Inc. bank account. We are unable to determine where petitioner obtained the $ 1,625.00. ↩
40. Cash distributed to Mrs. Schallmo by the Bertha Schallmo Trust as a result of checks written to her has been used to reduce respondent's original deposit classification for unidentified income. That is, to the extent that checks written to Mrs. Schallmo by the trustee can be traced to subsequent deposits of "cash" or "checks" to any of petitioners' accounts, the amounts of such deposits have reduced the amount of receipts from otherwise unidentifiable sources.↩
41. Respondent failed to include the 1965 semi-annual premium payment in his notice of deficiency, but he did present proof relating to that payment. During the proceedings respondent was granted leave to file an amendment to answer out of time to conform his pleading to the proof on the 1965 payment. No such amendment has ever been filed, and we do not consider that item for the 1965 taxable year.↩
42. These "goods" were stocks and securities, purchased from customers and other brokers.↩
43. Unless otherwise noted, our references to "inventory" refer to Hagen Investments' trading account inventory. For 1963 through 1966, closing inventories in both the trading account and petitioner's investment account were inventoried and valued by Hagen Investments for United States Security and Exchange Commission reporting purposes. For 1963 and 1964, values were based on cost. For 1965 and 1966, values were based on the lower of cost or market. Respondent used Hagen Investments' 1963 and 1964 trading account figures, valued at cost, to establish cost of goods sold for 1964. For 1965 and 1966, respondent converted the closing inventory of the trading account from lower of cost or market to cost before computing cost of goods sold. We accept these modifications to the cost of closing inventories. Also, respondent modified the cost of 1964, 1965 and 1966 purchases, established mainly from bank disbursements, consistent with the accrual method. He did so because inventories were a material income-producing factor of the business. Sec. 1.446-1(c)(2), Income Tax Regs.↩ We find that this modification was proper. We treat petitioner's closing inventories as having been based on the accrual method.
44. See Appendix B for additional findings relating to 1964 opening inventory, inventory purchases and other increases, miscellaneous decreases and closing inventory.↩
45. The adjustment to cost of goods sold in respondent's notice of deficiency was $ 18,120.16. Respondent has conceded the difference of $ 41.40.↩
46. See Appendix C for additional findings relating to 1965 opening inventory, inventory purchases and other increases, miscellaneous decreases and closing inventory.↩
47. See Appendix D for additional findings relating to 1966 opening inventory, inventory purchases and other increases, miscellaneous decreases and closing inventory.↩
48. The overstatement to cost of goods sold per respondent's proof at trial was $ 233,468.55. That amount is $ 1,688.34 greater than the overstatement to cost of goods sold per his notice of deficiency. Respondent did not amend his answer to account for this increase. Therefore, we do not consider it at this time. Also, we have modified certain of respondent's calculations relating to goods available for sale to arrive at $ 221,378.61. See Appendix D.↩
49. Petitioners' depreciable assets were miscellaneous items of furniture, office equipment, office fixtures, a rental unit and a home office.↩
50. The allowable automobile expense utilizes petitioners' mileage figures and applies a mileage rate of $ .10 per mile for the first 15,000 miles driven and $ .07 per mile for miles in excess of 15,000 miles. ↩
51. This figure includes, in addition to the allowance for mileage in the amount of $ 892.80, an employee auto expense in the amount of $ 1,339.20. ↩
52. The overstatement of the automobile expense deduction for 1965 in respondent's notice of deficiency is $ 780.90. Respondent has conceded the $ 73.00 difference.↩
53. Commissions were paid to employees of Hagen Investments as part of their overall compensation. Allowable commission expenses are derived from respondent's check classifications. We accept respondent's figures.↩
54. Other business expenses were paid from FNB X-XX0-079Other business expenses were paid from FNB X-XX0-079, Penn Square XX-803-2 Square XX-803-2, Guaranty XX6070, Guaranty XX6070 and Fidelity National Bank and Trust Company account No. XX0254 ("Fidelity 470254"), maintained in the name of Ed J. or Martha Jo Hagen. account No. XX0254 ("Fidelity 470254"), maintained in the name of Ed J. or Martha Jo Hagen.↩
55. Sec. 213(a) and (b)↩. Whether these expenses qualify as deductions will depend on petitioners' adjusted gross income as redetermined.
56. Per amounts stated on returns. ↩
57. Per check classifications.↩
58. Respondent initially determined that petitioners' tax expenses were understated as follows: 1964
$ 165.00  1965
$ 1,232.28
1966
$ 623.59  These amounts were derived in part from the Commissioner's general sales tax tables and in part from his check classifications. At trial respondent reduced the 1966 amounts paid by check by $ 16.43, reducing the understatement for 1966 from $ 623.59 to $ 607.16. Respondent did not amend his answer to reflect this modification, so we find that the amount of taxes paid by check is as initially stated in the notice of deficiency.↩
59. In his notice of deficiency respondent determined that petitioners had paid interest of $ 2,541.24 and that they had claimed a deduction of $ 2,756.00. On the basis of these figures respondent disallowed the interest expense deduction to the extent of $ 214.76. Petitioners actually claimed a deduction of $ 2,756.87. Also, we have accepted $ 2,541.32, not $ 2,541.24, as the correct amount of interest paid in 1965 based on respondent's proof. We have used these corrected figures in arriving at the $ 215.55 overstatement.↩
60. Our ultimate findings in this case, set forth infra, state that petitioners underreported taxable income in 1964, 1965 and 1966. That conclusion is based in part on findings using the bank deposits and disbursements method. Such a method does not seek to establish unreported income by examining specific transactions and determining whether income generated by each such transaction was reported. It compares the sum total of receipts based on bank deposits with receipts per a taxpayer's return, and it compares the sum total of expenses based on bank checks with expenses claimed by the taxpayer. The final adjustment to taxable income is derived from the results of these comparisons. We are able to analyze a limited number of transactions with greater specificity. We have isolated certain transactions occurring in 1964, 1965 and 1966 about which we can clearly find that income was not reported and have described their circumstances. In light of our findings with respect to the taxable years 1964 and 1965, petitioner is collaterally estopped to deny that he attempted to evade his and Mrs. Hagen's tax obligations for 1964 and 1965. Even so, we describe selected transactions occurring in those years because they are relevant to the issue of whether sec. 6653(b)↩ applies to the 1966 underpayment of tax.
61. Atkinson's stock records were compiled from data supplied to Atkinson by Hagen Investments.↩
62. Of the total commissions, $ 9,166.18 was deposited to a bank account controlled by petitioners. That was FNB 0-350-079, a personal account.↩
63. This figure was furnished to respondent in a letter from Bernard R. Bent, a manager of Occidental Life. See generally Part II.A.3., supra↩, "Life Insurance Commissions." 64. These commissions were also deposited in FNB X-XX0-079, a personal account.These commissions were also deposited in FNB X-XX0-079, a personal account.↩
65. Petitioner would then endorse these checks for deposit into FNB 0-350-079. ↩
66. These sales were to Ida L. Hoover and Clarissa Humphrey. In all, petitioner sold Hagen Holding Corporation stock to some 16 purchasers in 1965.↩
67. Mr. Dudley was secretary of Hagen Holding Corporation in 1965 and Mrs. Hagen was assistant secretary. Mr. Dudley denied at trial that he ever subscribed to the shares. Mrs. Hagen signed the minutes of the Special Meeting of the Board of Directors in which the alleged subscriptions are described.↩
68. The date of purchase was February 24, 1965. ↩
69. The trade occurred on October 7, 1965 and the purchase of the 300 Class B shares occurred on October 28, 1965. See also Appendix C. ↩
70. Petitioner was president of Hagen Holding Corporation in 1965 and in control of its records at all times.↩
71. Because the 1965 sales of these shares occurred at various times and to different persons, we do not list the dates the shares were reissued.↩
72. See our discussion, supra↩, and also Appendix C.
73. This is First National Bank and Trust Company account No. X-XX0-369 ("FNB 7-350-369"), maintained in the name of Ed J. or Martha Jo Hagen. account No. X-XX0-369 ("FNB 7-350-369"), maintained in the name of Ed J. or Martha Jo Hagen. ↩
74. This is Local Federal Savings & Loan Association of Oklahoma City account No. X1293 ("Local Fed'l. 51293"), maintained in the name of Hagen Investments.This is Local Federal Savings & Loan Association of Oklahoma City account No. X1293 ("Local Fed'l. 51293"), maintained in the name of Hagen Investments.↩
75. We have taken the recognition of the $ 279.71 in interest income into account in our adjustments to 1966 business receipts.↩
76. As with interest paid to Hagen Investments by Confederate Steel Corporation, we have taken the recognition of this amount into account in our adjustments to 1966 business receipts.↩
77. As noted earlier, Hagen Holding Corporation's name was changed to Alliance Corporation in September, 1966. ↩
78. One of the interest payments relates to a note given by Hagen Holding Corporation to Hagen, Ltd. in 1964. The note was distributed to Mrs. Schallmo after the dissolution of the partnership and she subsequently endorsed it to petitioner. See n. 37, supra↩.
79. All the checks were drawn against Penn Square XX-803-2, a business account, and were signed by either Ed J. Hagen or Mrs. Hagen. Square XX-803-2, a business account, and were signed by either Ed J. Hagen or Mrs. Hagen.↩
80. The sales transactions have been reconstructed from Hagen Holding Corporation's stock records and from respondent's deposit classifications. As stated hereinbefore, the only 1965 sales of Hagen Holding Corporation stock for which gain was reported were those to Ida L. Hoover and Clarissa Humphrey.↩
81. These checks were also drawn against Penn Square 13-803-2 and signed by either Ed J. Hagen or Mrs. Hagen.↩
82. Petitioner contended that these transactions and the transactions in which petitioner or Hagen Holding Corporation were the actual payees related to stock-for-stock trades. We find no evidence of such trades in petitioner's personal or business records and are unable to determine a sound business purpose for recording business transactions in the above manner. Petitioner admitted at trial that anyone trying to determine the nature of these transactions on the basis of Hagen Investments' books of account would be "hard pressed" to do so.↩
83. SECTION 7201. ATTEMPT TO EVADE OR DEFEAT TAX, as effective in 1964, 1965 and 1966 reads: Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 10,000, or imprisoned not more than 5 years, or both, together with the cost of prosecution.↩
84. The record does not include the transcript of the criminal proceeding.↩
85. United States v. Hagen, 470 F.2d 110↩ (10th Cir. 1972). 86. United States v. Hagen, 412 U.S. 905↩ (1973).
87. Allowable medical expenses, and also allowable tax expenses, marked (*), are mathematical determinations to be computed from adjusted gross income.↩
88. Petitioner prepared these returns, each of which was signed within 3 weeks after the close of the year for which it was filed.↩
89. For the years we now consider the precise amount of underpayment resulting from fraud need not be proved. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969); Nell v. Commissioner, T.C. Memo. 1986-246↩.
90. Respondent made concessions with respect to corporate distributions and they are shown in Appendix A. When Hagen Investments, Inc. is referred to hereinafter, it is sometimes referred to as "the corporation."↩
91. The adjustments are based on an analysis of deposits to FNB X-XX0-079, a personal account. The adjustments are based on an analysis of deposits to FNB X-XX0-079, a personal account. ↩
92. Respondent presented evidence at trial to establish that the 1968 understatement was $ 761.95, not $ 461.95. We do not consider the $ 300.00 increase since no amended answer was filed to conform the pleadings to the evidence.↩
93. Deposits that could be classified as loans and other non-income items were first eliminated from the category of unidentified income. ↩
94. Petitioner maintained at an early stage of the trial that this was an account of Hagen, Ltd. We have found that it was a personal account, noting, inter alia, that the account was active for a number of years after the partnership was dissolved on September 1, 1965. See n. 31, supra↩. 95. This account is State Capitol Bank account No. XXX-001-9 ("State Capitol 040-001-9"), maintained in the name of Mr. or Mrs. Ed J. Hagen. account No. XXX-001-9 ("State Capitol 040-001-9"), maintained in the name of Mr. or Mrs. Ed J. Hagen.↩
96. See Part II.A.7., supra↩.
97. Petitioners were shareholders of these corporations during the taxable years 1967 through 1971. ↩
98. The amount of deductions disallowed Hagen Investments, Inc. does not always correlate dollar for dollar with the amount of distributions because that corporation operated on a fiscal year and petitioners were calendar year taxpayers.↩
99. Petitioners received interest income in 1968 as well. The corporation reported it on its 1968 corporate return. See Appendix E, par. a), which reallocates the 1968 interest income to petitioners.↩
100. Respondent obtained information during his examination suggesting that shares of both classes may have been transferred from petitioners to Capitol Car Care, Inc. between 1963 and 1969. He was unable to verify these transfers. Accordingly, he treated the 150,000 Class B shares which split two-for-one in August, 1969 as having been held by petitioners alone. We agree that petitioners owned 150,000 Class B shares immediately prior to the August 1969 split. Hagen Holding Corporation's stock records through 1966 verify petitioners' purchases of Class B shares and the first and second stock splits. They do not record any transfers of these shares to Capitol Car Care, Inc. through 1966. Stock records for 1967 forward have not been made part of the record. We are therefore unable to state that such transfers were made.↩
101. Petitioners subscribed to purchase 30,000 shares of Class B stock at their par value of $ 1.00 per share at the first board of directors meeting in 1963. The first three purchases shown and the first stock split relate to that subscription. Petitioners purchased their first 6,000 Class B shares. They obtained 6,000 shares in the first stock split and purchased 18,000 shares from the corporation after the first stock split at their then par value of $ .50 per share.↩
102. FRI was an investment company. It owned stock in Thurston National Insurance Company, Thurston National Life Insurance Company and Alliance Corporation, all of which were under petitioner's control, and Computek Corporation, a wholly-owned subsidiary of FRI that was not yet doing business. A $ 263,827.65 adjustment has been made to the corporation's 1969 income relating to the sale of FRI stock, so we discuss FRI in considerable detail. See Part IV.A.4.b. of our findings, infra↩. 103. Hagen Investments, Inc. was also purchasing FRI shares from private parties at this time, and was setting the bid and ask prices for the stock. See Part IV.A.4.b., infra↩.
104. Conly, Peters and Smith, certified public accountants, examined FRI's consolidated balance sheet on March 3, 1970 and thereafter informed FRI's board of directors as follows: In view of the uncertain future of Financial Reserve, Inc. and the materiality of the investment in Alliance Corporation as well as several other stocks for which we are unable to determine a reasonable liquidation value, we are of the opinion that the financial statements do not present fairly the financial position of Financial Reserve, Inc. at December 31, 1969, or the results of operations for the year then ended, in conformity with generally accepted accounting principles.↩
105. Petitioner was no longer president nor a board member of Alliance but the officers and directors deferred to his recommendation to split the shares.↩
106. This figure is from an audit report prepared for Alliance by Peters and Chandler, certified public accountants.↩
107. The corporation's address was 5000 N.W. 31st Street, Oklahoma City, and although it ceased doing business in 1970, that address is used on the corporation's petition and on the notice of deficiency. The fiscal years are sometimes hereinafter referred to by the years in which they ended, e.g., "1968" for the fiscal year ended September 30, 1968. ↩
108. See also n. 112, infra↩.
109. See sec. 1.61-3(a), Income Tax Regs.↩
110. These figures were obtained primarily from workpapers and trial balances prepared for the corporation by its certified public accountant.↩
111. Respondent's figure was $ 681,343.79 and contains a mathematical error relating to the multiplier applied to the commissions of Tom and Bobby Summers. The understatement per the notice of deficiency was $ 191,768.95. ↩
112. The corporation did not include mutual fund commissions in gross profits on its corporate returns. They were reported as "other income." Because mutual fund commissions earned by the corporation are included in our reconstructed gross profit figures, we reduce gross profits by both gross profits per the returns and mutual fund commissions per the returns in calculating the adjustments. In doing so we have combined respondent's gross profit and mutual fund commission adjustments as shown in the notice of deficiency.↩
113. See Appendix E, par. a).↩
114. Keith Strong, one of the corporation's traders, usually handled sales of FRI stock. He worked closely with petitioner with respect to FRI sales. As Appendix J shows, we have excluded sales by Mr. Strong from our 1969 gross profit computations even though commissions paid to him did not relate solely to FRI sales. We have done so because we are unable to determine what amount of his 1969 commissions related to other than sales of FRI stock. Mr. Strong's commissions are, however, utilized in figuring gross profits for 1968 and 1970.↩
115. The notice of deficiency states that the amount of unreported income was $ 268,104.00. Of that amount, respondent conceded $ 4,273.35. We also correct a $ 3.00 mathematical error to arrive at unreported income of $ 263,827.65.↩
116. Additional facts relating to disallowed corporate expenditures are in Appendices E through H.↩
117. Petitioner substantiated $ 376.01 in expenditures at trial and this reduced the adjustment from $ 16,015.76 to $ 15,639.75. See Appendix F, par. a) and g).↩
118. See generally Appendices E through H. ↩
119. Due to concessions and evidence presented by petitioner at trial, we have reduced the adjustment from $ 994.89 to $ 234.40. See Appendix E, par. c). ↩
120. Petitioner substantiated certain expenditures at trial which reduced the overstatement from $ 667.95 to $ 362.45. See Appendix F, par. b). ↩
121. Petitioner substantiated total expenditures of $ 37.50 at trial which reduced the overstatement to $ 1,509.45. See Appendix G, par. b). ↩
122. See also Appendix H, par. a).↩
123. See Part III.B.2. of our findings, supra↩.
124. Respondent initially disallowed $ 1,204.61 for insurance expenses in 1969 and $ 1,933.84 for 1970, but conceded these adjustments. See Appendix F, par. d) and Appendix G, par. d). ↩
125. This figure was $ 2,187.47 in the notice of deficiency and respondent conceded the $ 153.00 difference.↩
126. In the notice of deficiency respondent claimed that the corporation overstated expenses of $ 976.48 on its 1968 return. He has since conceded that adjustment.↩
127. Petitioner substantiated repair and maintenance expenditures of $ 37.98 for electrical repairs. ↩
128. Petitioners substantiated repair and maintenance expenditures of $ 38.63 for repairs to a copier. ↩
129. Petitioners substantiated repair and maintenance expenditures of $ 132.21 for repairs to office equipment.↩
130. Also adjusted are "auto and travel" expenses for the 1968, 1969 and 1970 fiscal years. Adjustments in those years are distinct from the "travel and entertainment" category. ↩
131. See Appendix E, par. h).↩
132. See Appendix H, par. h), in which we treated the disallowed amount as a distribution to petitioners.↩
133. See Appendix F, par. i).↩
134. See Appendix H, par. g), for the treatment of these expenditures as distributions to petitioners in 1971.↩
135. The assets of the corporation were purchased by Key Securities, Inc. ↩
136. The corporation's 1970 return shows that the adjusted basis of the assets it sold was $ 13,185.24 after depreciation totalling $ 15,614.99. As stated before, many of the assets depreciated had been used for other than business related activities.↩
137. Respondent increased receipts in 1964 and 1965 to reflect the value of some stock received in trades. These non-cash trades were established from documentary evidence and oral testimony. The increases were minor.↩
138. We note that venue on appeal of these cases lies in the United States Court of Appeals for the Tenth Circuit.↩
139. Sec. 61(a) reads in pertinent part as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, * * * and similar items; (2) Gross income derived from business; * * * (4) Interest; (5) Rents; * * * (7) Dividends; * * *↩
140. See Part II.A.4.a., supra↩.
141. Sec. 702(a)(9), in effect in 1964, states as follows: SEC. 702. INCOME AND CREDITS OF PARTNER. (a) General Rule. -- In determining his income tax, each partner shall take into account separately his distributive share of the partnership's -- * * * (9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection. ↩
142. Sec. 704, in effect in 1964, states in pertinent part: SEC. 704. PARTNER'S DISTRIBUTIVE SHARE. (a) Effect of Partnership Agreement. -- A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement. (b) Distributive Share Determined by Income or Loss Ratio. -- A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if -- (1) the partnership agreement does not provide as to the partner's distributive share of such item, or (2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.↩
143. The Agreement reads in pertinent part as follows: Article VI
Accounting and Sharing of Profits and Losses
* * * 6.2 For each accounting period, the net profit shall be shared or the net loss shall be borne by the partners, General and Limited, in the ratios of their respective adjusted partnership capital accounts determined as of the end of the accounting period with respect to which such determination is being made but before adjusting for profits and losses for such period. If adjusted partnership capital accounts shall have been reduced to zero at the end of any accounting period, the net profit or net loss for such period shall be shared or borne in the ratios of the adjusted partnership capital accounts as they existed at the end of the last preceding accounting period before they were reduced to zero.↩
144. This is the amount of the adjustment per the notice of deficiency. Respondent proved that the amount of petitioners' capital account balances totalled $ (64,845.36). He did not amend his answer to conform his pleadings to his proof, so we have disregarded the modified figure.↩
145. All contributions of the partners were, according to our findings, contributions of money. ↩
146. Secs. 722 and 733, relating to the basis of a partner's interest in a partnership, state as follows: SEC. 722. BASIS OF CONTRIBUTING PARTNER'S INTEREST. The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution. SEC. 733. BASIS OF DISTRIBUTEE PARTNER'S INTEREST. In the case of a distribution by a partnership to a partner other than in liquidation of a partner's interest, the adjusted basis to such partner of his interest in the partnership shall be reduced (but not below zero) by -- (1) the amount of any money distributed to such partner, and (2) the amount of the basis to such partner of distributed property other than money, as determined under section 732. ↩
147. Sec. 731 reads in pertinent part as follows: SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION. (a) Partners. -- In the case of a distribution by a partnership to a partner -- (1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution * * *. Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner↩. [Emphasis added.]
148. Had the withdrawals been loans, there would have been no capital account deficits. Sec. 707(a), relating to a partner's transaction with a partnership other than as a member of the partnership, does not apply.↩
149. Petitioners did not contend that the capital account deficit should be treated as either gain from the sale of a partnership interest or↩ ordinary income. They simply argued that no deficit existed -- that the flurry of withdrawals and contributions were among three partnership bank accounts. However, we previously found as a fact that only one partnership account existed, and that the two other bank accounts were no more than personal accounts.
150. We are not convinced that Mrs. Schallmo was in complete control of her faculties in 1966; indeed, most of her personal assets were under the management of a trustee at that time. See n. 34, supra↩.
151. Respondent matched certain disbursements from the trust, made by check, with currency deposits to petitioners' bank accounts. These deposits were not treated as income.↩
152. The commissions were a portion of the total premium payment.↩
153. The cited regulation states: [Sec.] 1.61-1 Gross income. (a) General definition. Gross income means all income from whatever source derived, unless excluded by law. Gross income includes income realized in any form, whether in money, property, or services. Income may be realized, therefore, in the form of services, meals, accommodations, stock, or other property, as well as in cash. * * *↩
154. With a split-dollar life insurance plan at least some part of the policy must be split. The right to cash values available during the insured's lifetime and the death proceeds must be split between the employer and the employee (or the employee's beneficiary). It is not, however, necessary that the premiums be split between the employer and the employee. The amount of income to the employee each year is an amount equal to the one year term cost of declining life insurance protection to which the employee is entitled each year, less the portion of the cost provided by the employee. See Genshaft v. Commissioner, 64 T.C. 282↩ (1975).
155. Respondent also categorized transactions that had no impact on petitioners' taxable income: loans made and loans repaid, and transfers between accounts.↩
156. See n. 43, supra↩.
157. A dealer is one who like any other merchandiser lays in a stock of goods to be sold to customers. A broker is one who purchases securities on behalf of customers, for which the broker is compensated by way of commissions. Petitioner was a broker/dealer.↩
158. The closing inventories for 1963, 1964 and 1965 were the opening inventories for 1964, 1965 and 1966.↩
159. See also n. 137, supra↩.
160. Sec. 1211, in effect for 1964, provides as follows: SEC. 1211. LIMITATION ON CAPITAL LOSSES * * * (b) Other Taxpayers. -- In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $ 1,000, whichever is smaller.↩
161. Sec. 6653(b) was amended in 1971 by adding at the end thereof the following new sentence: "In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse." This amendment applies to all taxable years to which the Internal Revenue Code of 1954 applies. See Pub. L. 91-679, 84 Stat. 2063, 1971-1 C.B. 547↩-548.
162. With respect to petitioner for the years 1964 and 1965 we observe that the Court of Appeals for the Tenth Circuit had this to say: The testimony relative to specific items of unreported income showed that defendant [Mr. Hagen] had from time to time deposited the proceeds from the sale of stock to his personal account, in some instances identifying the deposits in his check register as the repayment of loans that he had made. Other testimony relative to specific items of unreported income showed that defendant had failed to report accurately monies he had received as commissions for selling life insurance, or had understated them as to the amount. This is proper testimony to show wilfulness of the defendant, and we find no error in its admission into evidence. [United States v. Hagen, 470 F.2d 110, 112 (10th Cir. 1972).] The record includes many additional unreported items not presented to the District Court. The quoted language is equally applicable to Mrs. Hagen, who was responsible for recordkeeping of the entities we consider, and had knowledge of most, if not all, of the unreported income for 1964, 1965 and 1966.↩
163. For example, Hagen, Ltd. received income in 1964 and 1965 yet no partnership return was ever filed nor was any partnership income reported on petitioners' returns. Also, substantial taxable income from interest, dividends, commissions, mutual funds and stock sales was not recorded in petitioners' books and records nor reported on their returns.↩
164. See n. 40, supra↩.
165. One of the bank accounts for which interest income was not reported was the controversial Liberty 584-667-6, which petitioners contended was a Hagen, Ltd. account. We disagreed.↩
166. Sec. 6653(a), in effect for the years 1968-1971, reads in relevant part: If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by Chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩
167. These and similar expenditures were among those inaccurately journalized as expenses of the business.↩
168. It is recognized that the "burden to adopt a method that will clearly reflect income is on the Government as well as on the taxpayer." Bradstreet Co. v. Commissioner, 65 F.2d 943, 945 (1st Cir. 1933). This does not mean, however, that respondent is required to compute the net income (or gross profits) of a taxpayer with mathematical exactness when the latter has failed to maintain adequate books of account. Approximation in the calculation of net income is justified in such circumstances. Harbin v. Commissioner, 40 T.C. 373, 377↩ (1963).
169. See Parts IV.A.4.a. and IV.A.4.b. of our findings of fact, supra↩.
170. SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS. (a) Requirements for Qualification. -- A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section -- (1) if contributions are made to the trust by such employer, or employees, or both, or by another employer who is entitled to deduct his contributions under section 404(a)(3)(B) (relating to deduction for contributions to profit-sharing and stock bonus plans), for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan; * * * (3) if the trust, or two or more trusts, or the trust or trusts and annuity plan or plans are designated by the employer as constituting parts of a plan intended to qualify under this subsection which benefits either -- (A) 70 percent or more of all the employees, or 80 percent or more of all the employees who are eligible to benefit under the plan if 70 percent or more of all the employees are eligible to benefit under the plan, excluding in each case employers who have been employed not more than a minimum period prescribed by the plan, not exceeding 5 years, employees whose customary employment is for not more than 20 hours in any one week, and employees whose customary employment is for not more than 5 months in any calendar year, or
(B) such employees as qualify under a classification set up by the employer and found by the Secretary or his delegate not to be discriminatory in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees; and
(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees. * * * (8) A trust forming part of a pension plan shall not constitute a qualified trust under this section unless the plan provides that forfeitures must not be applied to increase the benefits any employee would otherwise receive under the plan. * * * [Emphasis added.]↩
171. Correspondence between the District Director and petitioner shows that the plan instrument also had operational and technical problems. The corporation made no effort to correct them. It was this inaction as well as problems with vesting and nondiscrimination that caused the adverse determination to issue. We further note that HEPRET failed to satisfy sec. 401(a)(8), and that 1968 forfeitures were reallocated in a manner that sec. 401(a)(8)↩ seeks to prevent.
172. We have no facts relating to interest income on the 1968 deposits to the HEPRET bank account.↩
173. Upon redetermination we allowed training program expenses paid by Hagen Investments, Inc. See Part IV.B.1.k. of our findings of fact, supra↩.
174. They are shown in Part IV.B.1.a. through m. of our findings of fact, supra↩.
175. Due to concessions made by respondent and redeterminations made by the Court with respect to certain items the amounts pertaining to these additions will be reduced.↩
*. This figure was taken from a December 31, 1963 financial statement prepared by Mann and Garr, certified public accountants. It is the cost of Hagen Investments' closing inventory for 1963. ** Inventory purchases were made from Penn Square 13-803-2 and FNB 0-350-079. "Other increases" include an increase of $ 8,806.00, the fair market value of 8,447 shares of Class A and 422 shares of Class B stock in Hagen Holding Corporation. These shares were given to petitioner by Mrs. Schallmo on June 15, 1964 and sold in the same year. The value of the stock on the date of the gift was lower than Mrs. Schallmo's basis. We therefore utilize the fair market value of the stock on the date of the gift as its "cost." It is important to note at this point that Hagen Investments did not buy, sell or trade in Hagen Holding Corporation stock. Petitioner's acquisitions of its stock were therefore personal investments, notwithstanding the fact that petitioner did, on occasion, pay for such stock out of a checking account of the business. Nonetheless, when sales of Hagen Holding Corporation stock are found to have occurred, the proceeds have for convenience's sake been reflected in our corrected gross receipts figures set forth hereinbefore. Such gross receipts are offset by the cost of the stock because their cost is not included in closing inventory. This is what occurred in the case of the Hagen Holding Corporation stock obtained from Mrs. Schallmo. Purchases have also been increased by $ 3,300.00, relating to a 1964 trade with Max Sanders of 550 units of W. P. Bill Atkinson Enterprises, Inc. stock for 1,700 shares of First Equity Corporation stock; see our discussion at n. 20, supra. Additionally, the amount of purchases has been increased consistent with the accrual method. *** "Miscellaneous decreases" to purchases (before decreasing total goods available for sale by Hagen Investments' 1964 closing inventory) include increases totalling $ 96.40, the cost of Hagen Holding Corporation shares purchased by petitioner but not sold in that year. Since the shares were not resold in 1964, but since they would not have been in Hagen Investments' 1964 closing inventory because not business purchases, including the $ 96.40 in purchases would have improperly inflated 1964 cost of goods sold by that amount. They are therefore correctly excluded from 1964 purchases. We have also decreased purchases by $ 4,960.25, the cost to Hagen Investments of 1,561 shares of Sanco Finance Company, Inc. stock purchased in 1964 and placed in petitioner's investment account in that year. Since these shares were not sold in 1964 and were not part of Hagen Investments' 1964 closing inventory, they too are correctly excluded. The only other decrease for 1964 reduces purchases (accruing in 1963) consistent with the accrual method. **** This amount is taken from a financial statement prepared by Pansza & Bradshaw, certified public accountants, dated January 22, 1965. It is the value at cost of the closing inventory in the trading account for 1964.↩
*. See note **** to Appendix B, supra. ** Inventory purchases were made from Penn Square 13-803-2 and FNB 0-350-079. "Other increases" include the cost of 18,669 shares of Class A stock in Hagen Holding Corporation at $ 1.00 per share and 902 shares of Class B stock in Hagen Holding Corporation at $ 1.00 per share. Petitioner acquired these shares directly from Hagen Holding Corporation on February 4, 1965 for $ 19,571.00. All shares so purchased were sold by petitioner in 1965 and the proceeds are included in gross receipts. Since the shares would not have been in Hagen Investments' 1965 closing inventory even if they had not been sold in that year, but since they were in fact sold and the proceeds included in our gross receipts figures, their cost is properly included in 1965 purchases. Also included is the cost of 230 shares of Class B stock in Hagen Holding Corporation, at $ 1.00 per share. Increases to 1965 purchases also include the fair market value of 12 shares of United Founders Corporation ("United Founders") stock received by Hagen Investments in a stock trade with W. E. Metheny. In that transaction Hagen Investments sold 1,000 shares of United Income Life Insurance Company ("United Income Life") stock to Mr. Metheny at $ .50 per share. In consideration of the receipt of those shares (having a total value of $ 500.00), Mr. Metheny paid $ 404.00 and traded 12 shares of United Founders stock valued at $ 96.00, i.e., $ 8.00 per share. Respondent's 1965 gross receipts include both the $ 404.00 and the value of the 12 shares. The $ 96.00 addition to 1965 purchases parallels respondent's $ 96.00 increase to 1965 gross receipts. We have further increased purchases by $ 8,507.38, the cost of 2,000 shares of Sanco Finance Company ("Sanco") stock. These shares were in petitioner's investment account as early as December 31, 1963, and were to have been contributed by Mrs. Hagen to Hagen, Ltd. upon its formation in 1964. Sanco's books do not record the transfer of these shares to the partnership. However, the records of Hagen Investments show that 2,000 shares of Sanco (later known as Planned Credit, Inc.) stock were transferred from petitioner's investment account in 1964. Its records also show that none of these shares were in either the trading account or petitioner's investment account at the end of that year. See also our discussion of Hagen, Ltd., supra. To petitioner's benefit, we have used Hagen Investments' closing inventory figures, taken from a 1964 financial statement, to compute cost of goods sold for 1964. But we note that the 2,000 shares of Sanco that were to have been transferred to the partnership were part of Hagen Investments' 1965 closing inventory. They were, in fact, pledged as collateral to Penn Square National Bank to secure loans of $ 20,000.00 to the business in that year. We therefore find that 1965 inventory purchases should be increased by the original cost of these shares. Also, 1965 purchases have been increased consistent with the accrual method, and further increased by $ 1,725.00 to account for stock acquired in a trade with Midwest Securities. See n. 21, supra. *** "Miscellaneous decreases" to 1965 purchases include a $ 135.50 reduction for the cost of Hagen Holding Corporation stock purchased or otherwise received by petitioner in 1965 but not sold by year end. For similar decreases made to 1964 purchases, explained in greater detail, see note *** to Appendix B. Another decrease to 1965 purchases reflects the cost to petitioner of 348 shares of United Income Life stock. Hagen Investments purchased 14,148 shares of United Income Life for petitioner in 1965. Of the total, 7,800 shares were sold to various parties in that year, and 6,000 shares were traded by petitioner to Hagen Holding Corporation for 6,000 shares of its Class A stock. The 348 shares of United Income Life not sold or traded have been included in petitioner's investment account inventory at the close of 1965, and business purchases have been reduced by the cost of these shares, which was $ 87.00. We have not reduced purchases by the cost of the 6,000 shares of United Income Life traded by petitioner to Hagen Holding Corporation for its stock because all shares received by petitioner in the trade were sold in 1965 and their proceeds included in 1965 gross receipts. Finally, a decrease to purchases has been made to reflect cash purchases accruing in 1964 rather than 1965. **** The primary source of this figure is a 1965 audit report prepared for petitioner by Wesley J. Long, certified public accountant. Mr. Long's closing inventory figure, based on the lower of cost or market, was $ 57,739.75. That figure has been increased to $ 60,647.85 to reflect the actual cost of the 1965 closing inventory. See n. 46, supra↩.
*. See note **** to Appendix C, supra. ** Inventory purchases were made from Penn Square 13-803-2, Guaranty 176070 and FNB 0-350-079. "Other increases" for 1966 include an increase of $ 210.00, the cost of 420 shares of Class B stock in Hagen Holding Corporation purchased from Mary Jean Wise and sold in 1966. Also included is an increase of $ 3,406.90, the cost of Hagen Holding Corporation stock purchased by petitioner in 1966 from Mrs. Wise and Vernie Sanders and traded for 248 shares of Standard Life stock in that year. With respect to the latter increase, petitioner purchased 14,930 shares of Class A and 284 shares of Class B stock in Hagen Holding Corporation in 1966 from Mrs. Wise and Mr. Sanders, respectively. (The 284 shares originally numbered 71; the board of directors of Hagen Holding Corporation declared a two-for-one split of Class B shares on September 2, 1964 and again on December 22, 1965.) All these shares were traded in 1966 to Hagen Holding Corporation for 1,000 shares of Standard Life stock. Only 248 of the 1,000 shares were sold in 1966. The 752 shares not sold were placed in petitioner's investment account. The shares sold had a fair market value at the time of the trade of $ 3,406.90, and proceeds from the sales of these shares are in 1966 gross receipts. We find that $ 3,406.90 was the cost of the Hagen Holding Corporation stock traded for the shares of Standard Life sold in 1966, and we increase purchases accordingly. We do not increase purchases for the Hagen Holding Corporation shares purchased in 1966, then traded for the Standard Life shares not sold in 1966. Also included in "other increases" is the cost of 750 shares of Sanco stock removed from petitioner's investment account in 1966 and sold in that year. Purchases have also been increased consistent with the accrual method. *** Purchases have been decreased to reflect the receipt in 1966 of Standard Life shares by purchase or trade to the extent that such shares were not sold in 1966 and not included in Hagen Investments' 1966 closing inventory. Respondent reduced purchases by $ 45,680.60. We disagree with his figure. Part of respondent's $ 45,680.60 is the value of 752 shares of Standard Life received in a 1966 trade with Alliance, i.e., $ 10,330.60. The 752 shares were treated by respondent as purchases for petitioner's investment account; hence the decrease to business purchases. Respondent did not, however, first increase purchases by $ 10,330.66 to reflect either the receipt of the 752 shares of Standard Life or the cost of the Hagen Holding Corporation stock given in the trade. Since purchases were not increased by $ 10,330.66, purchases for 1966 should not be reduced by that amount. The decrease in purchases for the Standard Life stock not sold in 1966 and not included in closing inventory should therefore be $ 35,350.00 rather than $ 45,680.60. We have also decreased purchases by $ 1,425.00, relating to a transaction involving Vernie Sanders. Respondent erroneously reduced purchases by $ 1,496.00 rather than $ 1.425.00. His evidence shows that 1,425 shares of Class A and 284 shares of Class B Hagen Holding Corporation stock were purchased from Mr. Sanders in 1966 for $ 1,496.00. Respondent's evidence also shows that the Class B shares were traded to Alliance for Standard Life stock in 1966, along with shares obtained from Mary Jean Wise. See note **, above. Thus, only 1,425 shares of Class A stock purchased from Mr. Sanders at $ 1.00 per share remained in petitioner's ownership at year end. The cost of the Class B shares, $ 71.00, should not be included in respondent's reduction to purchases. Purchases have been further decreased to account for cash purchases accruing in 1965, and also decreased to reflect the transfer of miscellaneous stocks purchased by Hagen Investments in 1966 to petitioner's investment account. **** Closing inventory was $ 70,762.74 when valued at the lower of cost or market. That figure is taken from a 1966 audit report prepared by Wesley J. Long, certified public accountant. It has been increased to $ 88,539.62 to reflect 1966 closing inventory at cost. See n. 47, supra↩.
*. See also n. 111, supra↩.